# EXHIBIT 1

Back to Story | Print | Close ⊠



## U.S. SENATE COMMITTEE ON
# Commerce, Science, and Transportation

DANIEL INOUYE, Chairman                              TED STEVENS, Vice Chairman

**For Immediate Release**
**April 25th, 2007**

## STEVENS AND INOUYE ID THEFT PREVENTION ACT PASSES COMMERCE COMMITTEE

WASHINGTON, D.C. – The Senate Committee on Commerce, Science and Transportation today passed S. 1178 the "Identity Theft Prevention Act." Committee Vice Chairman Senator Ted Stevens (R-Alaska) and Commerce Committee Chairman Daniel Inouye (D-Hawaii) introduced the legislation and it is cosponsored by Senator Gordon Smith (R-Ore.) and Senator Mark Pryor (D-Ark.) and Senator Bill Nelson (D-FL). This bill would strengthen information safeguards and ensure notification to consumers whose sensitive personal information has been acquired without authorization. The bill would also direct the Federal Trade Commission (FTC) to enforce rules to protect such information. Under the bill, consumers would be able to freeze their credit for a reasonable fee to protect themselves from identity theft. The bill now moves to the Senate where it awaits consideration.

"ID theft is a growing problem that plagues Americans in the far reaches of our nation and everywhere in between," said Senator Stevens. "Studies of identity theft show that Alaskans are particularly susceptible to this criminal activity. It is time for Congress to act. We must take steps to help people protect themselves. I urge the Senate to take up this bill, which has received broad bipartisan support, and pass it quickly."

Identity theft has risen dramatically nationwide over the past decade and the FTC estimates that each year nearly 9 million Americans – or roughly 4.6 percent of the domestic adult population -- are victimized by identity thieves. The FTC indicates that physical and online identity theft accounted for 40 percent of the more than 616,000 consumer fraud complaints filed last year with the agency. The costs associated with identity theft are enormous. In 2006, it is estimated that the losses to businesses and financial institutions due to identity theft totaled $52.6 billion, and the out-of-pocket losses to consumers totaled $5 billion, which does not take into account the average 300 hours spent by each victim to restore their good name.

# EXHIBIT 2

Identity Theft -- Unplugged - WSJ.com



**October 8, 2005**

# Identity Theft -- Unplugged

Despite the High-Tech Threat,
When You Get Ripped Off
It's Usually Still the Old Way

**By ROBIN SIDEL**
Staff Reporter of THE WALL STREET JOURNAL
*October 8, 2005*

**DOW JONES REPRINTS**

ℝ This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit:
www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

Worried that shadowy gangs of Russian hackers are breaking into computer networks, stealing your financial secrets? Don't lose too much sleep over it.

But you might want to hide your checkbook when friends and relatives come visit your home.

Despite a series of alarming reports in recent months about security breaches that have made personal data potentially vulnerable to crooks -- such as the one at credit-card processor CardSystems Solutions Inc. affecting 40 million credit-card accounts -- most bank-related crimes remain stubbornly low-tech. They range from simple forgery of a check, to unauthorized credit-card use, to Dumpster-diving, which is when someone plucks a bank statement or credit-card bill from your garbage.

And the perpetrator probably may not be a stranger.

According to one recent study, by Javelin Strategy & Research, a consulting firm in Pleasanton, Calif., in 26% of all cases the fraud victims knew the person who had misused their personal information. (Typically it was a family member, friend or neighbor, or in-home employee.) In addition, as much as 50% of debit-card fraud occurs when a card is snagged by a family member or friend who knows the card's personal-identification number, according to a recent report from TowerGroup, a unit of MasterCard International Inc.

The term "identity theft" is often used loosely to describe a wide array of crimes. But true identity theft occurs when someone uses stolen information to create a new form of identity, such as opening a new credit-card account under the victim's name. That differs significantly from other kinds of bank fraud, such as when a criminal uses a stolen ATM card to get cash out of a teller machine.

Whether it's full-blown ID theft or small-scale fraud, even in cases where the criminal is a stranger, it's almost never a case of sophisticated computer hacking. Although 75% of all households use the Internet and 65% of those do some online banking, "most criminals obtain personal information through traditional rather than electronic channels," according to the Javelin study. Some 29% of victims surveyed said their personal information was obtained through a lost or stolen wallet, checkbook or credit card.

According to the study, the bulk of the rest were attributed to friends and relatives, corrupt employees, stolen mail, Dumpster-diving, and computer spyware. Computer viruses or hackers accounted for only 2.2% of incidents. While there has been a significant increase in the number of electronic attempts at

identity theft, "the ones that are working are the traditional ones," said James Van Dyke, Javelin's president.

The Federal Trade Commission itself defines identity theft broadly, describing it as when someone possesses or uses a person's personal or financial information without their knowledge with the intent of committing fraud or other crimes.

The commission estimates that identity theft affects nearly 5% of the adult population, costing businesses and individuals a combined $53 billion annually. It received 246,000 reports of identity theft last year, nearly triple the number received in 2001. The FTC has attributed much of that rise to heightened awareness of the issue among consumers, making them more likely to report incidents as identity theft.

Overall, statistics on identity theft are spotty. For one thing, research has found that most victims of identity theft don't report the crime to police. In many cases, they aren't even certain that they are truly crime victims and don't know how the incident occurred. Banks increasingly alert authorities when incidents occur, but even those disclosures can be incomplete.

There are a number of steps individuals can take to protect themselves.

Many financial institutions are increasingly urging their clients to start using paper shredders at home. Household models can be relatively inexpensive, and they significantly reduce the chances that a criminal can find any useful personal information in the trash. Banks typically recommend shredding documents that contain account information, Social Security numbers, credit-card and ATM receipts and credit-card offers. Also, shred blank checks that sometimes come in the mail as part of a solicitation.

Another suggestion: Be particularly aware if credit-card bills or bank statements are missing from the mailbox. If a bill arrives more than two weeks late, the American Bankers Association suggests contacting the local post office to be sure it isn't being forwarded without the recipient's knowledge. Also check with the company where the bill originated.

It's also wise to avoid disclosing any personal information on forms or applications unless absolutely necessary, says Mike Cunningham, senior vice president in the credit-card fraud department at J.P. Morgan Chase & Co.

As an example, Mr. Cunningham says, he was recently filling out an application to be a coach on his son's neighborhood football team in Arizona, and the form asked for his social security number, driver's license number and other personal information. He declined to provide the information, because there was no way for him to know whether his personal information would be kept under lock and key.

"I just told the team mom that I didn't see why they needed it -- it was the perfect amount of information for an identity thief," he said. He got the job anyway.

The only organizations you're required to provide with your social security number are your employer and your financial institutions. (This is for tax purposes.) If anyone else asks -- say, a retailer -- you don't have to give it. The company can decline to provide the service, but it's worth asking what other identification they might accept instead.

Amid the proliferation of old-fashioned fraud, some financial institutions are fighting back by urging their customers to abandon paper statements altogether and instead view their accounts online. Among them is **E\*Trade Financial** Corp., which says its online system is more secure than paper statements that can be stolen or copied. A spokeswoman declined to specify how much money the company will save by eliminating the printing and mailing of paper statements.

Banks are having a particularly tough time battling one of the oldest and most common kinds of crime: check fraud. Attempts of check fraud rose to $5.5 billion in 2003 from $4.3 billion in 2001, according to the American Bankers Association. The incidents resulted in losses of $677 million, representing a slight decline from $698 million in 2001; the trade group attributed the drop to better fraud-detection methods.

That slight decline isn't so reassuring to Lee Roberts, senior vice president at National Penn Bancshares Inc., a regional bank based in Boyertown, Pa. As recently as the past few weeks, the bank has been hit by a wave of incidents in which criminals have copied checks and then altered them for fraudulent use. That practice "has been around for seven or eight years," says Mr. Roberts. But as photocopiers and image-manipulation computer software become more sophisticated, he says, "they're getting better at it."

**Write to** Robin Sidel at robin.sidel@wsj.com[1]

URL for this article:
http://online.wsj.com/article/SB112872681279163325.html

Hyperlinks in this Article:
(1) mailto:robin.sidel@wsj.com

**Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

**RELATED ARTICLES AND BLOGS**

Related Articles from the Online Journal
· TJX in Security-Breach Deal
· Britain's Data Breach Has Banks Alert for Signs of Fraud
· Dentsu Can't Find Personal Data On Shareholders
· Stop the War on Drugs

Blog Posts About This Topic
· Theft Prevention Measures - identityforme.com
· Online, Phone, U.S. Mail or In-Person: Where is Your Credit Card and Perso... - bbg.neseck.com

**More related content**    Powered by Sphere 

# EXHIBIT 3

## DECLARATION OF KEITH J. KEOGH

Keith J. Keogh declares under penalty of perjury, as provided for by §1-109 of the Illinois Code of Civil Procedure, that the following statements are true:

The Law Offices of Keith J. Keogh, Ltd. consists of two attorneys and a paralegal as well as receptionists. The firm focuses on consumer protection cases for both individuals and class actions.

I am a partner of the firm and member of United States Court of Appeals for the Seventh Circuit, Northern District of Illinois, Southern District of Indiana, and Illinois State Bar as well as several bar associations and the National Association of Consumer Advocates and Association of Trial Lawyers of America.

I was lead counsel in the following class settlements: *Overlord Enterprises v. Wheaton Winfield Dental Associates*, 04 CH 01613, Circuit Court Cook County (Judge McGann); *Whiting v SunGard*, 03 CH 21135, Circuit Court Cook County (Judge McGann); *Whiting v. GoIndustry*, 03 CH 21136, Circuit Court Cook County (Judge McGann). I was the attorney primarily responsible for the following class settlements: *Wollert v. Client Services*, 2000 U.S. Dist. LEXIS 6485 (N.D. Ill. 2000); *Rentas v. Vacation Break USA*, 98 CH 2782, Circuit Court of Cook County (Judge Billik); *McDonald v. Washington Mutual Bank*, supra; *Wright v. Bank One Credit Corp.*, 99 C 7124 (N.D. Ill. Judge Guzman); *Arriaga v. Columbia Mortgage*, 01 C 2509 (N.D. Ill. Judge Lindberg); *Frazier v. Provident Mortgage*, 00 C 5464 (N.D. Ill. Judge Coar); *Largosa v. Universal Lenders*, 99 C 5049 (N.D. Ill. Judge Leinenweber); *Arriaga v. GN Mortgage*, (N.D. Ill. Judge Holderman); *Williams v. Mercantile Mortgage*, 00 C 6441 (N.D. Ill. Judge Pallmeyer); *Reid v. First American Title*, 00 C 4000 (N.D. Ill. Magistrate Judge Ashman); *Fabricant v. Old Kent*, 99 C 6846

(N.D. Ill. Magistrate Judge Bobrick); *Mendelovits v. Sears*, 99 C 4730 (N.D. Ill. Magistrate Judge Brown); *Leon v. Washington Mutual*, 01 C 1645 (N.D. Ill. Judge Alesia).

The individual class member's recovery in some of these settlements were substantial. For example, in one of the cases against a major bank the class members' recovery was 100% of their actual damages resulting in a payout of $1,000 to $9,000 per class member. In another case against a major lender regarding mortgage servicing responses, each class member who submitted a claim form received $1,431. *McDonald v. Washington Mutual Bank*

Some reported cases of mine involving consumer protection cases include: *Sawyer v. Ensurance Insurance Services* consolidated with *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 617 (7th Cir. 2007), *Echevarria et al. v. Chicago Title and Trust Co.*, 256 F.3d 623 (7th Cir. 2001); *Hill v. St. Paul Bank*, 329 Ill. App. 3d 705 (1st Dist. 2002); *Martin v. Wal-Mart Stores, Inc.*, 2007 U.S. Dist. LEXIS 89715 (N.D. Ill. 2007); *Elkins v. Ocwen Fed. Sav. Bank Experian Info. Solutions, Inc.*, 2007 U.S. Dist. LEXIS 84556 (N.D. Ill. 2007); *Harris v. Wal-Mart Stores, Inc.*, 2007 U.S. Dist. LEXIS 76012 (N.D. Ill. 2007); *Stegvilas v. Evergreen Motors, Inc.*, 2007 U.S. Dist. LEXIS 35303 (N.D. Ill. 2007); *Cook v. River Oaks Hyundai, Inc.*, 2006 U.S. Dist. LEXIS 21646 (N.D. Ill. 2006); *Gonzalez v. W. Suburban Imps.*, Inc., 411 F. Supp. 2d 970 (N.D. Ill. 2006); *Eromon v. Grand Auto Sales, Inc.*, 333 F. Supp. 2d 702 (N.D. Ill. 2004); *Williams v. Precision Recovery, Inc.*, 2004 U.S. Dist. LEXIS 6190 (N.D. Ill. 2004); *Doe v. Templeton*, 2003 U.S. Dist. LEXIS 24471 (N.D. Ill. 2003); *Ayala v. Sonnenschein Fin. Servs.*, 2003 U.S. Dist. LEXIS 20148 (N.D. Ill. 2003); *Gallegos v. Rizza Chevrolet, Inc.*, 2003 U.S. Dist. LEXIS 18060 (N.D. Ill. 2003); *Szwebel v. Pap's Auto Sales, Inc.*, 2003 U.S. Dist. LEXIS 13044 (N.D. Ill. 2003); *Johnstone v. Bank of America*, 173 F. Supp.2d 809 (N.D. Ill. 2001); *Leon v. Washington Mutual Bank*, 164 F. Supp.2d 1034 (N.D. Ill. 2001); *Ploog v. HomeSide Lending*, 2001 WL 987889 (N.D. Ill. 2001); *Christakos v. Intercounty*

*Title*, 196 F.R.D. 496 (N.D. Ill. 2000); *Batten v. Bank One*, 2000 WL 1364408 (N.D. Ill. 2000); *McDonald v. Washington Mutual Bank*, 2000 WL 875416 (N.D. Ill. 2000); and *Williamson v. Advanta Mtge Corp.*, 1999 U.S. Dist. LEXIS 16374 (N.D. Ill. 1999). The *Christakos* case significantly broadened  title and mortgage companies' liability under Real Estate Settlement Procedures Act ("RESPA") and *McDonald* is the first reported decision to certify a class regarding mortgage servicing issues under the Cranston-Gonzales Amendment of RESPA.

I have argued before the Seventh Circuit, the First District of Illinois and the Multi-Litigation Panel in *Sawyer v Esurance* (7th Cir. 2007), *Echevarria, et al. v. Chicago Title and Trust Co.* (7th Cir. 2001), *Hill v. St. Paul Bank* (1st Dist. 2002), and *In Re: Sears, Roebuck & Company Debt Redemption Agreements  Litigation* (MDL Docket No. 1389.)

*Echevaria* was part of a group of several cases that resulted in a nine million dollar settlement with Chicago Title.

My published works include co-authoring and co-editing the 1997 supplement to *Lane's Goldstein Trial Practice Guide* and *Lane's Medical Litigation Guide*.

In January 2007, Alexander H. Burke joined the firm. Mr. Burke previously worked for a consumer class action firm, and has devoted his legal career to protection of consumers' rights. Notable court opinions from cases that he litigated include: *Barnes v. FleetBoston Fin. Corp.*, C.A. No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D.Mass. Aug. 22, 2006) (appeal bond required for potentially frivolous objection to large class action settlement); *Longo v. Law Offices of Gerald E. Moore & Assocs., P.C.*, 04 C 5759, 2006 U.S. Dist. LEXIS 19624 (N.D.Ill. March 30, 2006) (class certification granted); *Nichols v. Northland Groups, Inc.*, case nos. 05 C 2701, 05 C 5523, 06 C 43, 2006 U.S. Dist. LEXIS 15037 (N.D.Ill. March 31, 2006) (class certification granted for concurrent classes against same defendant for ongoing violations); *Lucas v. GC Services, L.P.*, case No. 2:03

cv 498, 226 F.R.D. 328 (N.D.Ind. 2004) (compelling discovery), 226 F.R.D. 337 (N.D.Ind. 2005) (granting class certification); *Murry v. America's Mortg. Banc, Inc.*, case nos. 03 C 5811, 03 C 6186, 2006 U.S. Dist. LEXIS 42900 (N.D. Ill. June 5, 2006) (granting class certification); *Rawson v. Crediqy Receivables, Inc.*, case no. 05 C 6032, 2006 U.S. Dist. LEXIS 6450 (N.D. Ill. Feb. 16, 2006) (denying motion to dismiss in case against debt collector for suing on time-barred debts); *In re Kingen*, no. 01-84275, adv. No. 03-8020, 2004 Bankr. LEXIS 146 (Bankr.C. D. Ill. Feb. 17, 2004) (extending bankruptcy law in favor of debtor).

Subsequent to joining the firm, Mr. Burke was heavily involved in the following cases *Elkins v. Ocwen Fed. Sav. Bank Experian Info. Solutions, Inc.*, 2007 U.S. Dist. LEXIS 84556 (N.D. Ill. 2007); *Harris v. Wal-Mart Stores, Inc.*, 2007 U.S. Dist. LEXIS 76012 (N.D. Ill. 2007); *Stegvilas v. Evergreen Motors, Inc.*, 2007 U.S. Dist. LEXIS 35303 (N.D. Ill. 2007).

Mr. Burke graduated from Colgate University in 1997 (B.A. International Relations), and Loyola University Chicago School of Law in 2003 (J.D.).

During law school he served as an extern to the Honorable Robert W. Gettleman of the District Court for the Northern District of Illinois and as a law clerk for the Honorable Nancy Jo Arnold, Chancery Division, Circuit Court of Cook County. He also served as an extern for the United States Attorney for the Northern District of Illinois and was the Feature Articles Editor of the Loyola Consumer Law Review and Executive Editor of the International Law Forum. Mr. Burke's published work includes *International Harvesting on the Internet: A Consumer's Perspective on 2001 Proposed Legislation Restricting the Use of Cookies and Information Sharing*, 14 Loy. Consumer L. Rev. 125 (2002).

Mr. Burke is licensed to practice law in the State of Illinois and is a member of the bar of the United States Court of Appeals for the Seventh and First Circuits, as well as the Northern

District of Illinois, Central District of Illinois, Southern District of Illinois, Eastern District of Wisconsin, Northern District of Indiana and Southern District of Indiana. Mr. Burke is also an active member of the Chicago Bar Association, Illinois Bar Association and the National Association of Consumer Advocates.

Executed at Chicago, Illinois, on February 6, 2008.

Keith J. Keogh

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

WILLIAM HARRIS, individually         )
and on behalf of all others similarly )
situated,                            )
                                     )
            Plaintiff,               )    No. 07 C 2512
                                     )    District Judge Guzman
vs.                                  )    Magistrate Judge Schenkier
                                     )
CIRCUIT CITY STORES, INC.,           )
                                     )
            Defendant.               )

### REPORT AND RECOMMENDATION

The plaintiff, William Harris, has filed a motion for class certification (doc. # 22), pursuant

to Federal Rules of Civil Procedure 23(a) and (b)(3), individually and on behalf of all others

similarly situated, for alleged violations of the Fair and Accurate Credit Transactions Act

("FACTA") amendment to the Fair Credit Reporting Act ("FCRA"), codified as 15 U.S.C. §

1681c(g). The FACTA amendment provides, in relevant part, that:

> . . . no person that accepts credit cards or debit cards for the transaction of business
> shall print more than the last 5 digits of the card number or the expiration date upon
> any receipt provided to the cardholder at the point of the sale or transaction.

15 U.S.C. § 1681c(g)(1). Plaintiff alleges that the defendant, Circuit City Stores, Inc. ("Circuit City"

or "defendant"), willfully violated FACTA by issuing electronic receipts that contain the last 5 digits

of a person's credit or debit card number and/or the expiration date of that card (Complaint

("Compl.,") ¶¶ 4, 21, 27, 30)). Plaintiff also alleges that this violation is so widespread that a class

should be certified with statutory damages as a remedy (Compl. ¶¶ 16, 30). For the reasons that

follow, this Court respectfully recommends that the presiding district judge certify a class in this

case.

# I.

We begin with the allegations on which plaintiff bases his request for class certification, as well as the facts asserted by defendant in its answer and the evidence obtained by the parties during discovery thus far. For purposes of deciding the certification question, we do not presume that all well-pled allegations are true. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001). Rather, we are instructed to "look[] beneath the surface of [the] complaint to conduct the inquiries identified in" Rule 23(a) and (b) "and exercise the discretion" that Rule 23 confers upon the Court. *Id.* at 677.

## A.

On April 19, 2007, plaintiff purchased a television stand from a Circuit City "brick and mortar" store (Compl., ¶ 11; Def.'s Ex. B, at 20:12-23, 22:4-14).[1] The receipt that plaintiff received at this store fully complied with FACTA because it did not display more than the last five digits of plaintiff's credit card number, and it did not display his credit card expiration date (Def.'s Ex. B, at 26:17-27:10). This purchase, however, was not the end of plaintiff's transaction with Circuit City. Plaintiff says that in an effort to find a lower price for the item that he had already purchased and carried home, he accessed Circuit City's website store from his personal home computer and bought the same item online at a lower price (*Id.*, at 22:4-22, 23:9-24:21). Circuit City disputes this testimony and offers records to indicate that plaintiff conducted this second transaction not directly at the online store, but instead through Circuit City's telephone call center (Def.'s, Ex. C, at ¶ 5, 10) (Affidavit of Margy Hazelton). It is undisputed that, irrespective of whether plaintiff initiated this

---

[1] The parties use the phrase "brick and mortar" to identify physical store locations that customers may frequent to transact business, as distinct from business that customers transact by telephone or internet.

second transaction by telephone or over the internet, Circuit City's online system at www.circuitcity.com "generated an email confirmation of the transaction" (Def.'s Mem. at 1).[2]

To obtain a price adjustment on the original purchase, Circuit City required plaintiff to bring a copy of that email to its brick and mortar store to pick up the merchandise plaintiff had purchased online (Compl., ¶ 12; Def.'s Mem. at 3 (citing Def.'s Ex. B, at 22:4-22, 23:10-24:21)). Upon presentation of the email, Circuit City refunded plaintiff $27.18 on the original purchase transaction (Def.'s Ex. C, at ¶ 7). According to defendant, on April 24, 2007, several days after plaintiff obtained credit from the brick and mortar store, Circuit City voided the second purchase, and it credited plaintiff's credit card account for the full purchase price of the second television stand he ordered (Def.'s Ex. C, at ¶¶ 8-9). There is no dispute that, although the email did not display more than the last five digits of plaintiff's credit card number, it did display the expiration date on his card (Def.s, Ex. B, at 33:4-11; Def.'s Ex. D). Plaintiff has not alleged any actual damage as a result of these transactions (e.g., identity theft or compromised credit) (Compl. ¶ 30).

## B.

FACTA was enacted in 2003. It required that all credit card machines that were first put into use on or after January 1, 2005, had to immediately comply with these provisions. *See* 15 U.S.C. § 1681c(g)(3)(B) (requiring compliance "1 year after December 4, 2003"). With respect to other machines that were in use before January 1, 2005, Section 1681c(g)(3)(A) required compliance on or after December 4, 2006 ("3 years after December 4, 2003"). In this case, plaintiff alleges that

---

[2] The parties dispute whether this email from Circuit City was a "receipt" within the meaning of FACTA, as plaintiff alleges (Compl., ¶ 11), or instead was merely a "confirmation" of a telephone transaction that was sent to plaintiff's personal email account, as Circuit City contends (Def.'s Mem. at 1-2). As Circuit City concedes, this dispute creates a merits issue "to be resolved later" (Def.'s Mem. at 2). We do not find it germane to the issue of class certification.

3

Circuit City has failed to comply with the December 4, 2006 effective date; plaintiff asserts no FACTA violation predating December 4, 2006 (Compl., ¶¶ 14, 16).

To be liable under FACTA, a party must violate the statute with respect to a "consumer." *Ehrheart v. Lifetime Brands, Inc.,* 498 F. Supp.2d 753, 755-56 (E.D. Pa. 2007) (citing 15 U.S.C. § 1681n). A consumer who establishes a negligent violation of FACTA may recover actual damages, as well as reasonable attorneys' fees and costs. 15 U.S.C. § 1681(o). Upon proof of a willful violation of FACTA, a consumer has available a broader range of remedies: in addition to attorneys' fees and costs, a consumer may recover statutory damages (not less than $100 and not more than $1,000) in lieu of actual damages, and also may seek punitive damages. 15 U.S.C. § 1681(n). Thus, where a plaintiff proves a willful violation, no actual damages need be proven in order to obtain monetary relief.[3] In order to be willful for purposes of 15 U.S.C. § 1681n(a), a defendant's violation must have been either knowing or reckless. *See Safeco Ins. Co. Of Am. v. Burr,* ___ U.S. ___, 127 S.Ct. 2201, 2208-10 (2007).

Plaintiff here alleges that Circuit City "knew or should have known the requirement concerning the truncation of credit and debit card numbers and prohibition on printing of expiration dates" (Compl., ¶ 27), because the companies that sell cash registers and other devices that process electronic payments informed defendant of FACTA, its requirements and the relevant expiration dates (Compl., ¶ 28). Plaintiff further alleges that "[m]ost other retailers" were able to bring their machines, devices, and online sites into compliance by the required deadlines (Compl., ¶ 29). Thus, plaintiff asserts that Circuit City's failure to do so, as evidenced by the email that plaintiff received

---

[3] Where a plaintiff proves only a negligent violation, statutory damages are unavailable. We need not address here the availability, *vel non,* of other damages – such as, nominal damages – in the absence of proof of monetary damages.

4

with the expiration date of his debit card on it, is evidence that "Circuit City willfully disregarded

FACTA's requirements" and "continues to print receipts in violation of FACTA" (Compl., ¶ 30).

For this violation, plaintiff seeks for the class a judgment to include statutory damages, attorneys'

fees and costs, and such other relief as the Court deems proper (*Id.*).  Defendant disputes that it has

violated FACTA, and asserts that its conduct demonstrates good faith efforts to comply with FACTA

and the absence of willful conduct (Defs.' Mem. at 2, 4 (citing Ex. E, ¶ 8)).

## II.

To maintain a class action, plaintiff must demonstrate that he and the class he wishes to

represent meet all four requirements of Rule 23(a) and one of the requirements of Rule 23(b).

*General Telephone Co. v. Falcon,* 457 U.S. 147, 161 (1982); *Alliance to End Repression v.*

*Rochford,* 565 F.2d 975, 977 (7th Cir. 1977).  To satisfy Rule 23(a), plaintiffs must establish: (1)

numerosity (a class large enough to make joinder of all members impracticable); (2) commonality

(questions of law or fact common to the class); (3) typicality (named parties' claims or defenses

typical of the class); (4) adequacy of representation (representatives will fairly and adequately protect

the interests of the class). *Patterson v. General Motors Corp.,* 631 F.2d 476, 481 (7th Cir.), *cert.*

*denied,* 451 U.S. 914 (1981).[4]

It is well-established that the determination of class certification under Rule 23(a) turns not

on the ultimate merits of the case, but rather on whether the party seeking certification meets its

burden of showing that all the certification requirements of Rule 23(a) are met. *Falcon,* 457 U.S. at

---

[4]There are two implied prerequisites to class certification that also must be satisfied prior to addressing the
issues raised by Rule 23(a).  *First,* the class must be sufficiently defined so that the class is identifiable. *Alliance to End*
*Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir. 1977).  *Second,* the named representative must fall within the
proposed class. *Id.*  The defendant does not specifically challenge whether plaintiff has satisfied these two threshold
inquiries, and we see no evidence that he has not.  Thus, we need not address those implied requirements here.

161. "The court maintains broad discretion to determine whether a proposed class satisfies the requirements and should err in favor of maintaining class actions." *Rahman v. Chertoff*, 244 F.R.D. 443, 447 (N.D. Ill. 2007) (Guzman, D.J.).

Once a plaintiff satisfies the requirements of Rule 23(a), he must satisfy one of the three subparts in Rule 23(b). In this case, plaintiff seeks to maintain a class under Rule 23(b)(3). Rule 23(b)(3) delineates two requirements: (1) "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. ¶ 23(b)(3). The predominance factor requires consideration of the substantive elements of the plaintiff's cause of action, the proof necessary for the various elements, and the manageability of the trial on these issues. If individual issues predominate, then class certification is usually not a superior method for resolving the controversy, since management of such issues by a court will not be efficient. *Szabo*, 249 F.3d at 675.

The Seventh Circuit has directed that, "[b]efore deciding whether to allow a case to proceed as a class action, . . . a judge should make whatever factual and legal inquiries are necessary under Rule 23." *Szabo*, 249 F.3d at 676. When, as here, plaintiffs seek certification under Rule 23(b)(3), we must "make a preliminary inquiry into the merits" of the claims, to decide whether "the difficulties likely to be encountered in the management of the class action" preclude certification. *Id.* As this Court previously stated:

> We do not believe that *Szabo* directs district courts to decide class certification questions based on a preliminary assessment of the ultimate merits of the plaintiffs' claims: to base class certification on a prediction of who will win the case would be at odds with *Eisen [v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)]. In our view, the "preliminary inquiry into the merits" discussed in *Szabo* is a more limited one that

6

has as its focus not the substantive strength or weakness of the plaintiffs' claims, but rather whether the path that will need to be taken to decide the merits renders the case suitable for class treatment. It is in this limited sense that the Court assesses the "merits" of plaintiffs' allegations in considering the class certification motion.

*Humphrey v. Inat'l Paper,* No. 02 C 4147, 2003 WL 22111093, \*3 (N.D. Ill., Sept. 11, 2003)

(discussing *Szabo,* 249 F.3d at 675). *See also Murray v. Am. Mortg. Banc, Inc.,* No. 03 C 5811, 03

C 6186, 2005 WL 1323364 (N.D. Ill., May 5, 2005) (Report and Recommendation adopted,

modifications not relevant, by 2006 WL 1647531 (N.D. Ill., June 5, 2006)(Guzman, D.J.)).

### III.

We begin with an analysis of plaintiff's proposed class definition. The plaintiff asks the

Court to certify the following class:

> [A]ll consumers with Illinois addresses to whom Circuit City Stores, Inc., provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person['s] credit card or debit card number, and/or (b) the expiration date of the person's credit or debit card.

(Pl.'s Mot., at 1). The Court is not required to view plaintiff's proposed class definition as a take

it or leave it proposition. Rather, "[t]he Court . . . retains broad power to modify the definition of

a proposed class if it believes that the proposed definition is inadequate." *Wallace v. Chicago*

*Housing Authority,* 224 F.R.D. 420, 423 (N.D. Ill. 2004). Defendant argues that if a class is

certified, plaintiff's proposed definition is too broad and should be modified in two respects.

*First,* defendant argues that plaintiff's class definition is too broad because, by defining the

class by reference to the issuance of "an electronically printed receipt at the point of sale or

transaction," it sweeps in all transactions that have occurred at any Circuit City point of sale,

including those at brick and mortar stores (Def.'s Mem. at 2-3). Defendant asserts – without

7

contradiction by plaintiff – that there is no evidence that any Circuit City brick and mortar store has issued an electronically printed receipt that violates FACTA (Def.'s Mem. at 2, 12, n.5).

We agree that in this respect, the class definition that plaintiff proposes is too broad. Consumers who received receipts from brick and mortar stores are a distinct group from those who received receipts online. Including those who received receipts from brick and mortar stores would greatly expand the number of putative class members. A class definition that would greatly expand the number of people who might be part of the class must have some factual basis to support it. Here, there is none. Thus, the class definition should be modified to eliminate receipts issued by brick and mortar stores.

*Second*, defendant also contends that the class definition is too broad because it seeks to include a group of people whose "Circuit City receipts contained more than the last five digits of a credit/debit card number, even though plaintiff's email confirmation did not reveal more than the last four digits of his card number" (Def.'s Mem. at 12). We reject this argument. This portion of the proposed class definition would not expand the number of putative class members, since the potential universe of class members would be limited to those persons in Illinois who, during the applicable time period, received an electronically printed receipt for a transaction occurring other than at a brick and mortar store. We see no vice in plaintiff asserting alternative grounds for those receipts violating FACTA: the failure to truncate credit card numbers to show only the last four digits, or (as plaintiff asserts in his transaction) the failure to redact the expiration date.

Based on the foregoing analysis, the Court recommends that the class definition read as follows:

8

> All consumers with Illinois addresses to whom Circuit City Stores, Inc., provided an electronically printed receipt in connection with an online or over the phone transaction occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person's credit card or debit card number, and/or (b) the expiration date of the person's credit or debit card.

If at any time after discovery is completed there is still no evidence of receipts issued with more than the last five digits of the credit/debit card used, then the defendant may move to amend the class definition to "truncate" the class definition further. *See* Fed.R.Civ.P. 23(c)(1)(c) ("[a]n order under Rule 23(c)(1) may be altered or amended before final judgment").[5]

## IV.

With this modified class definition in mind, we turn to the requirements under Rule 23 for certifying this modified class, which we find plaintiff has satisfied.

### A.

The defendant does not challenge plaintiff's assertion that Rule 23(a)(1), requiring numerosity, is satisfied. We therefore only briefly review the standards and evidence offered on this factor.

Rule 23(a)(1) requires that the proposed class be so numerous that joinder is impracticable. While there is no bright line test for numerosity, courts have found this element satisfied where the putative class would number in the range of as few as 10 to 40, at least where the joinder of individual plaintiffs would be impractical. *See generally Humphrey*, 2003 WL 22111093, *6. Here, the complaint alleges that the class of persons who may have received electronically printed receipts, such as the email confirmation plaintiff received, numbers over 100 (Compl., ¶ 16). Subsequent

---

[5]Conversely, plaintiff may seek to amend the class definition if plaintiff discovers evidence that receipts issued by the brick and mortar stores did not truncate credit card numbers or redact expiration dates.

discovery has uncovered evidence of as many as 110,000 persons in the putative class (Pl.'s Reply Mem. at 8). Rule 23(a)(1) is therefore satisfied.[6]

## B.

Rule 23(a)(2) requires plaintiff to prove the existence of questions of law or fact common to the proposed class. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992). Thus, "some factual variation among the class grievances will not defeat a class action." *Id.* at 1017. This is true, even though the nature and amount of damages may differ among the class members, so long as those individual issues are manageable through bifurcated hearings or some other mechanism that allows the common issues to be adjudicated together. *Heastie,* 125 F.R.D. at 678-79. *See also Murray,* 2005 WL 1323364, at * 5.

In this case, plaintiff alleges that the common questions among the proposed class members are: (1) whether defendant had a practice of providing customers with a sales or transaction receipt on which defendant printed more than the last five digits of the credit card or debit card and/or the expiration date of the credit card or debit card; (2) whether defendant thereby violated FACTA; and (3) whether defendant's conduct was willful (Compl., ¶18(a)-(c); Pl.'s Mem. at 7). Defendant argues that commonality is not met for several reasons: (1) some of the 110,000 putative class members may have suffered actual damage (*e.g.,* identity theft), whereas others – like Mr. Harris – did not; (2) some may have purchased merchandise for commercial use and thus are not "consumers" for

---

[6]Circuit City has offered evidence (not contested by plaintiff) that as of May 2007, Circuit City adopted a policy of truncating credit card numbers and redacting expiration dates in all email "receipts" (without conceding that plaintiff's email here was a receipt or that defendant's prior conduct violated FACTA) (Def.'s Ex. E at No. 8). Thus, the putative class size should not grow during the pendency of this suit.

10

whom FACTA's requirements apply; (3) not all putative class members visited a Circuit City store following their online transaction; and (4) not all class members printed their email confirmation containing their credit/debit card expiration date (Def.'s Mem. at 9).

We do not find defendant's arguments persuasive. The class definition (and plaintiff's theory of this case) is centered on defendant's standardized conduct: the failure to truncate credit card numbers and/or redact expiration date on receipts issued after December 4, 2006. That conduct is the same, as is the violation alleged, with respect to all members of the proposed class. The law makes clear that commonality is not defeated by the kind of minor variations defendant cites here concerning the details of plaintiff's transaction (*e.g.,* the fact that he purchased the merchandise twice, once at a brick and mortar store and then "online" for the purpose of obtaining a price adjustment and a credit at the store; or the fact that plaintiff's "receipt" contains the card's expiration date rather than more than the last 5 digits of his card number).

Nor is the argument that some of the 110,000 putative class members may have been commercial and not consumer purchasers a persuasive argument against a finding of commonality. Circuit City has offered this argument as a theoretical possibility, without suggesting even in broad terms how many commercial purchasers may exist among the 110,000 putative class members. We are skeptical that the number is great, relative to overall putative class size. In any event, this issue – should defendant wish to pursue it – goes to the issue of the right of putative class members to participate in any class recovery if one is achieved. The issue does not go to the threshold question of whether a class should be certified at all. Even if some putative class members fall outside the class because they are not consumers under the statute, many others will not be excluded on that

11

basis and will fall within it.    This argument does not render class treatment of this case inappropriate.[7]

Finally, as the case law cited above establishes, the fact that plaintiff claims statutory damages, while other individuals may have actual damage claims, does not defeat certification. *Heastie,* 125 F.R.D. at 678-79.  Here, plaintiff here seeks certification of a class under Rule 23(b)(3). If some persons who fall within the proposed class definition wish to pursue a separate claim for actual damages, they are free to opt out of the class.  *See Murray v. GMAC Mort. Corp.,* 434 F.3d 948, 953 (7th Cir. 2006).

## C.

Rule 23(a)(3) requires a plaintiff to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  A claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983) (internal quotations omitted).  The typicality prong "may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of the other class members." *Id.*  The key to typicality is based on the relationship between the class representative and the class members: that is, whether the named plaintiff's interests are aligned with those of the proposed class in such a way that the representative, in pursuing his own claims, will also advance the interests of the class. *Guillory v. American Tobacco Co.,* No. 97 C 8641, 2001 WL 290603, * 3 (N.D. Ill., March 20, 2001).  As defendant acknowledges, the commonality and typicality inquiries

---

[7]Moreover, we note that plaintiff asserts that any putative class member who made a purchase on a business credit card, but was personally responsible for the payment obligation, still qualifies as a consumer and thus would not be excluded from class membership (Pl.'s Reply Mem. at 3).  We need not resolve that issue now.

"tend to merge" (Def.'s Mem. at 9). Thus, when the commonality prong is satisfied under Rule 23(a)(2), the typicality prong of Rule 23(a)(3) generally follows suit. *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D.Ill. 1984); *Patrykus v. Gomilla*, 121 F.R.D. 357, 361 (N.D. Ill. 1988).

This case is no exception. The defendant makes the same arguments to defeat typicality as they make to defeat commonality; those arguments fail for typicality as they did for commonality. We find that the typicality prong of Rule 23(a)(3) has been satisfied by plaintiff in this case.

**D.**

Rule 23(a)(4) requires "adequacy of representation." To be an adequate representative of a class, a plaintiff must have a sufficient stake in the outcome to ensure zealous advocacy and must not have antagonistic or conflicting claims with other class members; moreover, counsel for the named plaintiff must be experienced, qualified, and generally able to conduct the litigation. *Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 594 (7th Cir. 1993). The class representative must also have the same interest as the other class members in establishing the claims alleged against the defendant in this case. *Hoffman v. Grossinger Motor Corp.*, No. 96 C 5362, 1999 WL 184179, at * 5 (N.D. Ill., March 29, 1999).

The defendant raises several arguments with regard to this requirement, which are directed solely to the plaintiff's adequacy and not to that of class counsel. *First,* the defendant asserts that Circuit's City's records conflict with plaintiff's testimony, and show that the confirmation email he received was part of a telephone transaction and not an online order. Thus, according to defendant, plaintiff "never made an online transaction and the fact that his telephonic transaction . . . serves as the basis for his action . . . renders him inadequate to represent the putative class" (Def.'s Mem. at

13

11). *Second*, defendant argues that plaintiff cannot represent those who made a purchase online to be shipped or picked up from a Circuit City store (*Id.* at 12).

We do not find these arguments sufficient to render plaintiff an inadequate representative. Plaintiff has precisely the same interest as the class members: namely, to establish liability for disclosing information on the email that plaintiff says FACTA required Circuit City to truncate or redact. To the extent that plaintiff's testimony conflicts with Circuit City's records, that conflict represents a question of fact that we cannot resolve on a certification motion. Although we must probe beneath the surface of the complaint and look squarely at the merits to determine whether certification is, in fact, the best choice in this case, we are not authorized to resolve fact disputes that do not bear directly upon the certification determination before us. *See, e.g., Hnot v. Willis Group Holdings Ltd.,* 241 F.R.D. 204, 211 (S.D.N.Y. 2007). Whether the second transaction was initiated by phone or email, there is no dispute that Circuit City sent plaintiff an email with the credit card expiration date, which plaintiff then printed and used to complete a transaction at a brick and mortar store. Thus, the credibility dispute raised by Circuit City does not affect the class issues. We find that plaintiff is an adequate class representative.

## V.

We now turn to the question of whether the plaintiff has satisfied Rule 23(b)(3). As stated above, Rule 23(b)(3) permits class certification based on two findings: predominance of common questions over individual ones and superiority of the class action mechanism. The predominance requirement of Rule 23(b)(3) goes hand in hand with the commonality requirement of Rule 23(a), because commonality is a factor in both the Rule 23(a)(2) and Rule 23(b)(3) analysis. Both requirements are usually satisfied when there is standardized conduct by a defendant toward members

14

of the proposed class, and a common nucleus of operative facts is present. *Franklin v. City of Chicago,* 102 F.R.D. 944, 949 (N.D. Ill. 1984); *Patrykus v. Gomilla,* 121 F.R.D. 357, 361 (N.D. Ill. 1988). Class certification is usually considered a superior method of adjudicating claims involving standardized conduct, even if there are individual issues that exist among class members on questions such as damages, so long as those individual issues are manageable through bifurcated hearings or some other mechanism that allows the common issues to be adjudicated together. *See Murray v. Am. Mortg. Banc,* 2005 WL 1323364, at * 5; *Haroco v. American Nat'l Bank,* 121 F.R.D. 664, 669 (N.D. Ill. 1988); *Heastie,* 125 F.R.D. at 677.

### A.

The same considerations that led us to conclude that the commonality requirement of Rule 23(a)(2) has been satisfied likewise persuade us that the predominance requirement of Rule 23(b)(3) also has been met. The "common questions" identified by plaintiff are the same as the "predominate questions" (Pl.'s Mem. at 7). And, the evidence regarding predominance is the same as that offered for commonality: the alleged standardized conduct of defendant in failing to truncate credit or debit card numbers and/or to redact the expiration dates of cards.

Defendant's arguments in opposing a finding of predominance are essentially the same as well. Defendant argues that Rule 23(b)(3) certification is improper because individual fact questions predominate about which putative class members are "consumers" (Def.'s Mem. at 5-6). We find that argument no more persuasive on the question of predominance than we did on the question of commonality.

15

**B.**

The next question is whether a class action is superior to other available methods of adjudication. With respect to this question, Rule 23(b)(3) instructs us to consider the following factors: (a) the interest of the members in the class individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (d) the difficulties likely to be encountered in the management of a class action.

In this case, each of those factors support certification. The defendant focuses its argument on the last factor, the presumed difficulty of managing this case as a class action. Nowhere in their brief is there an argument that any of the first three factors are present here. We therefore turn to the last factor.

Defendant first contends that "[t]he issue of whether a transaction involves a consumer will not be apparent from a list identifying the number of transactions or even from the email confirmation itself so that each transaction will require a specific and detailed, individualized factual inquiry to determine whether a consumer was involved and there may be liability" (Def.'s Mem. at 7). In other words, defendants contend that there is no judicial economy to be gained by class treatment of this case (*Id.*). We disagree. Class treatment is the superior method for adjudicating the single act of conduct at issue in this case: whether defendant issued electronic receipts that violate FACTA to consumers during the relevant time period and did so willfully. Anyone with an actual damage claim who does not wish to remain in the class can opt out of a Rule 23(b)(3) class. Any issues about

16

whether putative class members are not consumers and thus not proper class members can be addressed through a separate mechanism if class liability is first established.

The defendant's second argument regarding superiority is that "class certification would create the threat of a blackmail settlement" (Def.'s Mem. at 7-8). The Seventh Circuit has observed that "blackmail settlements" can arise in situations where there is "a small probability of an immense judgment in a class action." *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995). As indicated, FACTA provides for the recovery of statutory damages between $100 and $1000 on proof of a willful violation. Circuit City has done the math, and it has come up with the following potential scenario:

> FACTA became effective on December 4, 2006, during the holiday shopping season. Between December 4, 2006, and May 8, 2007, Circuit City had approximately 100,000 transactions at its online store. Assuming that each customer was a consumer within the meaning of the FCRA, Circuit City could face liability of approximately $10,000,000 to $100,000,000, simply for sending confirmation emails containing credit/debit card expiration dates. The potentially crippling statutory damages would create unbearable pressure on Circuit City to settle this lawsuit.

(Def.'s Mem. at 7). Defendant says that class certification would subject it to "the risk of a ruinous judgment" and "may leave Circuit City with little choice but settlement, regardless of the merits of [p]laintiff's claim" (*Id.* at 7).

We have reviewed the decision in *Rhone-Poulenc,* and we find it distinguishable from this case. In the *Rhone-Poulenc* case, the Seventh Circuit was dealing with a situation where: (1) evidence of individual test cases showed that there was a "demonstrated great likelihood that the plaintiffs' claims, despite their human appeal, lack[ed] legal merit"; and (2) individual suits were not "infeasible" because the claim of each class member was not "tiny relative to the expense of litigation," *id.* at 1299, and many class members had large claims for actual damages. Here, by

17

contrast, the evidence does not show a "great likelihood" that plaintiff's claim lacks merit. There also

is no evidence that the damages claim of each class member, individually, would be large enough to

sustain individual actions. Rather, for those potential members of the class like plaintiff, there are

no actual damages and the recovery would be "tiny relative to the expense of litigation" on an

individual basis. Thus, we find the holding in *Rhone-Poulenc* inopposite to this case.

Moreover, the Seventh Circuit has more recently found that Rule 23(b)(3) "was designed for

situations such as this." *Murray*, 434 F.3d at 953. In *Murray*, the Seventh Circuit stated that where

"the potential recovery is too slight to support individual suits, but injury is substantial in the

aggregate[,]" then class certification is the superior method of adjudication. *Id.* at 953. Defendant

"acknowledges" that the Seventh Circuit's decision in *Murray* "may appear to reject the argument that

the potential damages should be considered in determining whether class certification is appropriate"

(Def.'s Mem. at 8). Defendant attempts to distinguish *Murray* on its facts from this case on two

grounds: (1) that the defendant in *Murray* sought "pecuniary gain from [the] conduct allegedly

violative of the statute" (Def.'s Mem. at 8), but here there is evidence that Circuit City did not benefit

from the alleged violation and actually acted in good faith by trying to eliminate the alleged violation

prior to the commencement of the lawsuit (*id.*); and (2) that here, unlike in *Murray*, there would be

no "societal gain" from certification where the risk of a large judgment would be too high for

defendants to attempt to litigate (*Id.*). We do not think these two distinctions make a difference in

this case, for three reasons.

*First,* defendant says that since it now indisputably is in compliance with FACTA, there is no

need for class certification. Perhaps that argument would have some force if the class sought

injunctive relief under Rule 23(b)(2). But, here, plaintiff seeks only damages under Rule 23(b)(3).

18

*Second,* defendant says it did not benefit from the alleged violation. But, FACTA is not designed to prevent the seller from getting a benefit. Rather, it seeks to protect the consumer from a detriment: exposure to the risk of identity theft. Financial Data Protection Act of 2006 House Report No. 109-454(I), § (b)(1) (May 4, 2004) ("(b) Findings. – The Congress finds as follows: (1) Protecting the security of sensitive information relating to consumers is important to limiting account fraud and identity theft"). Moreover, defendant ignores the societal benefit it may achieve from class treatment: if defendant is correct on liability, then that determination will be binding on all class members, and defendant will not have to worry about others bringing this claim in Illinois. *Third,* we find that there is "societal gain" in using the most efficient mechanism for determining liability in a case where the individual stakes are likely too small to support individual suits.

We cannot say whether a judgment from $10 million to $100 million would inflict "irreparable" harm on Circuit City. Circuit City has not disclosed whether this claim is insured, or if not, how a judgment of the amount claimed would compare to its net worth. That said, we cannot base the certification decision solely on the impact it might have on a party that has potentially violated FACTA. The statute does not create an "irreparable harm" exception, which would allow Circuit City to escape the consequences of any willful conduct. Moreover, a negligent violation of the statute will not subject Circuit City to the kind of damages it claims are irreparable.[8]

---

[8]We note that defendant attempts to have it both ways on this point. On the one hand, for purposes of the "blackmail settlement" argument, Circuit City says that the stakes of a judgment on liability are too high if the class is certified (Def.'s Mem. at 7). For those high stakes to kick in, there would have to be a finding of willfulness on the merits. See 15 U.S.C. § 1681n (only willful violations are entitled to statutory and punitive damages). Thus, for purposes of this argument, defendant assumes that there is a risk of such a finding if we certify the class, a risk sufficient to blackmail it into settlement. On the other hand, defendant argues that there is no evidence of willfulness and thus this case should not be certified as a class (Def.'s Mem. at 2). If defendant truly believes there is no evidence of willfulness, then there is nothing with which to blackmail it. See 15 U.S.C. § 1681o (negligent violations are only compensable with actual damages, plus fees and costs). But, if there is some evidence of willfulness, then why should defendant be protected from the consequences of that by a denial of certification?

19

### VI.

The last question we address is the appointment of class counsel. Rule 23(g)(1)(A) states that, "a court that certifies a class must appoint class counsel." Under Rule 23(g)(1)(B), an attorney appointed as class counsel "must fairly and adequately represent the interests of the class." Rule 23(g)(1)(C)(i) sets forth several factors listed that courts are instructed to consider in appointing class counsel, namely, the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; and, the resources counsel will commit to representing the class.

Defendant does not contest that class counsel is adequate under Rule 23(g). In fact, defendant does not challenge adequacy based on the factors listed in Rule 23(g)(1)(C)(i). Exhibit 5 to the plaintiff's motion for class certification includes an affidavit by the name partner of the firm representing plaintiff in this action, Keith J. Keogh. Based on the representations in this affidavit, the Court finds that Rule 23(g)(1)(B)(C)(i) has been satisfied, and we recommend the appointment of Mr. Keogh, Alexander H. Burke, and the Law Offices of Keith J. Keogh. Ltd., as class counsel in this case.

### CONCLUSION

For the reasons stated above, the Court respectfully recommends that the presiding district judge grant plaintiff's motion to certify (doc. # 22), and certify the following class:

> All consumers with Illinois addresses to whom Circuit City Stores, Inc., provided an electronically printed receipt in connection with an online or over the phone transaction occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person's credit card or debit card number, and/or (b) the expiration date of the person's credit or debit card.

20

The Court further recommends that Keith J. Keogh, Alexander H. Burke, and the Law Offices of Keith J. Keogh, Ltd., be appointed class counsel.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(b). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: February 7, 2007**

21