# Exhibit 6

**Page 1**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MARK THOMAS, individually       )
and on behalf of all others      )
similarly situated,              )   No. 08 C 453
        Plaintiff,               )
    vs.                          )
RITZ CAMERA CENTERS, INC.,       )
        Defendant.               )

The deposition of MARK EDWARD THOMAS, called as a witness for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before KELLY M. FITZGERALD, a Certified Shorthand Reporter of said state, at Suite 3000, 131 South Dearborn Street, Chicago, Illinois, on the 15th day of April, A.D. 2008, at 10:40 a.m.

**Page 2**

1   PRESENT:
2
3   LAW OFFICES OF KEITH J. KEOGH, LTD., by:
4   MR. KEITH J. KEOGH
5   227 West Monroe Street, Suite 2000
6   Chicago, Illinois  60606
7   312-726-1092
8       appeared on behalf of the Plaintiff;
9
10  HOLLAND & KNIGHT LLP, by:
11  MR. RICHARD T. WILLIAMS
12  633 West Fifth Street, 21st Floor
13  Chicago, Illinois  90071-2040
14  213-896-2410
15      appeared on behalf of the Defendant.
16
17
18
19
20
21
22
23  REPORTED BY:  KELLY M. FITZGERALD, CSR, RMR, CRR
24      CSR No. 84-4318.

**Page 3**

1           (Thomas Exhibit Nos. 1 & 2
2           marked as requested.)
3           MARK EDWARD THOMAS,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6           EXAMINATION
7   BY MR. WILLIAMS:
8       Q.   Please state your name.
9       A.   **Mark Edward Thomas.**
10      Q.   Okay.  Good morning, Mr. Thomas.
11      A.   **Good morning.**
12      Q.   My name is Richard Williams, and I'm with
13  the law firm of Holland & Knight LLP, and we're
14  representing the defendant Ritz Camera Centers, Inc.
15  And we're here this morning to take your deposition.
16  Have you ever had a deposition taken before?
17      A.   **Yeah.**
18      Q.   How many times?
19      A.   **I don't recall exactly.**
20      Q.   Well, give me an approximation.
21      A.   **Two, three, four.  I don't know.**
22      Q.   Mr. Thomas, let me go over briefly with
23  you the general procedures we're going to follow
24  today.

**Page 4**

1           The reporter has placed you under oath,
2   and your testimony here should be treated by you as
3   formally as if you were giving it in a courtroom in
4   front of a judge or a jury.  I'm going to ask you a
5   series of questions and the reporter will take down
6   the questions and answers that you give, any
7   comments that are made.  And we'll prepare from that
8   a transcript.  You'll have an opportunity to read
9   and review that transcript.  At that time you can
10  make any changes or corrections that you believe are
11  necessary to make it an accurate transcription of
12  your testimony.  Please understand that at time of
13  hearing or trial in this matter, I should be free to
14  comment on any change, as well as on the original.
15  So I urge you that it's probably in your best
16  interest to give your best and most accurate answer
17  today as we proceed.
18          If there's anything I ask you, you don't
19  understand, please let me know and I'll rephrase it.
20  Let me tell you that for the sake of the transcript
21  and the reporter's good health, it's best if only
22  one speaks at a time.  So please, I'll try and not
23  speak over you and ask you to do the same with me.
24          It's necessary for you to answer a

5

1  question audibly so that the court reporter can take
2  down your answer, so a nod of the head won't do it.
3  Please say yes or no or I don't know or tell us the
4  answer. I do not want you to speculate in giving me
5  an answer but do want your best estimate if you
6  can't be exact.
7          Is there anything I've said so far that
8  you don't understand?
9      A.    Not at all.
10     Q.    You told me your name was Mark Edward
11 Thomas?
12     A.    Yes.
13     Q.    Have you ever used any other name?
14     A.    No.
15     Q.    Where were you born?
16     A.    Chicago.
17     Q.    When?
18     A.    October 15, 1964.
19     Q.    What's your present residence address?
20     A.    7001 Brookbank, B-r-o-o-k-b-a-n-k, Road,
21 Darien, Illinois, 60561.
22     Q.    I was born in this town but I clearly
23 preceded the founding of Darien. Whereabouts is it?
24     A.    It's a west suburb, Hinsdale, Burr Ridge,

6

1  Downers Grove.
2      Q.    Hinsdale and Downers Grove are
3  recognizable names to me.
4      A.    Right next to them.
5      Q.    How long have you lived at that address?
6      A.    About two and a half years.
7      Q.    And what was your address before then?
8      A.    40 Sawgrass, Lemont, Illinois.
9      Q.    How long did you live there?
10     A.    I think it was a little less than a year.
11 I was actually staying with my cousin.
12     Q.    And what was your residence before
13 Sawgrass?
14     A.    Actually I worked a year in Colorado,
15 part of it was at a hotel and then I have a condo
16 out there. I can't remember a specific address.
17     Q.    Okay.
18     A.    It's in Aurora though, Aurora, Colorado.
19     Q.    Near Denver?
20     A.    Yeah, just a south suburb of Denver.
21     Q.    And before your year in Colorado?
22     A.    Orland Park.
23     Q.    And how long were you in Orland Park?
24     A.    Probably total about four years, two

7

1  different residences.
2      Q.    Okay. Educational background, where did
3  you go to high school?
4      A.    Gordon Tech in Chicago.
5      Q.    Did you go on to college?
6      A.    Yeah, I took classes at University of
7  Chicago and DePaul.
8      Q.    Did you graduate?
9      A.    No.
10     Q.    Did you have a major?
11     A.    Well, I mean, geared towards it but I
12 didn't attain it.
13     Q.    What was it?
14     A.    Accounting.
15     Q.    Have you attended any other college or
16 university courses?
17     A.    Yeah, various -- I mean, one was a
18 paramedic class at South Suburban College and
19 various just different college, you know, oriented
20 courses in different locations.
21     Q.    And are you working towards some
22 particular degree or just taking courses as they
23 interest you?
24     A.    I'm actually currently not taking any

8

1  courses.
2      Q.    Okay. Let's talk about your employment
3  history. Did you go direct from Gordon Tech into
4  college classes or was there a period when you
5  worked?
6      A.    Both.
7      Q.    When did you graduate from Gordon Tech?
8      A.    '82. First job at 16, I started at
9  All-American Bank of Chicago, six years of banking.
10 And then I went full-time into college while I was
11 working full-time at the bank.
12     Q.    Okay. And you started at the bank then
13 in 1982?
14     A.    No, actually sophomore, when I turned 16,
15 I started on the teller line and I just worked there
16 for six years.
17     Q.    So that would be?
18     A.    '80.
19     Q.    1980?
20     A.    Yes.
21     Q.    And you continued to work with the bank
22 until when?
23     A.    A few years for that bank, about four
24 years for that bank. Then I went to Golf Mills

9

1   State Bank for two years, obviously didn't continue
2   full-time at college. It decreased to part-time but
3   full-time employment.
4       Q.   How do you spell Golf Mills State?
5       A.   Golf, G-o-l-f. It's not there anymore.
6       Q.   And you were there two years. So that
7   would take you to 1986?
8       A.   About that.
9       Q.   Okay. What did you do after that?
10      A.   Then I went in to be an office manager at
11  auto dealerships. First one was Orloff, Jaguar,
12  Volvo, for a couple of years.
13      Q.   And where was that?
14      A.   In Chicago but not their current
15  location, but in Chicago.
16      Q.   And how long did you stay with that
17  dealership?
18      A.   A little over two years.
19      Q.   Then what?
20      A.   Then Borg Pontiac GMC in Downers Grove
21  for about two and a half years.
22      Q.   And you were office manager?
23      A.   Comptroller there.
24      Q.   And that takes us up to about --

10

1       A.   Before that I was also -- while I was at
2   the bank I started I think -- at one of the places I
3   became a volunteer firefighter/EMT in River Grove.
4       Q.   In what?
5       A.   I'm sorry?
6       Q.   In River Grove?
7       A.   Yeah, in River Grove.
8       Q.   Good for you. And how long did you
9   continue to be a volunteer?
10      A.   Total for 13 years, 13 or 16, I don't
11  know. I can't remember. It was many, but I've been
12  retired for a few years now.
13      Q.   After your stint as controller at Borg?
14      A.   Then I went to St. Charles Pontiac in
15  St. Charles, probably another two and a half years.
16      Q.   As?
17      A.   Secretary/treasurer.
18      Q.   And what was your next position after
19  St. Charles Pontiac?
20      A.   You're really testing my memory. I think
21  I went six months at Gjovik out in Sandwich,
22  Illinois, G-j-o-v-i-k.
23      Q.   Auto dealership?
24      A.   Yeah.

11

1       Q.   Then what?
2       A.   Then I think -- well, let me think now.
3   Then somewhere in there, Gjovik could be before or
4   after, I don't remember, I went to work for Ed
5   Napleton, which is an auto dealer, number of
6   dealerships in the Chicagoland area, in Oak Lawn is
7   the first place I started. I worked for him for a
8   total of five years.
9       Q.   From when to when?
10      A.   I don't remember specifically. It was in
11  that time frame there. I should have brought a
12  resume to refresh my memory. No, it was in the, you
13  know, late '80s, '90s, something like that.
14      Q.   After Napleton, five years there?
15      A.   And then Napleton five years, I left Ed
16  Napleton to become a full-time firefighter/paramedic
17  in Orland Fire Protection District in Orland Park.
18      Q.   And how long?
19      A.   Total, seven years. I'm retired for five
20  now.
21      Q.   So that --
22      A.   While I was working full-time, I went
23  back to working full-time at a dealership then also,
24  because we were 24 on, 48 off. On my 48 off, I

12

1   worked full-time at City Auto Group in Chicago.
2       Q.   What position?
3       A.   Assistant controller and that was for
4   probably about five years. Then I got hurt on the
5   job so I obviously wasn't working at that time while
6   I was on worker's comp. At the dealership -- I got
7   hurt at the fire department and then after a period
8   of time, I couldn't return back to work so I had to
9   take an early retirement, a disability retirement
10  from the fire department.
11      Q.   And when was that?
12      A.   It was official probably six years ago
13  now, five and a half, six years ago.
14      Q.   2002?
15      A.   Yeah, that sounds about right.
16      Q.   And did you continue to work with City
17  Auto Group?
18      A.   No, then I went to -- well, while I was
19  at City Auto Group, I was also doing a little work
20  at one of the Napleton dealerships part-time for a
21  couple of years with all the other stuff. Then I --
22  after the fire department, primarily I went to go
23  work for Bob Watson, another car dealer, for, I
24  don't know, three years, a number of his

13

1  dealerships.
2     Q.    Which in particular?
3     A.    The Chevy store, there in Midlothian,
4  their motor sports, which consisted of Yamaha,
5  Suzuki, Kawasaki and then used car locations, they
6  had like four used car locations, as the capacity of
7  controller, corporate controller.
8     Q.    Were you given an agency where you were
9  or were you controller for the whole organization?
10    A.    Yeah, looked over all his stores.  It was
11 a newly created position, corporate controller, for
12 whatever, two and a half years, two years.
13    Q.    Okay.
14    A.    Then I think I went to Colorado for 11
15 months actually total, Mercedes-Benz of Littleton,
16 part of the Brayman organization out of Miami.
17    Q.    And your position there?
18    A.    Comptroller.
19    Q.    And that would be roughly 2004, 2005?
20    A.    Yeah, the end of 2004, November 2004.
21 You're following along there.  It's a lot of jumping
22 around.  You kept on pace.
23    Q.    And when did you finish up in Colorado?
24    A.    Well, I came back in November, the end of

14

1  November.
2     Q.    2004?
3     A.    Yeah.
4     Q.    Okay.
5     A.    And started out there in January.
6     Q.    Okay.  And since November of 2004?
7     A.    Primarily just been working for myself as
8  an independent contractor for various dealerships
9  and businesses throughout the United States.
10    Q.    I invite you to give me a little more
11 specificity about that.
12    A.    I don't remember which one is first.  I
13 mean, I'll go for short-term.  Sometimes it's a
14 couple of days, be it out to three and a half weeks
15 in a Hawaii dealership, dealership out in Honolulu.
16    Q.    Mostly it's auto dealerships?
17    A.    All auto dealerships with the exception
18 of currently the last six months, a business down in
19 Louisiana.
20    Q.    Okay.  What's that business?
21    A.    Well, the guy owns six convenience store
22 gas stations.  I just do the bookkeeping and
23 accounting work for it.
24    Q.    How did you hook up with him?

15

1     A.    He used to be in a car dealership and I
2  went to do an evaluation on the dealership down in
3  Louisiana when he was there, about two years ago or
4  a year and a half ago.  And then some of the other
5  dealers in Louisiana I worked for intermittently at
6  different times and let's see where else.  Wisconsin
7  I went to once, several in Illinois, couple in --
8  two in Hawaii, and then a few sporadic little things
9  out in the East Coast, Pennsylvania, New Jersey,
10 Florida.
11    Q.    And how do you get these jobs?
12    A.    Just referrals, word of mouth, going to
13 the National Auto Dealers Convention the last couple
14 of years.
15    Q.    And what kind of work do you perform when
16 you're working with these dealerships?
17    A.    Whatever they need.  I mean, primarily
18 it's accounting related, bookkeeping related,
19 operations, operational, evaluations of performance,
20 productivity, training of the office staff.
21           And there was, let's see, about a year
22 ago, I took an internal position at a CPA firm --
23 well, it was -- I mean, it ended up being internal
24 but they sold the firm.  It was Devalk & Associates.

16

1     Q.    D --
2     A.    D-e-v-a-l-k, probably about six months
3  before they sold the firm.
4     Q.    Where was it located?
5     A.    Downtown Chicago.
6     Q.    Where?
7     A.    I don't know.  Over by union station.  I
8  can't remember whether it was a Canal address or
9  Monroe or Randolph.  Oh, it was a Riverside Plaza
10 address, now that I think of it.  And that was
11 primarily tax work, accounting work for a few
12 dealership clients that they had, also.
13    Q.    Did you take any accounting classes at
14 Gordon Tech?
15    A.    Yeah, one in Gordon and a couple in
16 college, mostly hands-on experience from the bank is
17 where it all started.
18    Q.    What kind of work did you do at the bank?
19    A.    I started at 16 on the teller line for
20 about six months.  And the bank president took me
21 under his wings and moved me through all the facets
22 of bookkeeping.  By the time I was 18, I was doing
23 the board reports and financial reporting
24 investments.  And that kind of consisted of the same

17

1   period, he went out to Golf Mills State Bank and
2   then I went out there with him, kind of doing the
3   same type of duties at that time, doing all the FDIC
4   regulatory reporting and the board reports.
5       Q.    He had been president of that
6   All-American and became president at Golf?
7       A.    Right, then he went out to Golf Mills
8   State Bank.
9       Q.    What was his name?
10      A.    Raymond Wojnar.
11      Q.    How do you spell that?
12      A.    W-o-j-n-a-r.
13      Q.    You were a comptroller at various auto
14  dealerships. What does the comptroller at an auto
15  dealership do?
16      A.    Depending on the size and the operation
17  and if it's a holding company, it does vary -- it
18  can consist of just running the full financial
19  reporting for the single dealership. But in a few
20  of those where they were multiple dealerships, I had
21  people do that and I just reviewed the reports and
22  kind of made sure they did their jobs. But I would
23  do all the financial reporting, regulatory issues
24  affecting the dealership, keeping up to date and

18

1   informed on those items, cash management. In the
2   small one, it might have included payroll or doing
3   the full spectrum of all the payroll reports.
4       Q.    Interaction with retail customers?
5       A.    Very little but yeah, I mean definitely
6   if you've got a complaint, you, you know, interject
7   and try to handle them, but primarily not.
8       Q.    People --
9       A.    Not at the forefront. I was more at the
10  back end if issues would occur, if people had
11  titling problems that weren't getting addressed by
12  the billers let's say doing the title work for them,
13  purchasing their vehicles, then I might get the call
14  and try to interject and get the matters handled or
15  resolved.
16      Q.    Or approval of credit for --
17      A.    No, I really didn't -- I mean, that
18  wasn't my main -- that's what a finance manager
19  would do.
20      Q.    Would the finance manager report to you?
21      A.    No, he would report to the general
22  manager or owner.
23      Q.    Mr. Thomas, this morning we're taking
24  your deposition. What did you do to prepare for

19

1   this deposition, if anything?
2       A.    Nothing specific.
3       Q.    Did you meet with Mr. Keogh to prepare
4   for this deposition?
5       A.    Just briefly before coming over here.
6       Q.    How long?
7       A.    Ten minutes, if that.
8       Q.    Have you done anything else for
9   preparation?
10      A.    No. I mean, reviewed the documents that
11  were forwarded to me at different times.
12      Q.    What documents did you review in
13  preparation for the deposition?
14      A.    Copies of the filing.
15      Q.    Mr. Thomas, do you subscribe to any
16  newspapers?
17      A.    No, not really.
18      Q.    Magazines?
19      A.    Nothing recently.
20      Q.    Last two years?
21      A.    No.
22      Q.    What are your principal sources of
23  information for news?
24      A.    Well, nowadays with the Internet when you

20

1   log on, you have the news sector of the websites and
2   that.
3       Q.    msn.com?
4       A.    Yeah, or whatever comes up on AOL when I
5   log on, primarily otherwise the news obviously on
6   TV, CNN, that kind of stuff.
7       Q.    Did you happen to bring any documents
8   with you today other than the receipt that your
9   counsel provided me?
10      A.    Just the receipt, yeah.
11      MR. KEOGH: Just make sure you don't talk
12  over each other is what I was going to interject.
13      MR. WILLIAMS: Other than the receipt,
14  Mr. Keogh, are there any documents that you've
15  brought with you today with respect to this
16  deposition for Mr. Thomas?
17      MR. KEOGH: You're asking me a question?
18      MR. WILLIAMS: Yeah, just to see.
19      MR. KEOGH: No, I don't have any
20  documents.
21      MR. WILLIAMS: Fine. Thanks.
22  BY MR. WILLIAMS:
23      Q.    Mr. Thomas, you're the plaintiff in this
24  lawsuit, the guy who is bringing the complaint.

21

1  Have you ever been a class representative before?
2      **A.    No.**
3      **Q.**    Have you ever been a party to a lawsuit,
4  the plaintiff or the defendant?
5      **A.    I mean, nothing that I can remember,**
6  **recall offhand, but I'm sure there were different**
7  **times that things consisted of it. I guess define**
8  **the lawsuits or whatever so that I have a clear**
9  **picture of your question.**
10     **Q.**    Okay. This current case is a lawsuit?
11     **A.    Correct.**
12     **Q.**    You're the person bringing the complaint
13  and we call that the plaintiff. Ritz Camera Centers
14  is the person against whom you're bringing a
15  complaint. They're the defendant. This particular
16  case is pending in the federal court. There are
17  also state courts. Have you ever been a plaintiff
18  bringing a complaint in another court before this
19  case, whether it's federal or state or whatever?
20     **A.    I don't -- I'm not positive on the**
21  **classification of the suit, but obviously there were**
22  **some settlement suits with my worker's comp**
23  **settlement and the fire department and at different**
24  **times on the fire department, we were named as**

22

1  **parties, occasionally when different people were,**
2  **you know, sued on behalf of the village obviously.**
3  **But nothing ever materialized out of those.**
4      **Q.**    Setting aside your worker comp
5  proceedings and any judicial proceedings connected
6  with that and setting aside anything where you were
7  sued because you were a firefighter, have you ever
8  otherwise been involved in a lawsuit?
9      **A.    One time suing ATA Airlines for injury on**
10  **a flight.**
11     **Q.**    When was that?
12     **A.    Probably about six years ago.**
13     **Q.**    2002?
14     **A.    To my recollection, yeah, 2002 or 2003.**
15  **I can't remember.**
16     **Q.**    Flight from where to where?
17     **A.    Flight from Honolulu that landed in**
18  **San Francisco.**
19     **Q.**    Had you been in Honolulu on vacation or
20  on business?
21     **A.    Yeah, I was on vacation, that time.**
22     **Q.**    How were you injured?
23     **A.    The plane kind of slammed down on the**
24  **runway and reinjured my back.**

23

1      **Q.**    Okay. And where did you bring that
2  lawsuit?
3      **A.    I'm sorry?**
4      **Q.**    Where did you bring that lawsuit?
5      **A.    Where was it filed?**
6      **Q.**    Yeah.
7      **A.    Here in Chicago.**
8      **Q.**    State court, federal court?
9      **A.    I don't recall.**
10     **Q.**    Who was your attorney?
11     **A.    His last name is slipping me. First name**
12  **was Paul. I don't recall.**
13     **Q.**    Was your deposition taken in that
14  lawsuit?
15     **A.    I'm sure it was, yeah.**
16     **Q.**    Was your deposition taken in any of the
17  firefighter lawsuits?
18     **A.    Yes.**
19     **Q.**    Other than the ATA lawsuit and the
20  firefighter lawsuits, has there been any case before
21  today where you've had your deposition taken?
22     **A.    No, not that I can recall.**
23     **Q.**    Did the ATA case go on to trial or was it
24  settled?

24

1      **A.    It was settled.**
2      **Q.**    Before trial?
3      **A.    Yes.**
4      **Q.**    Have you ever given trial testimony?
5      **A.    Not that I can recall it ever being**
6  **called a trial. I don't recall. I mean, I've been**
7  **at court before but not in front of a jury. I mean,**
8  **so I don't believe it being a trial.**
9      **Q.**    What brought you to be in court?
10     **A.    Divorce court.**
11     **Q.**    When were you divorced?
12     **A.    It was in the neighborhood of '86, I**
13  **believe, but I don't recall specifically the date**
14  **and time. Maybe it was '90. I don't remember. It**
15  **was eleven years ago.**
16     **Q.**    That would be 1997?
17     **A.    '86 when I got married so '90 something.**
18  **'86 is when I got married so ten years. About '87,**
19  **'88, '88 actually. My daughter was born in '87 --**
20  **no, '90. I don't know. Let's see.**
21     **Q.**    You were married for approximately ten
22  years?
23     **A.    Yeah. My daughter was born '87, so it**
24  **would be like '97 because my daughter was around ten**

25

1  years old. I've got to associate it to different
2  things to remember the dates.
3      **Q.**    And the divorce was filed and took place
4  in --
5      **A.    Cook County.**
6      **Q.**    Cook County. Have you subsequently
7  remarried?
8      **A.    Yes, I had and divorced again.**
9      **Q.**    When was that? When was the remarriage,
10  when was the second divorce?
11      **A.    Remarriage was 2002, I believe. Those**
12  **are bad memories I don't latch onto. And then**
13  **divorce two years after that so probably 2004.**
14      **Q.**    And you're presently single?
15      **A.    Yes.**
16      **Q.**    Any other occasion that you have not
17  talked about yet where you have been in court?
18      **A.    Not that I can recall, no. I don't**
19  **believe I went to court for any of the fire**
20  **department things but they were many years back. As**
21  **a witness, no.**
22      **Q.**    Have you been a witness in any cases
23  where you were not a party?
24      **A.    That possibly could have been the fire**

26

1  department. They called us in as witnessing the
2  treatment of that patient.
3      **Q.**    But other than that?
4      **A.    No.**
5      **Q.**    We've got two kinds of witnesses. We
6  have what we call percipient witnesses, people who
7  have actually experienced something and they tell us
8  about what happened to them, and we have expert
9  witnesses, people who testify because there's
10  something about their experience or education that
11  enables them to express an opinion about a subject
12  that's relevant to a lawsuit. Have you ever been an
13  expert witness?
14      **A.    No.**
15      **Q.**    Did you take any courses in law in
16  college?
17      **A.    Business law in high school, high school**
18  **and college actually.**
19      **Q.**    Any lawyers in your close family,
20  parents, grandparents, cousins?
21      **A.    No.**
22      **Q.**    Siblings?
23      **A.    Not yet.**
24      **Q.**    You've got siblings. Is one of them a

27

1  lawyer?
2      **A.    No.**
3      **Q.**    Have you ever been employed in a law
4  firm?
5      **A.    No.**
6      **Q.**    Your attorney in this case, the firm of
7  Mr. Keogh and his colleague Mr. Burke, when did you
8  first meet either Mr. Keogh or Mr. Burke? Who did
9  you meet first?
10      **A.    Mr. Keogh.**
11      **Q.**    When did you first met him?
12      **A.    Briefly I met him one time at a charity**
13  **event I was at with my cousin.**
14      **Q.**    What charity was that?
15      **A.    I don't recall specifically.**
16      **Q.**    When was that?
17      **A.    A couple of years ago. And it was basic**
18  **general conversation. They introduced me. He used**
19  **to be a college roommate of my cousin's.**
20      **Q.**    So Mr. Keogh was the college roommate of
21  your cousin?
22      **A.    Yeah. That was based on how I was**
23  **introduced.**
24      **Q.**    I understand. And what was your cousin's

28

1  name?
2      **A.    Jeff Batterson, with a B.**
3      **Q.**    B-a-t-t-e-r-s-o-n?
4      **A.    Yes.**
5      **Q.**    When did you next see Mr. Keogh?
6      **A.    I believe the next time was -- it could**
7  **have been an event or something I was at with my**
8  **cousin, just, you know, he was at the same event at**
9  **the same time. But other than saying hi and just**
10  **being at the same place at the same time, that**
11  **generally was probably it.**
12      **Q.**    And the next time you met Mr. Keogh?
13      **A.    Actually seeing him was probably -- well,**
14  **other than here, more phone conversations.**
15      **Q.**    Was when?
16      **A.    Seeing him physically was within today,**
17  **seeing him at the office and here. I had**
18  **conversations with him on the phone prior to that.**
19      **Q.**    Well, glad for the chance for the two of
20  you to see each other today. Anything we can do to
21  accommodate.
22          Alex Burke is Mr. Keogh's colleague.
23  Have you ever met Mr. Burke face to face?
24      **A.    No.**

29

1    Q.    Your complaint was filed earlier this
2    year, Mr. Thomas. As I recall, it was February but
3    I could be mistaken.
4    A.    **Time flies too fast for me to remember.**
5    Q.    Okay. How did you come to see Mr. Keogh
6    and his firm professionally for the purpose of this
7    case? What led you to him?
8    A.    **In conversation with my cousin.**
9    Q.    Did you consult any other lawyers?
10   A.    **No.**
11   Q.    And before today in connection with this
12   lawsuit, you dealt with Mr. Keogh on the telephone?
13   A.    **Yes, and e-mail.**
14   Q.    I've asked the reporter to mark as
15   Exhibit 1 a copy of the complaint in this action.
16   Would you take a look at it, sir.
17        Do you recognize it as the complaint in
18   this lawsuit?
19   A.    **Yes, I do.**
20   Q.    Have you read the complaint?
21   A.    **Yes.**
22   Q.    Did you read the complaint before it was
23   filed?
24   A.    **I may have. I believe I did. It was one**

30

1    **of the e-mails that I received and read.**
2    Q.    Did you see it in draft form before it
3    was filed?
4    A.    **Yeah, I'm sure I saw it in draft form.**
5    Q.    Did you make any changes to it?
6    A.    **No, I did not.**
7    Q.    Other than today, how many visits have
8    you made to the Keogh Burke law offices?
9    A.    **None.**
10   Q.    Did Mr. Keogh or Mr. Burke come to visit
11   you?
12   A.    **No.**
13   Q.    Have you received any compensation from
14   Mr. Keogh, Mr. Burke or their law firm?
15   A.    **No.**
16   Q.    Do you expect to?
17   A.    **No.**
18   Q.    What are your goals with respect to this
19   lawsuit?
20   A.    **Other than hopefully, you know, business**
21   **and people, you know, following the things that**
22   **continue to protect people's identity from being**
23   **stolen and creating problems for the individuals.**
24   Q.    Anything else?

31

1    A.    **No.**
2    Q.    I asked the reporter to mark as
3    Exhibit No. 2 a receipt which you had before you,
4    Mr. Thomas. Is that a receipt, copy of a receipt,
5    for a credit card transaction that you made at a
6    Ritz Camera Center store location?
7    A.    **Yes, it was.**
8         MR. KEOGH: And if I could interject for
9    one second, we previously produced this receipt and
10   produce it again today with the understanding that
11   it be kept confidential, that if anything is going
12   to be attached to the court records, the expiration
13   dates will be redacted. I believe Suzanne of your
14   office agreed to it. Eventually I'm sure we'll get
15   a protective order in place.
16        MR. WILLIAMS: I hope so. The only
17   information that you're receding confidentiality for
18   on the receipt is the expiration date, correct?
19        MR. KEOGH: That's correct.
20        MR. WILLIAMS: Well, that's our
21   agreement.
22   BY MR. WILLIAMS:
23   Q.    Mr. Thomas, let's talk about this
24   transaction and Ritz for a minute. Where did you

32

1    make a purchase from Ritz Camera?
2    A.    **Which location?**
3    Q.    Yes.
4    A.    **The Woodfield Shopping Center.**
5    Q.    And where is Woodfield Shopping Center?
6    A.    **Schaumburg, I believe, Hoffman Estates,**
7    **Schaumburg.**
8    Q.    And at the time that you made that
9    purchase, what's the date on that receipt?
10   A.    **December 20, 2006.**
11   Q.    December 20, 2006. Does that square with
12   your recollection of when you made the purchase at
13   the Woodfield Mall from Ritz?
14   A.    **Yes, it was just before Christmas.**
15   Q.    Is that a Ritz Camera location or some
16   other brand name?
17   A.    **I believe it's Ritz Camera.**
18   Q.    Okay.
19   A.    **Some of the chains here are called Wolf,**
20   **but I believe it was a Ritz Camera.**
21   Q.    And at that point in time, you were
22   living on Brookbank Road in Darien?
23   A.    **Yeah, if not Lemont. I think I bought**
24   **the house but I didn't move into the house right**

33

1  away. I was in Lemont for a while, actually through
2  the holidays because I did remodeling at the house
3  on Brookbank before moving into it, from my
4  recollection.
5      Q.   How far distance is Lemont from Woodfield
6  Mall in Schaumburg?
7      A.   25, 30 minutes, depending on traffic.
8      Q.   How many miles would you say?
9      A.   15 maybe, 20.
10     Q.   How far is Darien from Schaumburg?
11     A.   Probably close to the same, maybe a
12  couple miles less than that because it's from a
13  little different direction.
14     Q.   12, 15?
15     A.   15.
16     Q.   15 miles?
17     A.   Yep.
18     Q.   So what took you to the Woodfield Mall on
19  December 20?
20     A.   Christmas shopping.
21     Q.   Why that mall? Good news about Chicago
22  is there's a slew of malls.
23     A.   More selection, more stores in a shorter
24  amount of time running around.

34

1      Q.   So like me, you're not big on shopping if
2  you can avoid it?
3      A.   Yeah, especially around Christmas.
4      Q.   Okay. Had you shopped at that Ritz
5  location before?
6      A.   I believe I've been in and out of it. I
7  don't believe I bought anything at that specific
8  location before.
9      Q.   Have you bought anything there since?
10     A.   Not at that location.
11     Q.   The top line on that receipt, Exhibit 2,
12  makes reference to a Fuji Finepix. Do you see that?
13     A.   Yes, digital camera I purchased.
14     Q.   It has the notation and handwriting
15  returned?
16     A.   I returned it to a Ritz in -- I believe
17  it was Downers Grove for a different camera.
18     Q.   So if I understand, you purchased the
19  camera on this date, December 20, at the Ritz in
20  Schaumburg?
21     A.   Yes.
22     Q.   And there came a later time when you
23  returned that camera?
24     A.   Correct.

35

1      Q.   To a different Ritz store?
2      A.   To my knowledge, yeah.
3      Q.   And the store you returned it to was a
4  Ritz location in Downers Grove?
5      A.   Yeah, I believe so.
6      Q.   Approximately when did you return that
7  camera?
8      A.   I don't remember specifically. It was
9  around that time, shortly around that time.
10     Q.   So within a month or two after you bought
11  it?
12     A.   Less than a month probably.
13     Q.   Less than a month?
14     A.   Yeah.
15     Q.   And what caused you to return the Fuji
16  camera?
17     A.   I don't remember specifically whether it
18  was an option or didn't work or whatever and got a
19  different Fuji camera.
20     Q.   So when you returned it -- when you
21  returned the Fuji camera referred to on this receipt
22  to the Ritz Camera store in Downers Grove, in
23  exchange for that return you got another Fuji
24  camera?

36

1      A.   Correct.
2      Q.   Same model, different model?
3      A.   I don't recall. I don't have it anymore.
4      Q.   You no longer have the Fuji camera you
5  got and returned?
6      A.   Correct.
7      Q.   What happened to it?
8      A.   I don't remember specifically. I have
9  the box still. I ran across it not too long ago
10  actually. I think one of my kids borrowed it and
11  left it somewhere.
12     Q.   You mentioned you have a daughter. How
13  old is she now?
14     A.   She'll be 21 in July.
15     Q.   Congratulations. Do you have any other
16  children?
17     A.   A son, 16. That's it.
18     Q.   Any other children?
19     A.   No.
20     Q.   You returned that camera to a Downers
21  Grove location for Ritz. Have you shopped at the
22  Downers Grove location before that time?
23     A.   I don't believe so, afterwards buying
24  film, returning film, maybe a frame or something

37

1  like that.
2      Q.    So no prior transactions with that
3  Downers Grove store before you returned the Fuji
4  camera, but subsequently, more recently, you have
5  gone back to that Downers Grove Ritz location for
6  film imaging products?
7      A.    Not recently but probably within that
8  first year after buying that camera.
9      Q.    Have you been to any Ritz location more
10 recently than visiting the Downers Grove store?
11     A.    Not purchasing anything. I think I
12 looked at cameras for my mom back at Christmas this
13 past year, just looking at that location.
14     Q.    Downers Grove?
15     A.    Other locations, other Ritz Camera
16 locations.
17     Q.    When would you estimate was the last time
18 you were in the Downers Grove location and made a
19 purchase?
20     A.    Made a purchase, over a year ago. I
21 don't remember specifically. I think it would have
22 been to buy film from what I recall.
23     Q.    Could have been --
24     A.    I mean turning film in.

38

1      Q.    April 2007, May 2007?
2      A.    Could have been. I don't recall.
3  Obviously from my job, being in and around all over
4  places, it's hard to, you know, remember specific
5  times.
6      Q.    Are you a pretty avid photographer and
7  picture taker?
8      A.    I travel a lot so I take pictures when I
9  travel.
10     Q.    You don't?
11     A.    I do travel a lot so I take pictures when
12 I travel.
13     Q.    I'm sorry. So how many pictures would
14 you take in a year; hundred, 500, a thousand?
15     A.    Probably a couple hundred over the course
16 of a year.
17     Q.    Have you had them developed or printed
18 any other place other than Ritz?
19     A.    Oh, yeah.
20     Q.    Mr. Thomas, I'm going to ask that we take
21 a short break right now. I'm going to use the
22 restroom.
23     A.    Okay.
24     Q.    And then expect to resume in a few

39

1  minutes. I invite you to stand up, stretch, use the
2  restroom as well.
3          (WHEREUPON, a recess was had.)
4  BY MR. WILLIAMS:
5      Q.    Long shot. Your lawyer in the ATA case,
6  you mentioned his first name was Paul.
7      A.    I think maybe Paul Akin now.
8      Q.    A-k-i-n?
9      A.    A-k-i-n, I believe. Assoon as you were
10 starting to ask that again, it started to ring a
11 bell.
12     Q.    Okay. Thank you. I asked you about
13 Downers Grove but I'm not sure I asked you about
14 Schaumburg. Had you bought anything at the
15 Schaumburg Ritz Camera store before December 20,
16 2006?
17     A.    I don't believe so.
18     Q.    I want you to take me through that day,
19 that transaction as best you can remember it. When
20 you -- why did you go into the Ritz store in
21 Schaumburg that day, anything in particular you were
22 looking for?
23     A.    Just looking for a camera, and I know you
24 get the most selection at a camera shop than a Sears

40

1  or a different store.
2      Q.    Camera for yourself, camera for someone
3  else?
4      A.    It was for myself.
5      Q.    Any particular kind of camera you were
6  looking for?
7      A.    I think that was my first digital camera
8  purchase actually.
9      Q.    How long were you in the store?
10     A.    I don't recall specifically. Probably
11 picking it out and ringing it up and all that,
12 probably took 20, 20 minutes to get the description
13 on what it did.
14     Q.    Did you look at any other products, just
15 digital cameras?
16     A.    Yeah, I mean, that's all I was looking
17 for at that store.
18     Q.    And did you pretty much buy the first one
19 you saw or did you go through a process?
20     A.    I think actually from what I remember as
21 you're asking me this, as I came in, I parked and
22 walked through the Sears and happened to see one at
23 the Sears. And it kind of struck my interest to
24 check them out, coming up to the holidays, I never

4/15/2008

MARK EDWARD THOMAS

**41**

1   had a digital camera.  I saw them then and I went
2   into Ritz and looked at them.  And they had one on
3   sale and I purchased it.
4       Q.    And that particular Fuji model was on
5   sale?
6       A.    Well, they had other ones on sale, but
7   that was the one that struck me.  For whatever
8   reason, I decided to buy that one.
9       Q.    Okay.  Do you have any recollection of
10  the reasons?
11      A.    No, not specifically.  It seemed to do
12  everything I wanted it to do.
13      Q.    So after you picked it out, what happened
14  next?
15      A.    I would assume they rang me up.  And
16  after I knew what I was buying, I purchased it.
17      Q.    Did you have any particular conversation
18  with the cashier?
19      A.    Not that I can recall, other than
20  purchasing it.
21      Q.    Okay.  You tendered a Visa credit card
22  it says here.  Was it a Visa card?
23      A.    I believe so.  I don't recognize the last
24  four of the numbers.

**42**

1       Q.    I'm sorry.  You do --
2       A.    I said I do not recognize offhand the
3   last four to signify which company it's with.  It
4   could have been my credit union.
5       Q.    How many credit cards were you using at
6   that point in time, December '06, on a regular
7   basis?
8       A.    Probably two or three.
9       Q.    Was this the only Visa card or were they
10  all Visas?
11      A.    No, there was an American Express card in
12  there also and Visa.  I didn't have any Mastercards.
13      Q.    And at that point, you were doing most of
14  your banking with a particular credit union?
15      A.    Well, I mean, I had the credit union
16  through the fire department and I also had -- I
17  don't know what it was back then, First National,
18  Bank One, now currently Chase, which I have been
19  with for a period of time.
20      Q.    So one of your credit cards came from a
21  credit union?
22      A.    Yeah.
23      Q.    What was the name of the credit union?
24      A.    Illiana.

**43**

1       Q.    You better spell that.
2       A.    I-l-l-i-a-n-a, something like that,
3   Illiana Financial Credit Union.  I believe they're
4   based out of Calumet City, Illinois.
5       Q.    And where is the branch at which
6   you're --
7       A.    That was it at the time.  I mean, they
8   had a couple other branches that weren't
9   geographically close to me, I think in Bradley and
10  Chicago Heights.  And then they had one in
11  Naperville that they opened recently.  I think they
12  had one in Downers Grove for a period of time that's
13  closed up now.
14      Q.    And do you think your Visa card was with
15  the Illiana Credit Union?
16      A.    That one I would have to look back at a
17  statement to know for sure.  It was either that or
18  it could have been Chase or one of the other ones.
19      Q.    Okay.  And Chase has acquired the
20  Bank One?
21      A.    Like I said, it was First National Bank,
22  Bank One, Chase, all during the course of the --
23      Q.    Okay.  Do you remember if that was a
24  Visa?

**44**

1       A.    Yeah, it is a Visa logo on the cash
2   station card.
3       Q.    And then you have an American Express?
4       A.    Yeah.  Probably at that time also had a
5   Union Plus card which is also Visa.
6       Q.    What bank is that with?
7       A.    Union Plus is the name.  Don't ask for
8   the address because I don't know what it is.
9       Q.    Did you have any conversation with the
10  cashier when you checked out buying the camera?
11      A.    You asked me that.  I answered it as far
12  as the purchasing it and checking out, that was all
13  that I could recall.
14      Q.    Okay.  Did you examine your credit card
15  receipt at the time?
16      A.    I don't recall specifically.  If I did,
17  it could have just been to look at the amount at
18  that point in time.
19      Q.    And was the amount the correct amount?
20      A.    I would assume so or I would have said
21  something at that time.  I don't recall
22  specifically.
23      Q.    Did you have any conversation with
24  anybody at the store about the expiration date on

45

1  the credit card?

2      A.    No, not at that location.

3      Q.    At any time, regardless of the day, at

4  that location, did you have any conversation about

5  the expiration date on the credit card?

6      A.    No, not at all.

7      Q.    At the Downers Grove location, have you

8  had any discussion with any personnel at a Ritz

9  store about the expiration date on a credit card?

10     A.    No, not at any Ritz locations.

11     Q.    When you made purchases at the Downers

12  Grove Ritz store, did you use a credit card?

13     A.    When I made purchases, other purchases,

14  whenever I purchased them, I may have. I don't

15  recall specifically each transaction. I mean, if I

16  have cash on me, I pay with cash. If I don't have

17  cash with me, depending on the price, I may pull a

18  card out and may use a card. Whether it's American

19  Express or Visa, I don't recall specifically.

20     Q.    Have you saved any of your credit card

21  receipts from the Downers Grove Ritz store?

22     A.    I don't recall specifically. I don't

23  have one that I'm aware of at this point in time.

24     Q.    Do you have any kind of habit or custom

46

1  or practice with regard to saving your credit card

2  receipts, how long you save them?

3      A.    Generally I save them with all the travel

4  that I do for tax purposes obviously, general

5  practice I save my receipts.

6      Q.    And how long you save them, a couple

7  of years?

8      A.    Yeah, at least. Sometimes I'll thin them

9  down at some point in time, but generally speaking,

10  I usually save them for at least three years.

11     Q.    Any reason to think that you wouldn't

12  have saved any credit card receipts from the Downers

13  Grove Ritz location?

14     A.    Any reason I wouldn't have, as far as for

15  some reason I didn't have it, it accidentally got

16  thrown out in the bag, I mean, just general if I had

17  it in my pocket versus occasionally, you know, not

18  checking to make sure I have the receipt, but

19  nothing specifically.

20     Q.    Do you compare your receipts with your

21  credit card statements each month?

22     A.    Not as much as I probably should, but --

23     Q.    Pull up more studies.

24     A.    Well, I only say that because that's kind

47

1  of my job that I do, is checking balance and

2  accounting, and that's the only reason I preface

3  that.

4      Q.    You'll notice that, too.

5      A.    Practice what you preach. It's one of

6  those type things.

7      Q.    Do you have any recollection of

8  encountering any of the Downers Grove Ritz location

9  credit card slips --

10     A.    No.

11     Q.    -- on your statements?

12     A.    No. Actually tell you the truth, other

13  than asking me at this point, I never really thought

14  of that location to see if I had any receipts so it

15  is possible. I mean, I know it's possible since I

16  know I bought things before, but I know I have not

17  actively recalled that since you questioned me today

18  on it.

19     Q.    Okay. Have you purchased any products at

20  a Ritz Camera location or Wolf Camera location other

21  than the Schaumburg and Downers Grove stores?

22     A.    I'm sure at different times when I

23  traveled and sometimes got cameras, you know, photos

24  developed. I know I might have gone into one or

48

1  two, be it in Florida, California or wherever.

2      Q.    But no particular recollection?

3      A.    No. I know I've been into some and I

4  know at some point in time in my history, I remember

5  taking film in to get developed. I know once or

6  twice I brought them into a Ritz Camera location.

7      Q.    What about during 2007, any recollection?

8      A.    I don't recall specifically other than

9  the Downers Grove one.

10     Q.    During 2008?

11     A.    Possibly traveling I could have. Not

12  2008, no.

13     Q.    Going back to 2007, any particular

14  recollection come to mind of any particular Ritz

15  location other than Downers Grove or Schaumburg?

16     A.    No, not particular. I mean, like I said,

17  I do recall going to one, you know, in another state

18  somewhere to get film developed. It might have been

19  in '07, but I don't know. I have not checked my

20  records to know whether I have, if that's where

21  you're going with that question. And I may have

22  bought something over the years prior to '06

23  actually at the Orland Park location as I start to

24  think about that.

49

1    Q.    Orland Park?

2    A.    **Yeah, I believe that would have been**

3    **prior to '06 because that would have been more when**

4    **I was on the fire department and living out there.**

5    Q.    The credit card that you used, and let me

6    just review each of them, and the question is going

7    to be for each of these cards, is this a personal

8    card in your name.

9    A.    **They all are.**

10   Q.    The Illiana Credit Union credit card is

11   personal in your name?

12   A.    **Yes, all of them are.**

13   Q.    So the Chase Visa is personal in your

14   name?

15   A.    **Yes.**

16   Q.    The American Express credit card is

17   personal in your name?

18   A.    **Yes.**

19   Q.    And the Union Plus bank Visa is personal

20   in your name?

21   A.    **Yes.**

22   Q.    Is anybody else -- pardon me.  Was

23   anybody else besides yourself authorized to use any

24   of those four credit cards in December '06?

50

1    A.    **No, not then or any time.**

2    Q.    Your purchase of the camera -- strike

3    that.

4          Looking at Exhibit 2, what else did you

5    purchase at the same time as the Fuji camera from

6    Ritz in Schaumburg?

7    A.    **The 9.99 was a package -- I mean, I'm**

8    **sorry -- was a case.**

9    Q.    Okay.  This is the raki ridge black for

10   $9.99, that was a case for the camera?

11   A.    **Correct.**

12   Q.    And then the digital package?

13   A.    **That was not anything I selected.  That**

14   **was what they rang up with a promo package they had**

15   **at Christmas which they claimed was a $300 value**

16   **worth of coupons and school and stuff and training**

17   **classes and all bunch of stuff that I never actually**

18   **used anything.  And they rang it up and took it off**

19   **as a promotional item.**

20   Q.    So you were charged nothing for that

21   item?

22   A.    **No.  I mean, obviously they rang it up**

23   **and I even questioned it actually now that I think**

24   **of it, why they rang it up for $300, not knowing**

51

1    **that there was no way that it actually had a true**

2    **value of $300.**

3    Q.    What leads you to say it may not have had

4    a value of $300?

5    A.    **Because a coupon doesn't have a value**

6    **unless you use the coupon for a value.  It's just a**

7    **piece of paper.  So that was primarily all that was**

8    **in that package that was in there.  So that's my**

9    **interpretation of coupon.  It's no value until it's**

10   **tendered for some exchange of a monetary value or**

11   **value of something in exchange.**

12   Q.    But you received the coupons?

13   A.    **Yeah.**

14   Q.    Did you ever have occasion to use any of

15   them?

16   A.    **No, as I said before, I never even used**

17   **anything that was in there.**

18   Q.    Okay.  Do you recall any conversation

19   with anybody in the store other than the cashier?

20   A.    **No.**

21   Q.    Okay.  Did you make any notes after you

22   left that store about what happened at the store?

23   A.    **No.**

24   Q.    Okay.  Fine.  When you returned the

52

1    camera to the Downers Grove store, did you also

2    return the case?

3    A.    **I don't believe so.**

4    Q.    Okay.

5    A.    **Actually that posed -- that question just**

6    **posed.  Okay.  They only circled the one.  I might**

7    **have gotten -- you know, I don't know.  I don't**

8    **recall returning that, wherever it was, that I don't**

9    **know why that wasn't returned also because like I**

10   **said, I turned the camera in and I got one back in**

11   **exchange.  So I'm sure that replacement camera fit**

12   **into the case and that's why the case wasn't**

13   **returned also.**

14   Q.    Okay.  Possible.

15   A.    **Yeah.**

16   Q.    Is this your handwriting, the word

17   returned?

18   A.    **No, it's not.**

19   Q.    Is it a clerk from the Downers Grove

20   store?

21   A.    **Clerk from whichever store I returned it**

22   **to.  Like I said, I don't know for sure, but I think**

23   **it was Downers Grove that I returned it, but I don't**

24   **know specifically.  But it was the handwriting and**

4/15/2008

MARK EDWARD THOMAS

53

1  circling by a clerk.
2      Q.     When you returned the Fuji camera and got
3  a replacement camera, did you pay anything
4  additional?
5      A.     I don't recall. I would have to look
6  back at my receipts and find out. You're posing
7  questions that are bringing up additional questions
8  in my mind as far as that purchase.
9      Q.     Sorry, but it's my job.
10     A.     No, I'm just stating that I don't know.
11     Q.     I'm trying to just bring your memory back
12 with regard to the replacement of this camera, can
13 you recall, is it a nonfunctioning problem that led
14 you to replace it, was it something it just wouldn't
15 work?
16     A.     I don't remember specifically, as I
17 stated earlier.
18     Q.     Was it something you didn't like?
19     A.     As I stated earlier, I either brought it
20 back for the model, it wasn't doing what it was
21 supposed to do or it wasn't operable. I don't
22 recall what reason that I returned it and got one in
23 exchange for it.
24     Q.     And you were satisfied with the one you

54

1  got in exchange?
2      A.     Yeah, because I had it for however period
3  of time until it was -- whatever happened to it, it
4  vanished.
5      Q.     And you used --
6      A.     My kids.
7      Q.     -- it successfully?
8      A.     Yes.
9      Q.     In your complaint, Exhibit 1, there's a
10 paragraph No. 17 I would draw your attention to and
11 it says third page, and it reads Mr. Thomas is a
12 former victim of identity theft?
13     A.     Yes.
14     Q.     When did you realize that you had been a
15 victim of identity theft?
16     A.     A couple of years ago.
17     Q.     More precise?
18     A.     I don't remember specifically. It was a
19 couple of years ago, two, three years ago. I don't
20 recall specifically. I would have to look back at
21 my documentation and find out, but I had a courtesy
22 call from American Express and from the credit union
23 because of purchases that were out of state. And
24 also I received regularly, even prior to this,

55

1  credit management or whatever on my credit report
2  and obviously saw that after I was already informed
3  of it, but I saw the purchasing activity of somebody
4  fraudulently stealing my identity. And at a later
5  date, it was again stolen about a year later and
6  used again, a repetitive time.
7      Q.     Same card or replacement card?
8      A.     Same --
9      Q.     Same card as the --
10     A.     I don't recall specifically now which one
11 it was on. Again, it wasn't on -- it was identity
12 theft so it's not on a specific card. They took my
13 identity and went to Lowe's and they went to Home
14 Depot or whatever and made purchases. And actually
15 one of the occurrences, I believe it was the
16 Bridgeview Police Department caught somebody using
17 one of my cards and identity at one of the stores at
18 a Bridgeview location by Ford City, at which time I
19 was asked about that being pursued. I mean, I got
20 initial calls in regards to it and whether I was
21 willing to press charges, and I did and I never
22 heard anything back, whoever was doing the charges,
23 state attorney's office or whatever.
24     Q.     So you were willing to press charges and

56

1  you did but nothing --
2      A.     I said I did but nothing ever
3  materialized out of it. They told me they would
4  call back. And obviously at that point in time when
5  they caught the person that did it, they asked if I
6  give them any permission to do all that, all that
7  typical stuff over the phone. I never had to go
8  into -- I don't believe I went in to fill anything
9  out.
10     Q.     Okay. The date on the Ritz receipt,
11 Exhibit 2, is December 20, 2006?
12     A.     Correct.
13     Q.     The identity theft the first time was
14 before that?
15     A.     I don't remember specifically. I would
16 have to look back at my records to know exactly when
17 it was, which obviously won't be too difficult to
18 find because there were numerous purchases that were
19 made, both the first time and the second time that
20 it happened.
21     Q.     Back in 2006 did you have a shredder at
22 your home?
23     A.     Yes. I don't remember specifically when
24 I acquired one, but I did purchase a shredder

57

1   several years ago.
2       Q.    Before your identity theft or after?
3       A.    Oh, no, before. Again, part of what I
4   do, part of my jobs in the dealerships kind of
5   pertain to the Fair Credit Act to some extent and
6   some of the safeguard and safekeeping or
7   safeguarding, whatever that law is called, that as
8   far as proper documentation, driver's license,
9   things with Social Security numbers being shredded
10  in the location and stuff like that. So I become
11  abreast of those issues at that point in time from
12  my job.
13      Q.    What kind of documents do you shred at
14  your home that are personal documents, not business?
15      A.    Generally all the lousy credit card
16  applications that you keep getting in the mail, like
17  every single day you get one, those seem to be the
18  main ones. Other than that, just generally if I'm
19  going to be throwing out receipts, I shred those.
20  But like I said, I generally save my receipts.
21      Q.    For three years?
22      A.    Generally, yes, although my daughter is
23  starting to tell me dad, you don't need to keep all
24  these papers, you got to throw some of them out.

59

1   there is a specific location there on 95th Street.
2       Q.    And you wouldn't be surprised if I told
3   you there isn't?
4       A.    Not at all. Because I don't know if
5   that's Chicago even, 2200 on 95th Street. I think
6   it's closer to Evergreen Park.
7       Q.    That was what I thought.
8       A.    Only from my buddies on the Evergreen
9   fire department, I know kind of the location there.
10      Q.    That's where I was born.
11          MR. KEOGH:  I think most people know
12  Little Company of Mary.  My grandma lived on 87th
13  and California.
14          MR. WILLIAMS:  Yes.
15  BY MR. WILLIAMS:
16      Q.    Mr. Thomas, in this lawsuit, you complain
17  about a federal statute called FACTA for short, Fair
18  Accurate Credit Transactions Act, and it's an
19  amendment to the Fair Credit Reporting Act that you
20  just mentioned. When did you first become aware
21  that there was a statute dealing with expiration
22  date display on credit cards?
23      A.    I think it was brought up actually and
24  really didn't dawn on me effectively in February

58

1       Q.    In the complaint on the same page,
2   paragraph 20, it says you received a receipt from
3   Ritz that is a 2255 West 95th Street store in
4   Chicago. That statement is not correct?
5       A.    Yes. I don't know where that -- I didn't
6   recall seeing that there.
7       Q.    But it is correct that you did not get a
8   receipt from such a store?
9       A.    No, I don't know of any such store,
10  unless that -- well, I don't recall any of these
11  stores. I mean, one of the purchases that they had
12  found from that fraud case was at a 95th Street
13  address, one occurrence, and then also in
14  Bridgeview. Whether it's related or not, I don't
15  know, now that I see that. But I don't even recall
16  seeing that previous time that I read this as far as
17  the 95th Street address in Chicago. But as I'm
18  reading it now, I know there was one of those times
19  where they caught the guy in Bridgeview, but it also
20  pertained to some purchase on 95th Street in the
21  city. If there is such a location, I don't know.
22      Q.    You don't have a recollection of visiting
23  a Ritz store yourself on 95th Street?
24      A.    No, like I said, I don't even know if

60

1   when I was at the National Auto Dealers Convention
2   in Las Vegas. And I say I don't recall that because
3   when it was brought back up again this year at the
4   NADA convention in San Francisco, they referred to
5   last year talking about it, and I know I was in on
6   that class.
7       Q.    So you're referring to a class you
8   participated in on the subject of FACTA at the
9   National Auto Dealers Association annual convention
10  in Las Vegas, February 2007?
11      A.    Yes. I had to pause for the year, but
12  yes, it was February '07 was Las Vegas and possibly
13  even the year before, the first NADA I went to in
14  Orlando, but I don't recall going to any fair credit
15  reporting seminars at that point in time.
16      Q.    And after the February '07 class on FACTA
17  at the NADA convention in Las Vegas, when did you
18  first think about how it applied to you personally?
19      A.    Actually applied to me personally was
20  just in conversation with my cousin.
21      Q.    How did that --
22      A.    For whatever reason it just never dawned
23  on me, you know, even though I'm doing this for the
24  dealership and made sure the stores that I was at at

61

1  the time were not violating the FACTA law.
2      Q.    When was the conversation with your
3  cousin that you're just talking about?
4      A.    Within this year, maybe the end of last
5  year but the first part of this year, around
6  Christmas time I believe.
7      Q.    And this is Jeff Batterson?
8      A.    Yes.
9      Q.    And tell me about the conversation.  Who
10 else was in the conversation?
11     A.    Just him.  He just basically stated that,
12 you know.
13     Q.    What were you talking about?
14     A.    It reminded me of -- it reminded me of
15 the FACTA from the dealership side, you know, but I
16 never dawned on it from a personal standpoint of
17 looking at the receipts and that.
18     Q.    Were you in a store with him and looking
19 at a receipt?
20     A.    No, we were in a restaurant at dinner,
21 something like that.
22     Q.    Okay.
23     A.    I believe from what I remember he was
24 making -- he was picking up dinner and when he paid

62

1  for it, he had made mention of the receipts.  And he
2  looks for that at that point because whatever,
3  however, he learned of it prior to that to, you
4  know, keep an eye on it.
5      Q.    What business is he in?
6      A.    Currently I believe he's like an
7  investment banker.
8      Q.    And what was he before he was an
9  investment banker?
10     A.    Well, I mean, he's just doing that as far
11 as I know.  He was in college before that.  I can't
12 remember specifically what he was doing.  Over the
13 years I have seen him, many times with the holidays
14 as we grew up, we were second cousins and, you know,
15 in the recent years, we hung out a little bit more
16 often.  So I don't -- other than going to college
17 and I know he was down in -- he lived in the city
18 for a while and went and saw him once or twice down
19 there.  But other than that, I can't specifically
20 recall.
21     Q.    The two of you were in a restaurant early
22 this year, he's picking up the tab, looking at the
23 receipt and he makes a comment about the expiration
24 date, correct?

63

1      A.    Yeah.
2      Q.    Was the expiration date shown or not
3  shown on that tab?
4      A.    At that place I believe it was not shown,
5  yeah.
6      Q.    Okay.
7      A.    And that's where he said, you know, hey,
8  do you happen to check your receipts, you know, for
9  the expiration date being on there.  And I was like,
10 what are you talking about actually.  And then like
11 I said, when he started talking about it, then it
12 reminded me from, you know, the dealer application,
13 which that's just one small sliver of the fair
14 credit that affects a lot of the issues within my
15 job.  That it dawned on me and I started to be more
16 conscious that any time I purchase, I make purchases
17 and then also, you know, I happened to look back,
18 randomly through my receipts.  I didn't dig through
19 every single one, but I went through mine to see,
20 you know, if I had any at that time that, you know,
21 had that situation which led me to, you know, ask
22 him about it and learned of, you know, Keith at that
23 point in time.
24     Q.    Why did you go back through your prior

64

1  credit card receipts?
2      A.    Well, to see if I had any.  Because
3  again, after learning the hard way from identity
4  theft, you know, I don't take that, you know,
5  lightly.  I take that pretty seriously, especially
6  when it has inconvenienced me numerous times when I
7  would, you know, make any future purchases at this
8  point in time because I had to have the fraud alerts
9  put on each of my credit bureaus.  I've seen it in
10 issues where other people have had their identity
11 stolen that I've had to handle situations at
12 dealerships for, and when it personally happened to
13 me and I'm still to this day still feeling the
14 effects of it because it is on there.  So when you
15 go to buy a car or you go to make a home purchase or
16 whatever, they're questioning you like crazy whether
17 you're the real person or not.
18     Q.    Partly because of the reference on your
19 credit report that relates to the identity?
20     A.    Right.  Which I didn't have on there
21 prior to the identity theft, which even after it was
22 put on, somebody still managed to steal my identity
23 a second time after there was a fraud alert.  So
24 like I said, I don't take that lightly.

**65**

1    Q.    You said you went back through receipts
2  randomly.  Why didn't you go back through all your
3  receipts?
4    A.    From what I had seen handy there, I have
5  receipts in various places, I stumble across when I
6  pull out a folder and realize this is for remodeling
7  repairs that I did on the house, they're in a
8  separate folder, you know.  Then I keep general
9  receipts on a regular basis.  I started to come to a
10  point where I keep them kind of in envelopes based
11  on months in case I need to refer to something, but
12  when I do specific projects, I try to keep track of
13  what I spend on that.  Obviously with my travels and
14  different clients I work for I will have those
15  receipts filed by, you know, the work that
16  accompanies that client's job so I can get a true
17  and accurate track of the expense structure on that
18  job versus the income I've taken.  So that's what I
19  mean by it's different locations.  If I kept them
20  all in an envelope by each month that obviously
21  would have been easier.  But I don't keep every
22  single receipt in that filing system.
23    Q.    Did you keep the receipt that's Exhibit 2
24  in a file with any of your business?

**66**

1    A.    No, that would have been -- that was in
2  one of those monthly files.
3    Q.    Did you go through your monthly files for
4  personal receipts?
5    A.    No, the monthly is what I primarily
6  looked at.
7    Q.    And did you go through all of your
8  monthlies?
9    A.    What I had on my -- my regular monthly
10  stuff I have there.
11    Q.    So when you used the word randomly a few
12  minutes ago, you actually went through all of your
13  monthlies that you have retained?
14    A.    I randomly went through all of my
15  receipts, but I specifically went through my monthly
16  accumulation of receipts.
17    Q.    Personal rather than business?
18    A.    I have receipts in various locations
19  based on, as I just explained, whether it's home
20  repairs and home projects versus business projects
21  that are in different locations as you're
22  questioning me, those are locations that I have not
23  reviewed receipts that maybe it may have other
24  incidents on that.

**67**

1    Q.    And did you find receipts from retailers
2  other than Ritz that had an expiration date?
3    A.    Yeah, actually I even found one from in
4  Colorado where this year they had the entire credit
5  card number in addition to the expiration date for a
6  restaurant in Colorado this year.  Like I said, I'm
7  conscious of that at this point.
8    Q.    The receipt is from 2008?
9    A.    I'm sorry.  2007, I believe.  The last 12
10  months is what I meant when I said last year or this
11  current year.
12    Q.    All right.  So you found the Ritz receipt
13  from December 2006.  What did you do with it?
14    A.    Out of the receipts that I had found, you
15  know, in a brief recap, I had forwarded, you know,
16  copies of the receipts to the attorney's office and
17  had them review the receipts that I had questioned
18  as far as being possible violations of the FACTA
19  law, both in state and out of state.  Again, I
20  travel so there's numerous I have from other states
21  also.
22    Q.    How many receipts did you send to
23  Mr. Keogh's office?
24    A.    I would guesstimate around 15 or 20 that

**68**

1  had the, you know, limited number of digits listed
2  and the expiration date fully stated on the customer
3  copy.
4    Q.    And did you send him any receipts that
5  had more than five digits of the credit card number
6  printed?
7    A.    Possibly six or so but that one that I,
8  you know, recall recently was when I was reviewing
9  my bills and my business files for the tax year of
10  2007, that's where I had just saw that one for the
11  purchase at the restaurant in Colorado that had the
12  entire credit card number on the receipt.
13    Q.    Okay.  Did you send Mr. Keogh any
14  receipts other than Exhibit 2 from Ritz Camera
15  Centers?
16    A.    I don't believe so.
17    Q.    In your jobs as controller or other
18  similar positions with auto dealerships, what have
19  you done to assist the dealerships in compliance
20  with FACTA?
21    A.    Well, some policies and procedures,
22  again, the truncation is only a sliver of the issues
23  for the dealership, and I focus more in on driver's
24  license and Social Security numbers and credit aps,

69

1  that they're not left openly and freely and make
2  sure they are kept in a locked office, kept locked
3  up at night, do random audits, if you want to call
4  it that, like if I come in first thing in the
5  morning at the dealership, I'll scope the sales
6  department and see if I find any that are left out.
7  Then if I find any that are left out, I bring it to
8  the general manager.  Then we have a little
9  discussion with the individual that left them
10 unlocked and out in the open.
11     Q.    Appreciating as you've said that this is
12 a tiny sliver of the overall security related work
13 you were doing with the dealerships, did you take
14 steps to make sure the point of sale printers for
15 credit card receipts at the dealerships were
16 compliant?
17     A.    Yeah, at different times when I recalled
18 it, yes, I did, and they were.  So I can't tell you
19 what I would have done if I found that they weren't.
20 They were in each of the situations that I reviewed.
21     Q.    Were you responsible for changing the
22 software or hardware to make it compliant?
23     A.    No.  Again, they all were from any time
24 that I looked at that so we didn't need a change.

70

1      Q.    Have you at the time of a transaction
2  with a credit card brought it to the attention of
3  any merchant that their credit card receipt was not
4  in compliance?
5      A.    I don't remember specifically.  I think
6  once or twice I may have brought that to somebody's
7  attention at a restaurant, but I don't recall at
8  this time specifically where or when it was.  My
9  tendency leads me to believe it was in Hawaii.
10     Q.    When about would that have been?
11     A.    I think this year -- well, it wasn't this
12 year.  It was actually last year, March of '07.  I
13 was doing work out there.
14     Q.    About a month after the convention in
15 Las Vegas?
16     A.    Actually not even because that's part of
17 my routine I kind of done the last couple of years.
18 I do the NADA convention and then I go out to Hawaii
19 after that for vacation and for work the last two
20 years in a row.
21     Q.    So it was fresh in your mind?
22     A.    Exactly.
23     Q.    So you had a situation in Hawaii.  You go
24 to a restaurant.  They printed out something they

71

1  shouldn't have printed out on the credit card
2  receipt and you brought it to their attention?
3      A.    Specifically whether it was that time I
4  don't recall, but I do remember one time that I did
5  bring it to -- ask for a manager and I brought it to
6  their attention, and I think it was in Hawaii.
7      Q.    And you got home after that and it didn't
8  register with you to take a look at your credit card
9  receipt at that time?
10     A.    In March of '07?
11     Q.    Right.
12     A.    I don't -- not that I know of.  I mean,
13 actually I didn't get back into Chicago until April
14 actually of '07 and went on to my next job and
15 didn't look at those receipts until the later period
16 of time.  But actually that could have been actually
17 this year now that I think of it because I don't
18 recall -- I don't know.  I know it was within the
19 last time after this -- as I brought up before, you
20 know, my years don't tend to solidify all together
21 so it actually was probably this year when I was in
22 Oahu because it was after this filing of this issue.
23     Q.    After the complaint was filed?
24     A.    Yes, so obviously it was in 2008 and not

72

1  2007.  And this was fresh in my mind.
2      Q.    This being Exhibit 1, the complaint?
3      A.    This, yes, knowing there was a situation
4  that was there that again, you know, businesses had
5  greater than a year to already start to get to a
6  point of correcting these issues.  And it was
7  because San Francisco was where it was brought up
8  again in the NADA convention again, that was the
9  truncation issue was brought up specifically.
10     Q.    And the San Francisco convention was
11 which year?
12     A.    2008, just a few months ago.
13     Q.    After the Las Vegas convention, 2006 --
14     A.    2007.
15     Q.    You told me Orlando was 2007.
16     A.    Orlando was '06.
17           MR. KEOGH:  I think you're misstating the
18 record.  I think he did state '06 for Orlando.
19           MR. WILLIAMS:  Maybe I got it wrong.
20           THE WITNESS:  Because Orlando in '06 was
21 actually prior to the law because I believe the law
22 took effect sometime in the end of '06.  I was only
23 making reference of Orlando as one of the
24 conventions I went to.

**73**

1  BY MR. WILLIAMS:
2      Q.    Did the effective date of FACTA in
3  December of '06 come to your attention at or about
4  that time as part of your job?
5      A.    I think a little bit where I was at and
6  what I was doing at that point in time, I believe
7  December of '06 I was not working at the dealership
8  specifically and I didn't start working -- yeah, I
9  was off that -- part of November, into December and
10  didn't take a first job until January of '07.
11      Q.    And which job was that in January of '07?
12      A.    Since I came back from Colorado, just
13  doing consulting work.  I wasn't employed there, and
14  in January, I started to work at Fletcher Jones
15  part-time for a period of seven months here in
16  Chicago as again an independent contractor.  None of
17  those places I was on the payroll as an employee.  I
18  worked for myself.  One of the plus sides of being
19  self-employed is I didn't have to work during the
20  holidays so I was able to spend time with my kids
21  when they were off for school.
22          MR. KEOGH:  Hopefully I'll find that as a
23  part of my being self-employed.
24          THE WITNESS:  I can't lie.  The fire

**74**

1  department makes it a little bit easier to do when
2  they cover my benefits.  Then I don't have to stay
3  full-time to have insurance benefits.
4          MR. KEOGH:  Just a reminder, there's no
5  question pending.
6  BY MR. WILLIAMS:
7      Q.    Using the NADA conventions as kind of
8  time markers, you've now told me February '06 is
9  Orlando and February '07 is Las Vegas and
10  February '08 is San Francisco?
11      A.    Correct.
12      Q.    There first identity theft, is it before
13  Las Vegas, is it before Orlando?
14      A.    I don't recall.
15      Q.    The second identity theft, is it before
16  Las Vegas or before Orlando?
17      A.    Again, I don't recall specifically when
18  it was.
19      Q.    I'm trying to get the best you got.
20      A.    I don't know.  I would have to look back
21  at my records.  I didn't know that was going to be a
22  point of reference that I would need to know the
23  fact for.  I don't recall right now as you're
24  questioning me when it was.

**75**

1      Q.    What records would you look at?
2      A.    Well, numerous records.  Obviously I
3  filed and I saw my credit report that there were all
4  these credit cards that were opened so I retained
5  those records.
6      Q.    Do you have that in a particular file or
7  folder?
8      A.    In my credit file folder, where
9  periodically I get credit reports.  Plus I had to
10  fill out a form to send in for, what is it, Citibank
11  credit protection, whatever, that they file the
12  thing.  So I would have a point of reference at that
13  point in time of filing.
14      Q.    Okay.
15      A.    On the first occurrence.  Now, that
16  second one when they caught the guy and all that, I
17  don't know offhand what date that was, although
18  probably on the report there would be a card that
19  was opened and closed during that time due to fraud.
20      Q.    And do you have any documents from that
21  time relating to your conversation, Bridgeview
22  police?
23      A.    My credit files I keep as I get them for
24  numerous reasons, but obviously so I could look back

**76**

1  at the files because I do keep those.
2      Q.    Okay.  Would it be fair to say that you
3  were aware of the requirement of FACTA that's
4  printed in paragraph 2 of your complaint as of the
5  class at Las Vegas in February '07?
6      A.    No, not specifically.  I know it was
7  brought up again this year in San Francisco.
8      Q.    Okay.
9      A.    And I only make reference that it could
10  have been brought up in Las Vegas because one of the
11  classes that I took had to do with safeguarding.
12      Q.    Credit?
13      A.    You know, whatever that -- they call it
14  from the dealership side, safekeeping something.  I
15  can't remember the name of it.  But that was the
16  name of that class and obviously that might have
17  been one -- again, I could tell you if I had to look
18  up the records because I do save that material as
19  the handout that I could reference to to see whether
20  it was, in fact, in that packet that I got.  But
21  whether it was covered in the class, I would have to
22  acquire the tape that was presented.
23      Q.    So if there was a handout from the
24  Las Vegas, Nevada NADA class, you would likely have

77

1  retained it?
2      **A.    Yeah.  It doesn't mean I recall that I**
3  **actively went and reviewed that at that point in**
4  **time at places I was working.**
5      Q.    After your identity was stolen for the
6  first time, did anybody counsel you on things you
7  might do to better protect your identity?
8      **A.    Well, they mail you brochures and**
9  **information or booklets and then through a general**
10  **conversation on the phone.**
11      Q.    And who?
12      **A.    I think it's sponsored by Citibank.**
13      Q.    Okay.
14      **A.    Again, I have that file if I had to pull**
15  **it out because it came in a brochure that I use as a**
16  **file.**
17      Q.    And was there any reference in that
18  counseling to truncation of information on credit
19  card receipts?
20      **A.    I don't recall.**
21      Q.    Do you recall being sensitive to looking
22  at credit card receipts after that time?
23      **A.    For that specifically, I don't recall.**
24      Q.    Okay.

78

1      **A.    That it was brought up.**
2      Q.    Basically the first time it kind of
3  flashed in your mind to think about it for yourself
4  was your conversation with Jeff?
5      **A.    When my cousin brought it up, yes.**
6      Q.    And that was early in 2008?
7      **A.    Well, either December of '07, whatever it**
8  **was, yeah, in or around that time.**
9      Q.    The complaint, Exhibit 1, makes reference
10  to various statements and publications.  Let me ask
11  you to turn to page -- well, paragraph 38.  And
12  you'll see there's a reference to comments by the
13  CEO of Visa U.S.A. on March 6, 2003.  Do you see
14  that?
15      **A.    Yeah, I see that.**
16      Q.    Is that information you provided to
17  Mr. Keogh?
18      **A.    No.**
19      Q.    Is that information you yourself came
20  across?
21      **A.    No.**
22      Q.    That's information that Mr. Keogh has
23  located?
24      **A.    I would assume so.**

79

1      Q.    You haven't?
2      **A.    No.**
3      Q.    Okay.  Paragraph 39 refers to Mastercard
4  and American Express announcing certain requirements
5  within 24 hours.  Do you see that?
6      **A.    Hold on one second.**
7      Q.    Paragraph 39.
8      **A.    Can you restate the question again, what**
9  **are you asking?**
10      Q.    Did you provide the information about
11  that to Mr. Keogh?
12      MR. KEOGH:  I just want to caution you,
13  anything you told me or I told you is privileged and
14  I'll instruct you not to answer.  If maybe you can
15  rephrase the question.
16      MR. WILLIAMS:  I'll be happy to.
17  BY MR. WILLIAMS:
18      Q.    Before reading it in a complaint, had you
19  been familiar with that statement?
20      **A.    Not specifically that I could recall.**
21      Q.    Did you have any information about
22  Mastercard or American Express requirements on
23  merchants?
24      **A.    Not specifically.**

80

1      Q.    The paragraph 41 makes reference to an
2  August 12, 2006 edition of rules for Visa merchants.
3  Do you see that?
4      **A.    I see that.**
5      Q.    Back in August of 2006, were you aware of
6  rules for Visa merchants?
7      **A.    Not that I can recall.**
8      Q.    The paragraph 42 refers to contracts
9  requiring compliance for Visa.  Have you, before the
10  lawsuit was filed, reviewed anybody's contracts with
11  Visa, any merchant contracts with Visa?
12      **A.    Well, what do you mean Visa specifically?**
13  **Merchant contracts as far as agreements for**
14  **dealerships I review but not as far as their**
15  **regulatory responsibilities.  They don't cover any**
16  **merchant contract.**
17      Q.    Have you reviewed merchant contracts with
18  credit card processors such as Visa or American
19  Express?
20      **A.    From what point in time?**
21      Q.    Before 2007.
22      **A.    Before 2007?**
23      Q.    Yeah.
24      **A.    Well, yeah, because one of my duties**

81

1 would be to limit the expense of the dealership for
2 what they would be paying.
3    Q.    Okay.
4    A.    But I don't read -- I read the contract
5 for what the charge is, not for what the guidelines
6 are spelled out on regulatory issues.
7    Q.    Did you -- in the course of your work
8 with dealerships, did you receive manuals or
9 newsletters from Visa or American Express about
10 their rules or their changes to rules?
11    A.    I might have, but that's not my regular
12 job description.
13    Q.    And does that mean you did or didn't look
14 at them?
15    A.    No, I would not have looked -- that would
16 not have been -- I would have looked and said okay,
17 you're paying 3 percent on Visa, Mastercard, you
18 could pay less than that and request a quote from
19 the company for that. And that would be the extent
20 of what I would do at that point in time.
21    Q.    And if there were information on other
22 credit card receipt related subjects in that mailer
23 or manual or whatever from Visa or American Express,
24 you wouldn't have paid particular attention to that?

82

1    A.    No, my extent of what I would look at
2 would be primarily for the fee structure the
3 processors are charging the business that I assess.
4    Q.    Paragraph 43 refers to a manual by
5 American Express. Prior to 2007, do you recall ever
6 seeing the manual from American Express for credit
7 card processing?
8    A.    Not from American Express, no.
9    Q.    Paragraph 45 refers to a statement before
10 Congress by Mr. Fischer of Visa U.S.A. Were you
11 familiar with that statement before 2007?
12    A.    No, not until seeing it in this document.
13    Q.    Paragraph 46 refers to an early 2006
14 edition of a handbook published by the Office of
15 Thrift Supervision in the Treasury Department.
16 Prior to 2007, had you seen that handbook?
17    A.    No.
18    Q.    Paragraph 47 refers to website
19 information from Heartland Payment Systems, Inc.
20 Have you ever done business with Heartland Payment
21 Systems, Inc.?
22    A.    Not specifically that I can recall.
23    Q.    Have you ever looked at the Heartland
24 Payment Systems website?

83

1    A.    Not specifically that I can recall.
2    Q.    Paragraph 49 refers to Commerce Bank, a
3 credit card processor, and merchant compliance
4 awareness notices in 2004. Do you see that?
5    A.    Uh-huh.
6    Q.    Prior to 2007, had you become aware of
7 any of these merchant compliance awareness notices
8 from Commerce Bank?
9    A.    Not specifically.
10    Q.    When you say not specifically, do you
11 have any recollection at all?
12    A.    To what, Commerce Bank?
13    Q.    Yes.
14    A.    Not specifically to Commerce Bank sent
15 merchant compliant awareness, quote, unquote, no, I
16 don't specifically.
17    Q.    Do you even have a general recollection
18 that you saw them?
19    A.    No.
20    Q.    Paragraph 50 refers to restaurant and
21 retail trade associations and in particular to the
22 newsletter in 2005 of the Virginia Retail Merchants
23 Association. Do you see that?
24    A.    Yes.

84

1    Q.    Have you ever seen publications of the
2 Virginia Retail Merchants Association?
3    A.    No.
4    Q.    Paragraph 51 refers to the National
5 Association of Convenience Stores magazine in 2003.
6 Have you ever seen that magazine?
7    A.    No.
8    Q.    Paragraph 52 refers to the Food Industry
9 Advisor newsletter of April 2005. Have you ever
10 seen that newsletter?
11    A.    No.
12    Q.    It also refers to appearance of the same
13 article in the National Association of Convenience
14 Stores magazine from 2005. Have you ever seen that?
15    A.    No.
16    Q.    Paragraph 53 refers to the Connecticut
17 Restaurant Association newsletter in spring 2004.
18 Have you ever seen that document?
19    A.    No.
20    Q.    Paragraph 54 refers to the Wisconsin
21 Restaurant Association credit card transaction alert
22 document. Have you ever seen that document?
23    A.    No.
24    Q.    Paragraph 55 refers to the Massachusetts

85

1  Restaurant Association newsletter from January 2005.
2  Have you ever seen that document?
3      A.    No.
4      Q.    Paragraph 56 refers to the Ohio
5  Restaurant Association and Oklahoma Restaurant
6  Associations. Have you seen any newsletters or
7  publications of those two organizations?
8      A.    No.
9      Q.    Paragraph 57 refers to the 2000 -- March
10 and April 2006 edition of the Ohio Independent
11 Automobile Dealers' Association Dealer News
12 Magazine.
13     A.    No.
14     Q.    Pardon me. Let me ask you the question.
15 Have you ever seen that document?
16     A.    No.
17     Q.    Thank you. Paragraph 57 also says this
18 article appeared in the March/April edition of the
19 West Coast Independent Automobile Dealer News. That
20 would be 2006. Did you see that?
21     A.    No.
22     Q.    Paragraph 58 refers to the Independent
23 Insurance Agents & Brokers of America report to
24 members in 2005. Have you ever seen that document?

86

1      A.    No.
2      Q.    Paragraph 59 refers to the Compliance
3  Challenge from 2004 published by Credit Union
4  National Association News. Have you ever seen that
5  document before?
6      A.    No.
7      Q.    Paragraph 60 refers to the PT Bulletin
8  newsletters of the American Physical Therapy
9  Association from 2003. Have you ever seen that
10 document?
11     A.    No.
12     Q.    Paragraph 63, 64, 65, 66 and 67 provide
13 information about the individual digits of a credit
14 card number. Prior to 2007, were you familiar with
15 the information that's contained in these
16 paragraphs, that is what the significance of a given
17 digit in a credit card number is?
18     A.    The only ones, I knew the first several
19 letters signified Visa or Mastercard, you know,
20 started with a 4 or 5 from years back in banking,
21 but nothing specific on the remaining numerals'
22 locations.
23     Q.    Prior to your talking with Mr. Keogh
24 professionally earlier this year, did you have any

87

1  information concerning Ritz's efforts at compliance
2  with FACTA?
3      A.    Did we have any -- I'm sorry?
4      Q.    Did you have any information concerning
5  Ritz Camera stores' compliance with FACTA?
6      A.    No.
7      Q.    Anything about their efforts?
8      A.    No.
9      Q.    Anything about whether there came a time
10 when they were not printing expiration dates on
11 receipts?
12     A.    No.
13     Q.    Did you, before talking with Mr. Keogh
14 professionally in early 2008, yourself do any
15 investigation or inquiry with respect to Ritz
16 practices on the printing of expiration dates on
17 credit cards?
18     A.    No.
19     Q.    You've mentioned that you've dealt with
20 Mr. Keogh on telephone conversations, among other
21 things, between the beginning of '08 and today in
22 connection with this lawsuit. How many telephone
23 conversations would you say you've had?
24     A.    Three or four, four or five, something

88

1  like that.
2      Q.    And of those three to five telephone
3  conversations, how long would you estimate the
4  longest one was?
5      A.    Very short, primarily just to centralize
6  where and when I'm in town to set up the appointment
7  for the deposition.
8      Q.    Would you estimate that each of those
9  five conversations, if there were that many, took
10 ten minutes or less?
11     A.    Yeah.
12     Q.    You've communicated with Mr. Keogh by way
13 of e-mail you've said?
14     A.    Uh-huh.
15     Q.    Roughly how many e-mails would you say
16 you've sent to him?
17     A.    That I have sent to him? In response to
18 questions that he's asked as far as, you know,
19 copies of receipt or we need a better legible copy.
20     Q.    Okay. Have you sent -- have you
21 initiated any e-mails to Mr. Keogh where you were
22 not responding to his question, you were doing
23 something?
24     A.    Not that I can recall specifically.

89

1    Q.    Other than the complaint, have you
2  reviewed any other documents in this lawsuit before
3  they were filed in court?
4    A.    **Have I reviewed any documents prior to**
5  **them being filed?**
6    Q.    Right.
7    A.    **Yeah, the initial report prior to being**
8  **filed, I believe he forwarded me and I read it to**
9  **make sure I didn't have any comments or questions in**
10 **regards to it.**
11   Q.    How about any later documents?
12   A.    **After the filing, I believe I got a copy**
13 **of it, also.**
14   Q.    Okay.  Let me be clear.  After the filing
15 of Exhibit 1, the complaint in this case, Mr. Keogh
16 has filed other papers in the lawsuit?
17   A.    **Correct.**
18   Q.    Have you seen any of those papers in
19 draft form before they were filed with the court?
20   A.    **I don't remember specifically.  I know I**
21 **got a set before and I got a set through you**
22 **afterwards.**
23   Q.    Of the complaint?
24   A.    **Yeah.**

90

1    Q.    Okay.
2    A.    **And I didn't print them to look to see**
3  **whether they could have been specifically the same.**
4  **I don't know.**
5    Q.    Have you been in touch with any other
6  persons who might be members of the class that
7  you're seeking to represent?
8    A.    **No.**
9    Q.    Do you know of any other persons who are
10 members of the class you're seeking to represent?
11   A.    **No.**
12        MR. WILLIAMS:  I don't think I have any
13 further questions at this time.  I thank you very
14 much for your patience.
15        THE WITNESS:  Thank you.
16        MR. KEOGH:  And I have no questions.
17        THE COURT REPORTER:  Signature?
18        MR. WILLIAMS:  I don't know what your
19 practices are in this.  We ask the transcript, the
20 original would be sent to Mr. Keogh and he were to
21 arrange with his client for it to be reviewed and
22 signed.  And if it hasn't been signed within 30 days
23 of receipt, it may thereafter be used without
24 signature as if it had been signed.

91

1        MR. KEOGH:  It's the same procedure here.
2        MR. WILLIAMS:  Fine.  May we stipulate to
3  that?
4        MR. KEOGH:  If you want better, I know
5  you have a deadline for classification coming soon.
6        MR. WILLIAMS:  Yes.
7        MR. KEOGH:  I think, you know, you're
8  free to use it pending, you know, our reading and
9  obviously --
10        MR. WILLIAMS:  Thank you.
11        MR. KEOGH:  -- I can't imagine much being
12 changed.  If it will be, we'll bring it to your
13 attention before bringing it to the Court's
14 attention.
15        MR. WILLIAMS:  Thanks very much, Keith.
16        MR. KEOGH:  Sure.
17        MR. WILLIAMS:  I know it won't surprise
18 you, I hope it doesn't come as a shock to your
19 client, but I am going to ask you for the production
20 of the documents that he's made reference to today
21 in connection with any of the Ritz receipts and in
22 connection with any documents related to the
23 identity theft and in connection with the
24 conferences he attended on the FACTA subject at the

92

1  NADA, if he has any handouts from those things.
2        MR. KEOGH:  For the most part, I mean,
3  obviously there has been no document production.
4  And some of it is irrelevant, especially since he's
5  not seeking actual damages.  We'll make our
6  objection.  I don't foresee withholding any
7  documents.  I think it will just be easier to
8  produce them.
9        MR. WILLIAMS:  Fine.  Thanks.
10        MR. KEOGH:  We will want the protective
11 order, especially if there are credit records being
12 produced.  We can work that out.
13        MR. WILLIAMS:  We can work that out, but
14 yes, I agree, we're certainly going to want to treat
15 those confidential.
16        MR. KEOGH:  Yes.
17        FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23
24

93

1        IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

4   MARK THOMAS, individually    )

5   and on behalf of all others    )

6   similarly situated,          )  No. 08 C 453

7          Plaintiff,            )

8      vs.                       )

9   RITZ CAMERA CENTERS, INC., )

10         Defendant.            )

11       I hereby certify that I have read the

12  foregoing transcript of my deposition given at the

13  time and place aforesaid, consisting of Pages 1 to

14  92, inclusive, and I do again subscribe and make

15  oath that the same is a true, correct and complete

16  transcript of my deposition so given as aforesaid,

17  and includes changes, if any, so made by me.

18

19           MARK EDWARD THOMAS

20  SUBSCRIBED AND SWORN TO

21  before me this      day

22  of          , A.D. 200  .

23

24       Notary Public

94

1        CERTIFICATE OF OFFICER

2

3       I, KELLY M. FITZGERALD, a Certified

4   Shorthand Reporter, CSR No. 84-4318, of the State of

5   Illinois, do hereby certify:

6       That previous to the commencement of the

7   examination of the witness herein, the witness was

8   duly sworn to testify the whole truth concerning the

9   matters herein;

10      That the foregoing deposition transcript

11  was reported stenographically by me, was thereafter

12  transcribed under my personal direction and

13  constitutes a true, complete and correct record of

14  the testimony given and the proceedings had;

15      That the said deposition was taken before

16  me at the time and place specified;

17      That the reading and signing by the

18  witness of the deposition transcript was agreed upon

19  as stated herein;

20      That I am not a relative or employee or

21  attorney or counsel, nor a relative or employee of

22  such attorney or counsel for any of the parties

23  hereto, nor interested directly or indirectly in the

24  outcome of this action.

95

1       IN WITNESS WHEREOF, I do hereunto set my

2   hand at Chicago, Illinois, this 17th day of April

3   2008.

4

5

6       KELLY M. FITZGERALD, CSR, RMR, CRR

7       CSR No. 84-4318.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

96

1              I N D E X

2   WITNESS                EXAMINATION

3   MARK EDWARD THOMAS

4     By Mr. Williams          3

5

6

7

8          E X H I B I T S

9   NUMBER             MARKED FOR ID

10  Thomas Exhibit

11    Nos. 1 & 2              3

12

13

14

15

16

17

18

19

20

21

22

23

24

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK THOMAS, individually and on behalf of all others similarly situated, | ) ) ) | No. 08 CV 453 |
| | ) | Judge Guzman |
| Plaintiff, | ) ) | |
| | ) | Magistrate Judge Cole |
| v. | ) ) | JURY DEMANDED |
| RITZ CAMERA CENTERS, INC., | ) ) | |
| Defendant. | ) ) ) ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST DISCOVERY REQUESTS

## REQUESTS FOR ADMISSION

## REQUEST FOR ADMISSION NO. 1:

Defendant became aware of FACTA on or before December 4, 2006.

## OBJECTION TO REQUEST FOR ADMISSION NO. 1:

Request No. 1 is ambiguous as to the meaning of "became aware of"

and as what aspects or elements of FACTA the Request is directed to.

## RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Defendant admits that, prior to December 4, 2006, it understood that a

federal law dealing with credit card numbers had been enacted, but

1

settlement services providers), VeriSign, Inc. (Defendant's PCI consultant/auditor), Datavantage Corporation (Defendant's POS software system upgrade contractor) and Matthew Edmonds (Consultant to Defendant with respect to liaison with Chase Merchant Services LLC/First Data, American Express and credit card companies).

## INTERROGATORY NO. 5:

Identify and provide the number for all persons to whom defendant provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person credit card or debit card number, and/or (b) the expiration date of the person's credit or debit card.

## OBJECTION TO INTERROGATORY NO. 5:

This Interrogatory is ambiguous as to "identify"; further, it seeks information private to individual customers of Defendant, which Defendant cannot produce without an appropriate Protective Order in place herein; finally, it is oppressive and burdensome in that the information it seeks is contained in documents whose production may be sought, rather than requiring a separate listing in response to this interrogatory..

**RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiving the foregoing objection to this Interrogatory, Defendant responds that between December 4, 2006 and April 9, 2007, at Ritz Camera Centers Inc. retail locations in Cook County, Illinois, in credit card and debit card transactions, Ritz Camera Centers Inc. printed 75,000 receipts which displayed the expiration dates of a person's credit card or debit card and printed no receipts which displayed more than five digits of a person's credit card or debit card.

**INTERROGATORY NO. 6:**

State how and when you first learned of FACTA's expiration date and credit card number truncation requirements, and identify what steps and/or procedures you took in order to prevent credit card expiration dates or more than five digits of the card number from being printed on receipts. Include the date the step was taken, the person(s) who decided to lake the step, the person(s) who performed the step and how the step altered defendant's practices.

**RESPONSE TO INTERROGATORY NO. 6:**

In April 2005 Defendant commenced implementing coding changes for its Point of Sale ("POS") software in order to comply with VISA CISP

Illinois; further Defendant objects that the information sought would invade the privacy interests of consumers and will not be produced absent the approval and entry by the court of a Protective Order; finally, Defendant objects this request is oppressive and unduly burdensome with respect to electronic data and archived files and is ambiguous and overbroad in seeking "all documentation concerning" without further specification.

## RULE 34 REQUEST NO. 21:

All job descriptions for every person whose duties included monitoring laws to ensure that defendant was in compliance with laws applicable to credit card transactions during 2007.

## RESPONSE TO RULE 34 REQUEST NO. 21:

Subject to and without waiving the General Statement of Objection incorporated herein by reference, Defendant will make all non-privileged documents responsive to the request in its possession, custody or control available for copying at a time mutually agreeable to the parties.

Dated: April 2, 2008

HOLLAND & KNIGHT LLP
Richard T. Williams

By _____

Richard T. Williams

48

## VERIFICATION

I have read the foregoing document titled **DEFENDANT RITZ CAMERA CENTERS, INC.'s RESPONSE TO PLAINTIFFS' REQUESTS FOR ADMISSIONS, INTERROGATORIES AND REQUESTS FOR PRODUCTION** and know its contents. I am the Vice President of Logistics and IT and a duly authorized representative of Defendant Ritz Camera Centers, Inc. Apart from matters known to me of my personal knowledge, the matters stated in the foregoing document are based upon the investigation by Ritz Camera Centers, Inc. and by its representatives, and I believe such matters to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 2, 2008 at _Beltsville, Maryland_.

By: _____

Robert O'Hern

49

<u>Mark Thomas v Ritz Camera Centers, Inc.</u>
USDC–Northern District of Illinois, Case No. 08 CV 453

<u>PROOF OF SERVICE</u>

State of California          )
                             )        ss.
County of Los Angeles  )

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 633 West Fifth Street, 21st Floor, Los Angeles, California 90071.

     On **April 2, 2008**, I served the document described as **DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST DISCOVERY REQUESTS** on the interested parties in this action, enclosed in a sealed envelope, addressed as follows:

> Keith J. Keogh  (<u>keith@keoghlaw.com</u>)
> Alexander H. Burke  (<u>ABurke@Keoghlaw.com</u>)
> Law Offices of Keith J. Keogh, LTD.
> 227 West Monroe Street, Suite 2000
> Chicago, IL  60606
> (312) 726-1092
> (312) 726-1093 - Fax

**X**      **(By Mail)**

Following ordinary business practices, I placed the document for collection and mailing at the offices of Holland & Knight LLP, 633 West Fifth Street, 21st Floor, Los Angeles, California 90071, in a sealed envelope.  I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service, and, in the ordinary course of business, such correspondence would be deposited with the United States Postal Service on the day on which it is collected at the business.


     **AND**


**X**      **(By Electronic Mail)**

Following ordinary business practices, I electronically mailed an electronic copy of the documents referenced to the respective E-Mail addresses, where applicable.  This email originated from the address of <u>richard.williams@hklaw.com</u>.


I declare under penalty of perjury under the laws of the United States that the above is true and correct and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

     Executed on April 2, 2008, at Los Angeles, California.

_____
Richard T. Williams