# Exhibit 8
# Unpublished Cases

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

**H**
Hamilton v. O'Connor Chevrolet, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Deborah and Kwanza HAMILTON, Plaintiffs,
v.
O'CONNOR CHEVROLET, INC., Defendant.
**No. 02 C 1897.**

June 12, 2006.

*MEMORANDUM OPINION AND ORDER*

FILIP, J.
*1 Plaintiffs, Deborah and Kwanza Hamilton ("Plaintiffs or "the Hamiltons"), purchased an automobile from Defendant, O'Connor Chevrolet, Inc. ("Defendant" or "O'Connor"), and brought suit regarding that transaction under various federal and state statutes. (D.E. 26 (the operative complaint, also "Second Amended Complaint").) Defendant subsequently moved for summary judgment on various claims (D.E.50), which motions were granted in part and denied in part (D.E.82); the summary judgment rulings included a denial of a defense motion concerning Count VII of the Second Amended Complaint, a claim under the Illinois Consumer Fraud Act ("ICFA"), because of disputed material factual questions. (*Id.*) Plaintiffs have now moved to certify Count VII of the Second Amended Complaint for class treatment. (D.E.85.) For the multiple, independent reasons stated below, Plaintiffs' motion for class certification is respectfully denied.

FACTUAL BACKGROUND

As reflected by the fact that this Court denied the Defendant's summary judgment motion concerning Count VII, the parties have material factual disputes concerning the ICFA Section 2C claim and

related damages issues that require resolution by the jury at trial. The parties disagree-sometimes diametrically-about what happened in this case. A brief summary concerning the facts surrounding Count VII is provided below.

On March 15, 2001, the Hamiltons went to O'Connor to purchase a car. (D.E. 82 at 2.) They contend that they were told by an O'Connor salesperson that the 1996 Chrysler LHS they were considering purchasing was a "certified pre-owned vehicle that had passed a 'rigid 120-point' certified inspection and had been 'reconditioned to the highest standards." ' (*Id.* at 2-3.)O'Connor disputes that any such representations were made-but it does contend that the Chrysler had been the subject of an extensive inspection that would have revealed the existence of various defects which the Hamiltons claim were plaguing the car and which O'Connor denies existed at the time the car was sold. (See D.E. 58 at 7, 13.) These disputes about the putative problems with the car (concerning, for example, brakes, a tie rod, and some valves) are related to further heated and material factual disputes concerning the Hamiltons' driving of the car after they took possession of it. (*See, e.g.,* D.E. 64 at 3-5.) In this regard, Plaintiffs contend that the car was plagued by performance problems, including certain problems that scared them and caused them to cease using the car at all. (*See, e .g., id.* at 4-5.)Prior to the point in time that the Hamiltons' allegedly ceased using the car, the Hamiltons also contend that they used the car only for limited purposes. (*See, e.g., id.* at 4.) O'Connor offers multiple odometer readings that, if credited, reflect that the Hamiltons drove the vehicle some 10,500 miles in the approximately six months between when the Hamiltons took possession and the car was ultimately repossessed, including some 4,700 miles after the Hamiltons allegedly ceased driving the vehicle. (D.E. 58 at 6-7.) The Hamiltons assert that there is no proof that the odometer readings are accurate; they also deny driving the vehicle to the ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tent reflected in the odometer readings. (D.E. 82 at 7.)

*2 In any event, on March 15, 2001, the Hamiltons decided to purchase the 1996 Chrysler LHS and took possession of it. (*Id.* at 4-5.)As reported in the retail contract, the Hamiltons gave $2.000 as a down-payment and as consideration with respect to delivery of the Chrysler. (*Id.*) Ms. Deborah Hamilton has testified that when she left O'Connor on March 15, 2001, taking possession of the 1996 Chrysler LHS, she was "under the understanding that this retail installment contract, the percentage rate [of financing], and everything else was locked in."(*Id.* at 5.1 Relying on the affidavit of spot delivery signed on March 15, 2001, by both Ms. Hamilton and her son and co-Plaintiff, Mr. Kwanza Hamilton, O'Connor disputes this position, and O'Connor asserts that the Hamiltons understood that financing for the Chrysler was not locked in and was subject to subsequent review and approvals. (*Id.*)

On March 26, 2001. GMAC sent O'Connor a fax stating, "Please send a check or new contract for the rate difference. B tier is 14.75%. Contract is 12.75. To buy down it is $845.00."(*Id.*) Sometime shortly after March 26, 2001 (roughly two weeks after March 15, 2001, and at least March 26, 2001). the Hamiltons returned to O'Connor and signed a new retail contract with a revised financing rate of 15.75%. (*Id.*) The Hamiltons claim that an employee at O'Connor verbally told them that 15.75% was the best interest rate available to them. (*Id.*) O'Connor denies that such a representation was made. (D.E. 64 at 7.) It also appears that the Hamiltons did not seek financing from any other source than O'Connor, and thus were not approved or denied credit elsewhere on other terms.

The Hamiltons assert that they wanted to return the 1996 Chrysler when they returned to O'Connor and signed new documents completing the purchase at a higher interest rate. (D.E. 62 at 11.) O'Connor disputes this contention, and claims that the Hamiltons never returned the vehicle after the initial financing

the Hamiltons claim was "locked in" fell through, nor did they tell anyone at O'Connor that they wanted to return the car. (D.E. 64 at 8.) O'Connor also suggests that the Hamiltons "elect[ed] to apply the down payment to another retail installment contract" after the initial hoped-for financing fell through. (D.E. 58 at 11; *see also* D.E. 65 at 10 (O'Connor contending that "Plaintiffs ... knowingly chose to obligate themselves to a contract with a higher rate....").)

As mentioned, the Hamiltons contend that the 1996 Chrysler subsequently suffered from various problems, and further assert, at least taking the Hamiltons' stated positions and reasonable inferences from those positions most favorably to Plaintiffs, that the problems existed with the car at the time Plaintiffs took possession. (*See, e.g.,* D.E. 2 at 7.) The Hamiltons assert that they did not receive any reasonable servicing on the car, and were told that it would be months before the vehicle could be serviced. (*Id.*) O'Connor disputes all of these assertions and denies any such representations or statements were made. (*See, e.g.,* D.E. 64 at 4.) If the aforementioned odometer readings are credited by the jury, it would cast substantial doubt on the veracity of some, and perhaps many, of the damage allegations concerning the Chrysler's performance. (*See* D.E. 82 at 21.) However, there are at least some damages questions (e.g., concerning the allegedly rotted tie rod in the steering assembly) that seemingly might be colorable for the Plaintiffs even if the Defendant's odometer readings were credited. (*See id.*)(Put differently, even if someone were extensively driving a car for six months, it might be reasonable to conclude that the tie rod must have suffered from material and visible rusting at the time the car was sold: it might not be reasonable, however, to accept the contention that the brakes were hazardously defective if the driver were driving the car at an approximate rate of 20,000 miles year.)

*3 In connection with Count VII. the ICFA Section 2C claim, the Hamiltons claim damages and relief

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)**

in the form of, *inter alia,* "actual damages in an amount to be proven at trial," plus attorneys' fees and costs, as are provided for under ICFA. (*See* D.E. 26 at 24.) Plaintiffs have asserted that actual damages for them will include, at a minimum, damages associated with: "(1) two months of mechanical difficulties with the vehicle; (2) rental charges during the time the vehicle was being serviced; (3) delinquent credit reporting after revoking acceptance of the vehicle; (4) the continued stress, concern, and anxiety over having a car that could not reliably transport them between two points and yet asked to make monthly payments for it; and (5) the resulting three years of litigation."(D.E. 62 at 12-13.) Plaintiffs also demand punitive damages. (D.E. 26 at 24.) Defendant denies that any damages are warranted, and offers, for example, what it suggests are vehicle servicing records from when the Plaintiffs brought in the car which establish that claimed problems were non-existent or mistaken. (*See, e.g.,* D.E. 59 at 3.)

### LEGAL STANDARDS

"[T]he party seeking class certification assumes the burden of demonstrating that certification is appropriate."*Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993) (citation omitted). The Seventh Circuit has taught that "a district court has broad discretion to determine whether certification of a class is appropriate."*Id.* (citation omitted); *accord, e.g., Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 677 (7th Cir.2001) (certification assessment left to informed discretion of district court); *Andrews v. AT & T,* 95 F.3d 1014, 1022 (11th Cir.1996) ("Determining whether a class action is ... a superior method of fair and efficient adjudication, is committed to the discretion of the district court 'because that court 'generally has a greater familiarity and expertise' " ' with the practical problems involved in administering a piece of litigation) (quoting *Cent. Wesleyan Coll. v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir.1993) (in turn quoting *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 65 (4th Cir.1977) (*en banc* )); *Boughton v.*

*Cotter Corp.,* 65 F.3d 823, 828 (10th Cir.1995) (similar, when discussing assessment of predominance, superiority, and manageability considerations under Rule 23(b)(3)).

As the Seventh Circuit has also taught, the district court does not and should not talismanically accept the plaintiff's factual allegations as true when determining whether to certify a class. *Szabo,* 249 F.3d at 676 ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it."). A district court does not probe behind a plaintiff's allegations or factual assertions to attempt to determine whether the plaintiff or defendant ultimately will win on the merits: either party can win or lose in a case more properly handled as an individual suit or more properly handled as a class action. Instead, a district court often probes behind a plaintiff's allegations or assertions because it is necessary to determine whether, if the class were certified, the issues presented could fairly and confidently be resolved with respect to all the absent class members based on the proof offered on behalf of only the named plaintiff(s).*See, e.g., Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 457 (11th Cir.1996) (affirming denial of class certification because "the claims ... were not susceptible to class-wide proof" offered through only the name plaintiffs); *accord Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613 (1997) (teaching that "Rule 23's requirements must be interpreted in keeping with ... the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right,'28 U.S.C. § 2072(b)"); *Szabo,* 249 F.3d at 677 (explaining that a district court often must probe beneath the pleadings "to conduct the inquiries identified" in Rule 23 and to "exercise the discretion it confers").[FN1]

> FN1. Plaintiffs assert that should accept as true the allegations made in support of certification. (D.E. 86 at 5 (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

.) Plaintiffs misread *Eisen* in advancing this argument, as the precedent cited above repeatedly explains and establishes. *Accord, e.g., Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 677 (7th Cir.2001); *Cooper v. Southern Co.,* 390 F.3d 695, 712 (11th Cir.2004) (collecting Supreme Court and appellate authorities); *Rockey v. Courtesy Motors, Inc.,* 199 F.R.D. 578, 588 (W.D.Mich.2001) (rejecting reading of *Eisen* similar to Plaintiffs as a "gross over-reading" of the case, and collecting Supreme Court and federal appellate authority consistent with principles identified above).

*4 "The class action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " *McFadden v. Bd. of Educ. for Ill. Sch. Dist. U-46,* No. 05 C 0760, 2006 WL 681054, at *5 (N.D.Ill. Mar. 13, 2006) (Gettleman, J.) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979)). A class action "may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites of the rule governing class actions have been satisfied." *Gen. Tel. Co. of the S.W. v. Falcon,* 457 U.S. 147, 161 (1982); *accord, e.g., Clark v. Experian Info. Inc.,* 223 F.R.D. 508, 510 (N.D.Ill.2005) (quoting *Falcon,* 457 U.S. at 161).

## ANALYSIS

For an action to be maintained as a class action, all of the prerequisites of Rule 23(a) must be satisfied. If the Rule 23(a) requirements are met, the Court then must assess whether a class action is appropriate and prudent under the provisions of Rule 23(b). For the reasons set forth below, the Court concludes (or at least assumes) that Plaintiffs have satisfied the requirements of Rule 23(a), but Plaintiffs have not persuaded the Court that certification is appropriate under Rule 23(b)(3).[FN2]

FN2. Plaintiffs do not suggest that certific-

ation would be warranted under Fed.R.Civ.P. 23(b)(2), and such certification appears clearly inappropriate in any event, as this is not a case where injunctive relief would predominate over the monetary relief claimed. *Accord, e.g., Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir.1998) ( "[M]onetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief") (citing *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918, 928-29 (9th Cir.1982)); *id.,* 151 F.3d at 415 ("Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations."). Plaintiffs also do not suggest that certification would be warranted under Fed.R.Civ.P. 23(b)(1), which is also inapposite on the facts presented. *See, e.g., Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 834-35 (1999) (discussing limitations and prerequisites needed for proper Rule 23(b)(1) class).

## I. Rule 23(a) requirements

Rule 23(a) contains four express requirements: (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"), (2) there must be at least one question of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"), and (4) the representative parties and their counsel must be able to fairly and adequately protect the interests of the class ("adequacy").*See*Fed.R.Civ.P. 23(a).

## A. Numerosity

While Rule 23 does not identify a magic threshold

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)**

number required to establish numerosity, "permissive joinder is usually deemed impracticable where the class members number 40 or more."*Chandler v. S.W. Jeep-Eagle, Inc.,* 162 F.R.D. 302, 307 (N.D.Ill.1995). Defendant has stipulated as to the numerosity of the proposed class. (D.E. 90 at 5.) Based on present information, and O'Connor's stipulation, it appears that the putative class is sufficiently numerous that joinder is impracticable.

**B. Commonality**

For purposes of the commonality requirement, there must be at least one question "of law or fact common to the class" proposed. Fed.R.Civ.P. 23(a)(2). Defendant maintains that there is no common nucleus of operative facts to unite the Hamiltons with any other putative class member because "the resolution of [the Hamiltons'] common legal issue is dependent upon factual determinations that will be different for each purported class member. (D.E. 90 at 5 (citations omitted).) At a minimum, the claims share a common allegation that O'Connor's alleged practice of not immediately returning down payments violated Section 2C, and thus there is sufficient basis for the Court to assume, at least *arguendo,* that the commonality requirement is satisfied. *Accord, e.g., Fisher v. Bristol-Myers Squibb Co.,* 181 F.R.D. 365, 368 (N.D.Ill.1998).

**C. Typicality**

**\*5** The commonality and typicality requirements of Rule 23(a) are often interrelated. *See Rosario v. Lividatis,* 963 F.2d 1013, 1018 (7th Cir.1992)."The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members."*De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983). Defendant acknowledges the relationship between commonality and typicality, and its arguments with respect to each reveal no material differences. (*See* D.E. 90 at 5-6

(advancing virtually identical arguments with respect to commonality and typicality).) As with the commonality requirement, the Court will assume, at least *arguendo,* that the typicality requirement is satisfied. *Accord, e.g., Fisher,* 181 F.R.D. at 368.

**D. Adequacy of Representation**

"[A]dequacy of representation is composed of two parts: 'the adequacy of the named plaintiffs counsel, and the adequacy of representation provided [by the putative name plaintiff(s) ] in protecting the different, separate, and distinct interest[s]' of the class members."*Retired Chicago Police Ass'n,* 7 F.3d at 598 (quoting *Sec'y of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986) (*en banc* )). The adequacy of representation prong is often concerned with avoiding conflicts of interest between the class representative(s) and the rest of the putative class. *See, e .g., Amchem,* 521 U.S. at 625-26.

O'Connor does not challenge the adequacy of Plaintiffs' counsel. The Court also finds no basis to question the competency or earnestness of Plaintiffs' counsel. Defendant also fails to identify any conflict of interest between the Hamiltons and the putative class. The Court will thus assume, for the purposes of this motion, that the Rule 23(a)(4) adequacy requirements are satisfied.[FN3]

> FN3. O'Connor argues that the Hamiltons are inadequate representatives because O'Connor may have some defenses unique to the Hamiltons, meaning that their claims are not representative of the class as a whole or that the class is not definable. (D.E. 90 at 7.) This objection is better understood as an argument that certification is not warranted under Rule 23(b)(3), and will be addressed when the Court considers that issue.

**II. Certification Is Not Warranted Under Rule 23(b)(3) For Multiple Independent Reasons**

Rule 23(b)(3) allows for certification where the re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

quirements of Rule 23(a) have been met, and where the Court finds that "questions of law or fact common to members of the class predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for resolving the controversy."Fed.R.Civ.P. 23(b)(3). In looking at these factors, the Court must analyze, among other things, "the difficulties likely to be encountered in the management of a class action"(*id.*)-or what is typically referred to as the "manageability" analysis. For the reasons discussed below, the Court determines that the proposed common questions of law or fact do not predominate and, independently, that a class action is not superior to other methods of adjudication. In addition, and again independently, the Court concludes that the manageability problems that would ensue by attempting to resolve Count VII of this case via the proposed class action dictate that class treatment is imprudent and unwarranted.

A. Plaintiffs Have Failed to Establish That Classwide Issues Predominate

*6 "Determining whether [issues] common to the class predominate over individual issues requires that the court inquire how the case will be tried. This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class."*O'Sullivan v. Countrywide Home Loans,* 319 F.3d 732, 738 (5th Cir.2003) (citing *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996)). At its essence, predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis. *See Hewitt v. Joyce Beverages of Wisc., Inc.,* 721 F.2d 625, 628-629 (7th Cir.1983); *accord, e.g., Hudson,* 90 F.3d at 457.

Plaintiffs' assert, in support of class certification, that "the commonality requirement of Rule 23(a)(2) and the predominance requirement of Rule 23(b)(3)

are closely related and a finding of one will generally satisfy the other."(D.E. 86 at 11 (internal quotation marks omitted; offered district court authority).) With all respect, this assertion is a substantial error. As Justice Ginsburg explained in writing for the Supreme Court, "[e]ven if Rule 23(a)'s commonality requirement may be satisfied ... the predominance criterion [of Rule 23(b)(3) ] is *far more demanding."* *Amchem,* 521 U.S. at 623-24 (emphasis added). Justice Ginsburg's teaching on this point has since been underscored by the Supreme Court and numerous other courts. *See, e.g., Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831 n. 12, (1999) (citing *Amchem* and discussing the "demanding predominance requirements of Rule 23(b)(3)"); *O'Sullivan,* 319 F.3d at 738 ("The predominance and superiority requirements [of Rule 23(b)(3) ] are 'far more demanding' than is rule 23(a)(2)'s commonality requirement.") (quoting *Amchem,* 521 U.S. at 624);*Newton v. Merrill, Lynch, Pierce, Fenner & Smith,* 259 F.3d 154, 186 n. 32 (3d Cir.2001); *Clark,* 233 F.R.D. at 511.

Consistent with this Supreme Court teaching-*i.e.,* that predominance requires much more than the identification of a single common issue-precedent instructs that a class action movant cannot gerrymander predominance by suggesting that only a single issue be certified for class treatment (in which, by definition, it will "predominate") when other individualized issues will dominate or be meaningfully material to the resolution of the absent class members' claims. *See Castano,* 84 F.3d at 745 n. 21 ("Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).");[FN]*accord, e.g., Allison,* 151 F.3d at 422. As *Castano* explained, "[r]eading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case in which there is a common issue, a result that could have not been

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

intended."*Id.,* 84 F.3d at 745 n.21.

> FN4.Rule 23(c)(4) states, in relevant part, that: "When appropriate (A) an action may be brought or maintained as a class action to respect to particular issues...."

**\*7** Resolving a class certification motion does not require a trial court to determine whether the putative name plaintiff ultimately will prevail, but the Court is required to determine whether the case as framed is likely to proceed most sensibly as a class action. *See, e.g., Szabo,* 249 F.3d at 677. In this regard, the Court notes, without definitively passing on the underlying issue of Illinois law, that Plaintiffs are seeking class treatment to present a novel issue of Illinois law-although, as explained further below, this issue seems largely to be a product of the class certification effort, as the Hamiltons' actual merits positions do not depend on prevailing on the more aggressive interpretations proposed by their counsel concerning the Illinois statute that underlie the class certification proposal. With respect to this novel issue concerning the application of Section 2C of the ICFA, to be sure, there are a few reported decisions generally concerning the section. *See, e.g., Jones v. William Buick, Inc.,* 785 N.E.2d 910, 911 (Ill.App.Ct.2003); *see also Roche v. Fireside Chrysler-Plymouth, Mazda,* 600 N.E.2d 1218 (Ill.App.Ct.1992). However, the Hamiltons' do not cite any case meaningfully addressing: (1) the degree to which (if any) a seller may propose an alternative financing arrangement to a buyer in lieu of immediately returning a down payment check; (2) whether any putative obligation to return a downpayment is obviated or affected by a buyer's desire to simply complete the transaction at an adjusted rate of financing; or (3) whether any putative obligation to return a downpayment is affected by a putative buyer's refusal to return the purchase item, such as an automobile-all potential issues in this case or in the proposed class scenario.[FN5]Section 2C is silent on these issues-for example, it says nothing about the time-frame during which a down payment must be

returned, *see, e.g., Jones,* 785 N.E.2d at 911, nor does it address whether a buyer must return the purchased item to be able to demand return of a down payment of part of the purchase price.[FN6]In light of such ambiguities, and as explained further below, it is at best unestablished by Plaintiffs that their class proposal, in which a threshold and subsidiary statutory interpretation question is proposed, will resolve a meaningful chunk of the case.

> FN5. Plaintiffs cite *Najieb v. William Chrysler-Plymouth,* 2002 WL 31906466 (N.D.Ill.Dec. 30, 2002). (*See* D.E. 92 at 2 n.3.) However, in that case, the plaintiff returned the car to the dealership three days after receiving notice that her application for credit had been rejected, and after returning the car, the dealership did not refund the down payment.*Najieb,* 2002 WL 31906466, at \*3, \*10. *Roche v. Fireside Chrysler-Plymouth, Mazda,* 600 N.E.2d 1218 (Ill.App.Ct.1992) is also of no assistance to the Hamiltons, because, in that case, the plaintiff demanded that the dealership return her down payment and she did not remain in possession of the vehicle she had attempted to purchase. *Id.* at 1220-21.As a subsequent Illinois appellate court recognized, "[Section 2C] does not dictate a period within which this refund [of the down payment] must occur."*Jones v. William Buick, Inc.,* 785 N.E.2d 910, 911 (Ill.App.Ct.2003).

> FN6. Plaintiffs suggest that the text of Section 2C commands that a purchaser can demand return of the down payment, even if the purchaser refuses to return the item such as a car when financing falls through. Although the Court need not resolve this issue to adjudicate the Hamiltons' case (again, they claim they wanted to return the car and get their down-payment back), the Court notes that the language of Section 2C does not appear at least to unambi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

Page 8

giously command the result the Plaintiffs suggest; Plaintiffs also offer no caselaw in their class certification papers in support of their proposed statutory reading on this point.

Section 2C states, in relevant part, that: "The retention by the seller of part or all of the down payment ... under those circumstances [*i.e.,* where the seller rejects the putative purchaser's credit application] as a fee for investigating the credit of the consumer or as liquidated damages to cover depreciation of the merchandise which was the subject of the purchase order or contract or for any other purpose is an unlawful practice within the meaning of this Act, whether that fee or those charges are claimed from the down payment...." This language at least arguably only prohibits the seller from retaining or taking any credit investigation fee, or depreciation fee, or any other sort of service fee, when the credit application is rejected and the chattel is returned. Perhaps the language could be read as Plaintiffs' attorneys suggest-such that a seller would presumably left to only whatever other civil and or criminal remedies the law affords if the buyer demanded receipt of the downpayment but nonetheless refused to return the unfinanced automobile-but the Court need not resolve this open question of Illinois statutory interpretation to adjudicate the Hamiltons' case.

In this regard, a review of the basic elements of the ICFA, of which Section 2C is a part, is required to properly assess the appropriateness of any class treatment in this case. The Illinois Supreme Court has repeatedly instructed, in relevant part, that "[t]o succeed in a private cause of action under the [ICFA], a plaintiff must prove (1) a deceptive act or practice by the defendant ... and (4) actual damage

to the plaintiff (5) proximately caused by the deception."*Avery v. State Farm Mut. Auto. Ins. Co.,* 835 N.E.2d 801, 856 (Ill.2005) (internal quotation marks and citation omitted); *accord, e.g., id.* at 858-59 ("In order to sustain a private cause of action under the [ICFA], a plaintiff must prove that he or she suffered actual damage as a result of the Act.") (internal punctuation and citation omitted); *Oliveira v. Amoco Oil Co.,* 776 N.E.2d 151, 160 (Ill.2002) ("[A] private cause of action ... requires proof that the damage occurred 'as a result of the deceptive act or practice.") (internal citations omitted); *id.*(holding that a private plaintiff (as opposed to the Illinois Attorney General) must show "actual damage to the plaintiff" that was "proximately caused" by the putative deceptive practice) (collecting cases).

**\*8** These elements of the private cause of action under the ICFA are, as one would expect, of substantial consequence. Thus, for example, in *Avery,* the Illinois Supreme Court's most recent teaching on the ICFA private cause of action, the Illinois Supreme Court reversed class certification of an ICFA claim and also reversed verdicts in favor of the plaintiff and entered judgment in favor of the defendant-insurers because, *inter alia,* the plaintiff failed to prove that he suffered actual damages and, independently, because he failed to show proximate cause. *Id.,* 835 N.E.2d at 820. As for actual damages, the Illinois Supreme Court found that the plaintiff failed to establish that he suffered any actual "damage as a result of State Farm's specification or use of" non-original equipment manufacture parts for his car repairs-a failing that the Illinois Supreme Court described as a "striking deficiency" in the plaintiff's claim. *Id.* at 858;*see also id.* at 859 (holding that plaintiff "suffered no 'actual damage' as a result of State Farm's specification or use of non-OEM parts and, therefore, he cannot recover under the Act").*Avery* also independently held that the plaintiff failed to establish any ICFA violation because he was not deceived or affected by the defendant's alleged deceptive practice. *See id.* at 861.Similarly, in *Oliveira,* the Illinois Supreme

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

Page 9

Court rejected the plaintiff's proposed class-wide liability theory concerning allegedly deceptive advertising of the defendant-which allegedly falsely implied that certain higher-priced gasoline would improve engine performance and benefit the environment-because such a theory would improperly allow recovery by absent class members who "never saw the ads and, thus, were 'not deceived," ' or "who saw the ads but never believed them." *Id.,* 776 N.E.2d at 164. The Illinois Supreme Court held that such results would be "plainly at odds" with Illinois precedent concerning the ICFA private cause of action. *Id.* (citation omitted).

This precedent is relevant with respect to the instant class certification motion. As previously explained, the certification proposal is centrally concerned with proposing the litigation of a novel issue of state law-whether Section 2C of the ICFA requires a lender to physically return a down payment to a putative purchaser if his or her credit application concerning a financed sale falls through (*see, e.g.,* D.E. 86 at 1), seemingly irrespective of whether that purchaser instead wants to complete the transaction at an adjusted rate, or whether the customer is willing or unwilling to return the subject of the financed sale (*e.g.,* a car). (*See, e .g., id.*(seemingly suggesting that a violation is *per se* shown whenever a defendant maintains "dominion, custody, and control over consumer funds after rejecting their original credit applications"): D.E. 92 at 3 (similar).) Even if one assumes *arguendo* that this unequivocal outcome is mandated by the language of Section 2C, as Plaintiffs propose would be established in the class proceeding, that result would do little, if anything, towards establishing liability for any putative class member. As explained, substantial Illinois Supreme Court precedent teaches that actual damages and proximate cause must be shown to establish liability. So, for example, if a putative customer returns to the car dealer, is told that his or her original financing application has been rejected, and is asked whether he or she would like to finance at a marginally higher rate, there is no violation of the ICFA if the customer elects to complete

the transaction and would have done so irrespective of whether the car dealer went through the formality of actually handing the customer a check representing the proceeds of the down payment that the customer then would resign over to the dealer or need to redeposit in the customer's own account after writing a duplicate check back to the dealer. Likewise, even if the customer was not told of his or her option to get back the downpayment, and the customer refinanced the transaction at a marginally higher rate, the customer still would need to show both proximate cause and actual damages in a plaintiff-specific manner-for example, by analyzing whether the customer would have elected to unwind the transaction and/or would have shopped for and actually been able to obtain more advantageous financing in the market than the rate actually financed. Similar examples are readily imagined concerning proximate cause and actual damages issues for a plaintiff who would not even return the now-unfinanced automobile but would, seemingly under Plaintiffs' theory, be able to demand return of their downpayment and leave with both it and the unfinanced car. All of these plaintiff-specific inquiries would need to be undertaken-many, if not all of which, likely would involve a review of what various oral representations were made by each of the respective salespersons and putative classmembers in the relevant individual transactions-simply to assess liability *vel non* under Illinois precedent. *See, e.g., Oliveira,* 776 N.E.2d at 160 (holding that a private ICFA cause of action "requires proof that the damage occurred "as a result of" the deceptive act or practice.... [T]his language imposes a proximate causation requirement") (internal citation omitted). Moreover, these plaintiff- and episode-specific inquiries would need to be taken simply to assess whether any liability eventuated, even before one would move to the question of the amount of actual damages that might be recoverable-a subject that, as explained further below, further undermines any predominance assessment for the proposed resolution of the claim(s).[FN7]

FN7. To the extent that the Plaintiffs' pa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

pers can be read to support a more quali-fied statutory interpretation-under which, for example, a car dealer would act law-fully if it informed the putative purchaser of their right to the return of the downpay-ment, but did not actually tender a check to the purchaser (such as might readily occur if a purchaser did not want to incur the time and costs associated with waiting for such a check before discussing how to complete the sale)-that more qualified stat-utory interpretation would not assist the certification effort. Under such a more qualified interpretation, the Court would still need to make the same sort of plaintiff- and episode-specific inquiries to determine, for example, what representa-tions (including oral representations) were made by the affected parties, and what the putative class member actually wanted to do with the sale at issue. Little, if anything, is gained in terms of conservation of judi-cial resources by a "class proceeding" in which the Court would need to hold hun-dreds or thousands of hearings-one con-cerning each relevant car purchaser who ultimately financed a purchase at a higher rate than the rate that may have been ini-tially quoted when that respective class member left with the vehicle at issue.

**\*9** In this regard, the Court notes that the Hamiltons themselves do not need to prevail on the unyielding statutory interpretation proposed by their counsel as the basis for class treatment in order to prevail on their own claims. For example, Ms. Hamilton does not suggest that she intended to retain both the un-financed car and the downpayment, as she has spe-cifically testified to "not only a willingness, but a desire to return the vehicle" at issue in the instant case. (D.E. 62 at 11.) Similarly, Ms. Hamilton's claim that she would have returned the vehicle-as opposed to completing the financing at a different rate, as several of the putative class members ap-parently did (see, e.g., D.E. 86 (first example

presented by Plaintiffs of putative class member, who refinanced transaction for $555 from ori-ginal transaction))-obviated the need to see if a pu-tative buyer who wished to retain possession of the car and actually pay for it could have obtained a better financing rate elsewhere or would have wanted to incur the time and search costs required to look elsewhere in the first place as opposed to accepting the alternative financing proposed and completed.

These fact-specific inquiries concerning simply the liability assessment for each putative class member defeat any predominance finding in this case. The proposed statutory interpretation issue-in which this Court would wade in relatively unguided fashion into a novel threshold issue of state law-would settle little, if anything, both for the Hamiltons and for each putative class member. Instead, assessing liability would require individualized assessments along various factual axes-including the considera-tion of various putative oral representations and time-specific financing markets for any given buy-er. The Court is unpersuaded that this proposal sat-isfies the "demanding predominance requirements of Rule 23(b)(3)."*Ortiz*, 527 U.S. at 831 n. 12 (citing *Amchem*, 521 U.S. at 623-24)); *accord, e.g., Oshana v. The Coca-Cola Co.,* 225 F.R.D. 575. 585-86 (N.D.Ill.2005) (denying class certification motion for ICFA claim for lack of predominance based on individualized issues concerning causation and actual damages); *see id.* at 586 ("Consideration of the substance of Oshana's claims, as well as the form that resolution of these issues would take, mandate a finding that the highly individualized nature of the inquiries predominates over issues common to the class.") (collecting cases).[FN8]

> FN8. In their briefs, the Hamiltons at times argue that certification is warranted be-cause they have demonstrated that O'Connor engaged in a "pattern or prac-tice" of Section 2C violations. (*See, e.g.,* D.E. 86 at 3-4; D.E. 92 at 6-8.) This state-ment appears to be hinged to the proposed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

Page 11

absolutist reading of Section 2C, by which it would be violated, even if a borrower were fully informed of the right to return of a downpayment; that given borrower wanted to refinance so as to complete the transaction; and the borrower did not want to go through the formality (and concomitant expenditure of time and resources, which presumably would also tend to inflate the ultimate purchase price) of physically receiving a check representing his downpayment, which he would immediately resign back to the dealer or deposit into his own account after reissuing a duplicate check to the dealer for the final transaction. Moreover, even if O'Connor has engaged in the putative "pattern," precedent teaches that a "pattern" claim is not by itself a signal that class certification is appropriate. *See, e.g., O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732. 742 (5th Cir.2003) ("In both proposed class actions, there is a question whether an overall practice or policy violates a statute. But Rule 23(b)(3) predominance requires a court to ask, in light of how liability is established under the relevant statute, whether common questions predominate over individual ones."); *Rutstein v. Avis Rent-A-Car Sys.,* 211 F.3d 1228, 1234 (11th Cir.2000) ("Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.") (citing *Amchem,* 521 U.S. at 623). In some instances, of course, a "pattern or practice" case may be suitable or even ideal for class treatment. *See, e.g., Fields v. Maram,* 04 C 0174, 2004 WL 1979997, at *2 (N.D.Ill. Aug. 17, 2004). However, as explained above, in this case, the existence of the posited "pattern," does not even satisfy the proximate cause and actual damages elements required to show liability, much less

resolve any putative class members' actual case.

Over and above these individualized issues concerning liability, resolution of the class members' actual claims would implicate various other fact- and plaintiff-specific issues as well. As previously stated, precedent instructs that a trial court may-indeed, perhaps must-look at whether the proposed class issue(s) predominate with respect to the resolution of the putative class members' *claims,* not simply look at the tautological question of whether "the proposed class issues" predominate merely with respect to "the proposed class issues." *See, e.g., Allison,* 151 F.3d at 422;*Castano,* 84 F.3d at 745 n. 21. In the instant setting, a review of the Hamiltons' demanded damages and other requested relief reveals that assessing the amount of any putative damages would substantially complicate any classwide resolution of the putative class members' claims. In this litigation, the Hamiltons have stated that resolution of simply their own damages claims will require a look at, among other things: "the stress, concern, and anxiety" associated with the disputed transaction and subsequent events (D.E. 62 at 13); alleged damages associated with undisclosed mechanical difficulties concerning the car FN9 that manifested in subsequent months; and alleged problems concerning subsequent credit reporting and collection efforts. (*See, e.g.,* D.E. 62 at 12-13.)

> FN9. Defendant disputes that the alleged defects were present when the car was sold. Resolution of these car part repair claims will involve questions beyond the personal experience of many jurors (*e .g.,* concerning the expected performance and life expectancies of tie-rods and automobile valves), and will likely require expert or quasi-expert testimony about expected performance of the particular used car involved in the transaction at issue (a five year old Chrysler LHS). In addition, resolution of this component of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hamiltons' damages claim will require resolving the parties' conflicting contentions about how far the Plaintiffs drove the car after taking possession. (O'Connor points to odometer readings that suggest that the Plaintiffs drove the car extensively, such that substantial wear and tear was put on the car that might reasonably been seen as causing some or all of the allegedly hidden problems, while the Plaintiffs dispute the odometer readings and claim that they drove the car in limited fashion.) Such issues, even for this single component of the Hamiltons' damages case, will be specific as to them, the defects they allege, and the used car they bought and its subsequent driving and performance record.

*10 Resolving these sorts of damages issues alone would be a highly plaintiff- and episode-specific endeavor, further cutting against any predominance finding. Thus, for example, in *Aiello v. Providian Fin. Corp.,* 239 F.3d 876 (7th Cir.2001), the Seventh Circuit affirmed the denial of class certification involving a claim that a finance company was using unlawful collection practices to collect debts in violation of federal bankruptcy laws.*Id.* at 881.In affirming the denial of class certification, *Aiello* noted the individualized nature of damages claims for emotional distress (as are claimed here, among further individualized types of damages), and the need for extensive individualized damages hearings to resolve the class members' claims. *Id. Aiello* concluded that "the case is not suitable for class action treatment because of the variance of injury among the members of the class and the costs of individualized hearings [in terms of judicial resources] that would in consequence be required for assessing damages."*Id.* This holding of *Aiello* is consonant with many other federal cases denying certification where resolution of the putative "class" issue would settle a relatively limited portion of the dispute and substantial individualized hearings would remain to resolve the claims of the class members. *See e.g.,*

*O'Sullivan,* 319 F.3d at 744-45;*Allison,* 151 F.3d at 419 ("The plaintiffs' claims for compensatory and punitive damages ... focus almost entirely on facts and issues specific to individuals rather than the class as a whole.... Under such circumstances, an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.") (internal quotation marks and citation omitted); *Clark,* 233 F.R.D. at 512 ("Individual questions also predominate as to damages for each potential class member."); *Oshana,* 225 F.R.D. at 586;*Zapata v. IBP, Inc.,* 167 F.R.D. 147, 163 (D.Kan.1996) ( "Courts have held that claims for compensatory damages unique to each individual greatly complicate management of a class") (citing *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918, 928-29 (9th Cir.1982)); *Dahlgren's Nursery, Inc. v. E.I. Du Pont De Nemours & Co.,* No. 91-8709-CIV, 1994 WL 1251231, at *12 (S.D.Fla. Oct. 30, 1994) (citing *Windham,* 565 F .2d at 68). Although fact-specific questions concerning damages are not a *per se* bar against certification (each class proposal must be evaluated on its own facts), precedent teaches that such issues must be considered; when they are considered in this case, they confirm the impropriety of the certification proposed.

In sum, in this case, the proposed class issues have not been shown to predominate over those individualized issues that likely would need to be resolved. Because the Court concludes that the Plaintiffs have failed to establish predominance, certification is inappropriate.

B. Plaintiffs Have Not Shown That Class Treatment is Superior Method of Adjudication

*11 The Court also respectfully denies the Hamiltons' motion for class certification under Rule 23(b)(3) for the independent reason that class treatment has not been shown to be a superior method of resolving the putative class members' claims. When assessing superiority, a district court must "consider what other procedures, if any, exist for disposing of the dispute before it. It then must com-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

pare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court."Wright & Miller, *Federal Practice and Procedure,* Vol. 7AA, Civil 3 § 1779; *see also O'Sullivan,* 319 F.3d at 738 ("The predominance and superiority requirements [of Rule 23(b)(3) ] are 'far more demanding' than is rule 23(a)(2)'s commonality requirement.") (quoting *Amchem,* 521 U.S. at 624).

Plaintiffs' superiority claim is two-fold: (1) class certification is necessary because this is a putative consumer class action and individual claims may be too small to support a suit; and (2) a one-time adjudication of the legality of O'Connor's alleged policy is more efficient than repeated litigation over a policy that class members would challenge in individual suits. (*See* D.E. 86 at 12.)

With respect to the first claim-what is often referred to in jurisprudence as a potential "negative value suit"-if there really were no incentive for a litigant to bring a meritorious individual claim, then that obviously would be a substantial concern. However, this putative problem was not lost on the Illinois General Assembly, which provided for attorneys fees and costs for prevailing parties in actions under Section 2C (and other provisions in the ICFA).*See*815 ILCS 505/10a(c); *Allen v. Woodfield Chevrolet, Inc.,* 802 N.E.2d 752, 756 (Ill.2003). Precedent discussing the "negative value suit" problem in the context of other statutes teaches that the ability to recover attorneys fees and costs provides substantial incentives to bring meritorious individual suits. *See, e.g., Glover v. Standard Fed. Bank,* 283 F.3d 953, 965-66 (8th Cir.2002); *Castano,* 84 F.3d at 748;*Andrews,* 95 F.3d at 1025.

To be sure, the availability of attorneys fees and costs is not a *per se* bar against class certification. Nonetheless, as reflected in the federal appellate caselaw cited above, the fact that a case potentially involves small recoveries for an individual litigant

is equally not dispositive. The Illinois General Assembly was obviously attuned to the potential for negative value suits, it took meaningful steps to provide incentives for plaintiffs to pursue winning claims, and those incentives are material when assessing whether class treatment is superior and appropriate.

The Court is also unpersuaded by Plaintiffs' contention that the certification proposed (*i.e.,* concerning a novel state law issue or issues) produces sufficient efficiency benefits, as compared to available alternatives, to warrant class treatment. Plaintiffs maintain that proving O'Connor's alleged policy (of not automatically returning down-payments in the form of checks) is not a fact-intensive endeavor-at least according to Plaintiffs, a review of the loan jackets is sufficient to demonstrate that O'Connor does not immediately return down payments after the denial of financing. (D.E. 86 at 2.) As a result, to the extent Plaintiffs are correct, the existence *vel non* of O'Connor's "practice" will not even be a material factual issue in this trial, much less in any other. (And to the extent it is an issue and Plaintiffs are correct about the existence of O'Connor's "practice," offensive non-mutual collateral estoppel will potentially be available to subsequent individual suitors.)

**\*12** Thus, the only possible efficiency gains will come from having a single class-wide decision on Plaintiffs' proposed and novel reading of ICFA Section 2C. The Court envisions extremely limited gains from consolidating in one proceeding what is essentially a question of statutory interpretation-*i.e.,* whether Section 2C prohibits any further negotiations or transactions before physical return of a downpayment check and/or allows a purchaser to retain possession of the unfinanced vehicle while simultaneously demanding return of the partial payment in the form of the downpayment. Resolving such question(s) will take up a limited portion of the putative class proceedings-and the resolution(s) of such subsidiary issue(s) will not even touch upon essential, plaintiff-specif-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

Page 14

ic, inquiries concerning proximate cause and actual damages that are wrapped up in determining liability *vel non* for each putative class member under Illinois law. (Further individualized questions would attend to any damages assessments.)

Moreover, while the answers to statutory questions are not always driven by the facts of a given case, it is equally true that the factual context of a given plaintiff's or defendant's case can be helpful in analyzing a legal question, including a statutory one. That is one of the reasons why courts often issue narrower rulings as opposed to broader ones, and why respect for judicial restraint counsels against certification here. In this instance, little would be gained, and much potentially lost, by trying to interpret Section 2C as it should apply to an unknown universe of plaintiffs' cases, the facts relating to whom will be entirely divorced from the interpretive endeavor. This is especially true when the issue is one of state rather than federal law, and where the Illinois courts have not received a meaningful opportunity to construe the provision that this Court would putatively reach out to sweepingly interpret. *See, e.g., Shaw v. Republic Drill Corp.,* 810 F.2d 149, 150 (7th Cir.1987) (per curiam) ("In the context of pendent state law claims, we have already indicated our unwillingness to speculate on any trends in state law.").

These potential drawbacks, combined with the plaintiff-specific inquiries likely required in a class scenario and the concomitant administrability and manageability problems identified elsewhere in this opinion, lead to the conclusion that there is too little benefit in Plaintiffs' proposal to adjudge a class action superior to the alternatives. The Court determines that, independent of the question of whether classwide issues predominate (which they do not), the availability of an effective alternative to the class action device and the problems inherent in conducting hundreds or thousands of follow-on procedures means that the class action is not superior in this case. *Accord, e.g., Clark,* 233 F.R.D. at 511 ("If individual issues predominate, then class

certification is usually not a superior method for resolving the controversy, since management of such issues will not be efficient.") (citing, *inter alia, Szabo,* 249 F.3d at 675 (internal quotation marks omitted)).

## C. Plaintiffs Have Not Satisfied the Manageability Requirement of Rule 23(b)(3)

**\*13** Relatedly, the proposed 23(b)(3) class also fails on manageability grounds. Determining whether a class action satisfies manageability concerns involves a practical, on-the-ground assessment of whether the proposed efficiencies from a class action will outweigh the administrative problems and inefficiencies likely to ensue. *See, e.g., Andrews,* 95 F.3d at 1022 (collecting cases). This type of balancing analysis is appropriate because the district court must balance whether any administrative and management problems (which will also negatively impact other litigants) are outweighed by efficiencies to the absent class members (who either will proceed in this courtroom or otherwise be free to file their own suits if and as they see fit).

In the instant case, Plaintiffs have not meaningfully identified how the individual issues will be resolved; instead, they speak casually and in passing of "separate proceedings, mini trials, relaxed reliance standards, and subclasses."(D.E. 92 at 5.) Precedent teaches that this sort of cursory proposal and analysis is inadequate to discharge Plaintiff's burden of showing that class certification is appropriate. *See, e.g., Allison,* 151 F.3d at 420 (citation omitted); *see also Andrews,* 95 F.3d at 1023 (reversing class certification on grounds of manageability and predominance, and stating that if there are apparent problems with a proposed class action, the district court should not certify the class based on the speculation that a solution will be found or a problem will not eventuate).

In this regard, the Court notes that its own research reveals that the Seventh Circuit has, in limited instances, authorized "follow-on" procedures for in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

dividual issues of damages, following the resolution of liability on a class-wide basis. *See, e.g., In re Allstate Ins. Co.,* 400 F.3d 505 (7th Cir.2005); *see also Mejdrech v. Met-Coil Sys. Corp.,* 319 F.3d 910 (7th Cir.2003). However, these cases are inapposite because, in both instances, the efficiency gains from consolidation were far greater than in the case *sub judice* and the proposed follow-on procedures were equivalent to a bifurcated trial. Moreover, in both cases, the class-wide proceedings would definitively settle the liability question, and all that would be left for the follow-on proceedings was the extent of that liability.

The best-case scenario envisioned by Plaintiffs is that the statutory interpretation question will be resolved, at which time the Court potentially may need to conduct several hundreds or thousands of plaintiff-specific hearings at which proof of, *inter alia,* proximate cause, actual damages, and the amount of each class member's putative damages (including any claimed emotional damages) will need to be resolved. (*Id.*) In this scenario, there is a substantial chance (indeed, it is a virtual certainty) that the Court will be enmeshed in lengthy individualized proceedings, in which the expenditure of judicial resources will be geometrically greater than the resources needed to litigate the threshold legal question underlying Plaintiffs' class proposal-which is essentially a limited, subsidiary part of the liability case that each plaintiff individually will need to make irrespective of how the "class" issue is resolved. *See, e.g., Avery,* 835 N.E.2d at 858-59 (requiring proof of proximate cause and actual damages in private right of action case; citation omitted); *Oliveira,* 776 N.E.2d at 160 (same; collecting cases). There also will be attendant manageability problems presented by the individualized damages questions discussed herein. *Accord, e.g., Aiello,* 239 F.3d at 881 (affirming denial of class certification where putative plaintiff class sought to recover, *inter alia,* damages for emotional distress against creditor employing unlawful collection practices). On the other hand, if Plaintiffs are incorrect in their proposed statutory interpretation, the

class action will not only involve all of the individualized damages assessments mentioned immediately above, but it will also entail a plaintiff-by-plaintiff assessment of whether O'Connor has done anything culpable, even under Section 2C, with regard to that particular plaintiff-which outcome would negate *any* gains from class certification.[FN10] All of the related individualized issues concerning liability (*i.e .,* proximate cause and a showing of actual damages) would endure, of course, as would the individualized issues (and concomitant manageability problems) concerning the extent of any damages, including damages for emotional wrongs.

> FN10. Although the Court will not belabor the point, given the myriad other problems with the class proposal, to the extent the Plaintiffs' express suggestion that "relaxed reliance standards" could make certification easier can be understood as an invitation to apply a "relaxed" version of of the elements or showings required to prevail on an ICFA claim, fealty to precedent requires the Court to note that Rule 23 cannot be used to relax or modify the standards and rules that would otherwise apply to an individual litigant's case when the case would proceed as a putative class action. Specifically, the Supreme Court has specifically and repeatedly instructed that federal courts may not use Rule 23 to " 'abridge, enlarge, or modify any substantive right' ' " of a litigant's (whether plaintiff or defendant) that would adhere in a nonclass proceeding. *Amchem Prods, Inc v. Windsor,* 521 U.S. 591, 613 (1997) (quoting the Rules Enabling Act, 28 U.S.C. § 2072(b)); *accord Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 845 (1999) ("As we said in *Amchem,* no reading of the Rule [*i.e.,*Fed.R.Civ.P. 23] can ignore the Act's mandate that rules of procedure "shall not abridge, enlarge or modify any substantive right") (quoting the Rules Enabling Act, 28

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 16
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171)

U.S.C. § 2072(b): further citation to *Amchem* and related quotation marks omitted); *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 345 (4th Cir.1998) (reversing class judgment and certification order and holding, "courts considering class certification must rigorously apply the requirements of Rule 23 to avoid the real risk, realized here, of a composite case being much stronger than any plaintiff's individual action would be. Because the class action device permitted plaintiffs to strike Meineke with selective allegations, which may or may not have been available to individual named plaintiffs or franchisees, the judgment below cannot stand."). In this regard, the Plaintiffs' citation of *In re Visa Check Master Money Antitrust Litig.,* 280 F.3d 124 (2d Cir.2001)-*see* D.E. 92 at 8 n.18-is inapposite. In *In re Visa Check,* the record included testimony supporting a liability theory that "did not require analysis of any of the individualized questions" suggested by the defendants in that case. In this case, Plaintiffs do not meaningfully address, much less resolve, how their limited class proposal would resolve the numerous, individualized, and episode-specific issues needed to assess liability as well as damages for a given putative class member. As explained elsewhere, these extensive fact-specific issues, and the attendant manageability and superiority issues they would present, render class certification imprudent in this case.

**\*14** For these reasons, the Hamiltons' proposal also independently fails on manageability grounds. The likely administrability problems involved in their proposed class action are extensive and real, and the putative efficiency gains are limited at best. Class certification is not prudent under such circumstances. *Accord, e.g ., Clark,* 233 F.R.D. at 511 ("If individual issues predominate, then class certi-

fication is usually not a superior method for resolving the controversy, since management of such issues will not be efficient.") (citing, *inter alia, Szabo,* 249 F.3d at 675).

## CONCLUSION

For all of the aforementioned reasons, the Court respectfully denies the Plaintiffs' class certification motion (D.E.85). The Court is unpersuaded that the proposed class treatment is sensible, as it fails independently on predominance, superiority, and manageability grounds under well settled law. Under the circumstances presented, certification under Fed.R.Civ.P. 23(b)(3) is inappropriate.

So ordered.

N.D.Ill.,2006.
Hamilton v. O'Connor Chevrolet, Inc.
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2005 WL 2007147 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2007147)**

**H**
Iosello v. Lawrence
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Christopher IOSELLO, Plaintiff,
v.
Victor LAWRENCE, doing business as Lexington
Law Firm, Defendant.
**No. 03 C 987.**

Aug. 18, 2005.

Daniel A. Edelman, Alexander Holmes Burke,
Anne Michelle Burton, Cathleen M. Combs, James
O. Latturner, Tara Leigh Goodwin, Edelman,
Combs, Latturner & Goodwin, LLC, Chicago, IL,
for Plaintiff.
Steven Craig Florsheim, Adam P. Merrill, Matthew
P. Weisman, Sperling & Slater, Angela Dawn
Cook, Fisher Kanaris, P.C., David P. Germaine,
Daar & Vanek, P.C., Chicago, IL, Blake S. Atkin,
Lonn Litehfield, Atkin & Hawkins P.C., Joann
Shields, Atkins & Howard, Salt Lake City, UT, M.
Kevin Jones, M. Kevin Jones LLC, Ogden, UT, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

GUZMAN, J.
**\*1** Plaintiff filed a class action complaint alleging
violations of the Credit Repair Organizations Act
("CROA"), 15 U.S.C. § 1679*et seq.,* and the Illinois
Consumer Fraud and Deceptive Business Practices
Act ("ICFA"), 815 ILL. COMP. STAT.. 505/2*et
seq.* Before the Court is plaintiff's objection to Ma-
gistrate Judge Michael T. Mason's Report and Re-
commendation in which he recommends that
plaintiff's motion for class certification be denied.
For the following reasons, the Court adopts Magis-
trate Judge Mason's Report and Recommendation
and denies plaintiff's motion to certify a class.

*FACTS*

In this class action, Christopher Iosello has sued
Victor Lawrence d/b/a Lexington Law Firm
("Lexington") alleging that Lexington's business
practices do not comply with the CROA or ICFA.
He alleges that he contracted with Lexington Law
Firm for credit repair services via the Internet, mail
and telephone during 2002. (Second Am. Compl. ¶
6.) The terms of the contract were set forth on an
Internet site maintained by Lexington. (*Id.* ¶
6;*id.*Exs. A & B.) Plaintiff paid approximately
$145.00 to Lexington for credit repair services pur-
suant to such contract, which was refunded in full
by Lexington.(*Id.* ¶ 8.) Plaintiff alleges that Lexing-
ton's contract violates the CROA in three ways: (1)
it has insufficient and improper disclosures; (2) it
makes false or misleading representations; and (3)
it contains an unlawful payment scheme. (*Id.* ¶¶
11-44.)Plaintiff further alleges that the CROA viol-
ations also constitute violations of the ICFA as de-
ceptive and unfair business practices. (*Id.* ¶¶ 53-59.)

He alleges that Lexington's procedures do not com-
ply with three separate statutorily required disclos-
ure statements of the CROA. First, plaintiff alleges
that Lexington's written disclosure statement does
not mirror the language and direction of 15 U.S.C.
§ 1679c(a) and (b). Second, plaintiff alleges that
Lexington's contract cancellation disclosure does
not comply with 15 U.S.C. § 1679(b)(4). Third,
plaintiff alleges that Lexington does not properly
disclose the right of consumers to cancel their con-
tract as required by a "Notice of Cancellation" un-
der 15 U.S.C. § 1679e.

Fourth, plaintiff alleges that Lexington made false
or misleading representations in violation of the
CROA, 15 U.S.C. § 1679d(a)(3), which states that
no person may "make or use any untrue or mislead-
ing representation of the services of the credit re-
pair organization."These allegations center on
claims that Lexington's website, contract and dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2007147 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2007147)

closures imply it will write letters on a Lexington letterhead signed by a Lexington attorney, but instead Lexington sends letters to credit bureaus in its customers' names. (*Id.* ¶¶ 21-26.)

Finally, plaintiff alleges that Lexington's fee structure, charging a $75.00 file initialization fee and $35.00 per month charge for services performed thereafter, violates several provisions of the CROA. Plaintiff alleges this violates 15 U.S.C. § 1679b(b), which states that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."(*Id.* ¶¶ 27-34.)Plaintiff also alleges that Lexington's fee structure does not disclose, in writing, "the total amount of all payments to be made by the consumer to the credit repair organization or to any other person" as required by 15 U.S.C. § 1679d(b)(1).(*Id.* ¶¶ 35-40.)In addition, plaintiff alleges that Lexington's estimated length of period to perform does not comply with 15 U.S.C. § 1679d(b)(2)(B).(*Id.* ¶¶ 41-42.)

**\*2** Plaintiff's Second Amended Complaint also alleges two class action claims. Plaintiff's CROA claim is brought on behalf of a class consisting of all persons who contracted with Lexington on or after a date five years prior to the filing of this action. (*Id.* ¶ 45.)Plaintiff's ICFA claim is brought on behalf of a class consisting of all persons with an Illinois address who contracted with Lexington on or after a date three years prior to the filing of this action. (*Id.*)

Plaintiff seeks certification of two classes. The CROA Class is defined as "all consumers who paid a fee to, or were charged a fee by, Lexington Law Firm or Victor Lawrence for the purpose of challenging inaccurate, misleading, or unverifiable negative items on their credit reports between Feb. 10, 1998 and the present."(Pl.'s Mot. Incorporating Mem. Supp. Mot. Class Certification ("Pl.'s Obj.") at 2.) The ICFA Class is defined as "all consumers located in Illinois who paid a fee to Lexington Law

Firm or Victor Lawrence for the purpose of challenging inaccurate, misleading, or unverifiable negative items on their credit reports between Feb. 10, 2000 and the present."(*Id.*)

### DISCUSSION

Federal Rule of Civil Procedure ("Rule") 72 provides for the referral of pretrial matters to a magistrate judge. FED. R. CIV. P. 72. However, a motion for class certification may not be decided independently by a federal magistrate judge. 28 U.S.C. § 636(b)(1)(A). Accordingly, the district court has the authority to make the final determination on the motion and must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."28 U.S.C. § 636(b)(1).

For a class to be certified, the party seeking certification must first satisfy each of the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."FED. R. CIV. P. 23(a). Once these requirements are satisfied, the plaintiff must also satisfy one of Rule 23(b)'s requirements. *Cwiak v. Flint Ink Corp.,* 186 F.R.D. 494, 496 (N.D.Ill.1999). Because plaintiff has moved to certify the classes under Rule 23(b)(3), plaintiff must show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."FED. R. CIV. P. 23(b)(3). A failure of any of the requirements of Rule 23 results in a denial of class certification. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

Plaintiff objects to Magistrate Judge Mason's re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2007147 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2007147)

Page 3

commendation regarding the absence of numerosity, typicality and commonality under Rule 23(a). Specifically, plaintiff raises three objections: (1) Magistrate Judge Mason's determination that "plaintiff has not provided sufficient proof of numerosity was premature because plaintiff's objection to the Magistrate's prior recommendation denying plaintiff's motion to compel information about the class members had not yet been resolved," (2) notwithstanding the previous objection, plaintiff argues it has submitted sufficient evidence of numerosity, and (3) the requirements of typicality and commonality are met because defendant "does not dispute the terms of the standard form contract plaintiff is challenging, and the majority of plaintiff's claims are ... dependent on the terms of Lexington's form contract and Lexington's standard business practices."(Pl.'s Obj. at 1-2.)

A. Discovery Issues at the Time of Magistrate Judge Mason's 10/8/04 Report and Recommendation Have Since Been Resolved

*3 On July 1, 2004, the day after discovery closed, plaintiff moved to compel discovery of documents plaintiff now claims are essential to establishing numerosity. On that same day, Magistrate Judge Mason denied plaintiff's motion to compel or alternatively for rule to show cause. Plaintiff then sought review of that order by this Court, and such review remained pending as of October 8, 2004, the date of Magistrate Judge Mason's Report and Recommendation to deny class certification. Plaintiff contends that "it was erroneous for Judge Mason to deny class certification for failure to provide sufficient information regarding class size, given the fact that plaintiff's objection was still pending."(Pl.'s Obj. at 7.)

However, on December 13, 2004, this Court rejected plaintiff's objections to Magistrate Judge Mason's July 1, 2004 denial of plaintiff's motion to compel or alternatively for rule to show cause and ruled:

[W]ith regard to Magistrate Judge Mason's denial of Iosello's Motion to Compel, or Alternatively for Rule to Show Cause on July 1, 2004, the Court finds no error. Magistrate Judge Mason's Memorandum Opinion and Order of March 1, 2004 compelled Defendant to respond to specific interrogatories and document production requests. (Mem. Op. & Order of 3/1/04 at 6.) However, Magistrate Judge Mason clearly ordered Plaintiff to redraft and resubmit interrogatories 2, 3, and 4 to Defendant. (Id. at 2, 6.) In essence, the Motion to Compel was granted as to the inapplicability of the attorney-client privilege. (Id. at 2.) However, it is clear that Magistrate Judge Mason deemed interrogatories 2, 3, and 4 too broad and ordered them narrowed. (Id.) Thus, he could not have compelled a response to an interrogatory that had not yet been drafted.

Plaintiff combined interrogatories 2, 3, and 4, resulting in the completely new interrogatory 4a, and submitted it to Defendant as required. Defendant did not reply to the newly drafted interrogatory. For over two months Plaintiff did not compel Defendant's reply or seek any clarification from the Court. In fact, it was Defendant who moved for clarification on the newly drafted 4a on June 16, 2004. Plaintiff, with the end of discovery looming, waited until July 1, 2004 to notice-up a motion in order to compel such an answer. Plaintiff incorrectly states that the Magistrate Judge and this Court have compelled the defendant to answer interrogatory 4a (Pl.'s Obj. Mag.'s Ruling at 4.) Therefore, Plaintiff's argument of law of the case must fail because interrogatory 4a was not in existence at the time of the Memorandum Opinion and Order of March 1, 2004. Thus, this Court could not have addressed it in its May 24, 2004 Memorandum Opinion and Order in which it rejected Defendant's objections regarding Magistrate Judge Mason's March 1, 2004 order.

This Court holds that Magistrate Judge Mason was well within his discretion to enforce the cut-off date of discovery, to find the motion to compel untimely, and to hold that interrogatory 4a had at no time been compelled. Accordingly, the Court re-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2007147 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2007147)

Page 4

jects Iosello's objections to Magistrate Judge Mason's ruling of July 1, 2004.

*4 (Order of 12/13/04.) Thus, plaintiff's objection to Magistrate Judge Mason's Report and Recommendation regarding the denial of class certification might have been meritorious only if the scope of discovery had changed. However, after December 13, 2004, the status of discovery was exactly as it was on October 8, 2004, the date of Magistrate Judge Mason's Report and Recommendation regarding the denial of class certification. Plaintiff's objections regarding discovery issues were fully addressed and rejected by this Court on December 13, 2004. Therefore, plaintiff's objection to Magistrate Judge Mason's October 8, 2004 Report and Recommendation based on unresolved discovery issues is without merit.[FN1]

> FN1. In addition, it is important to note that plaintiff had eight months for completion of discovery, which included the Court's granting of two extensions of the discovery deadline. Plaintiff waited until after close of discovery to bring to the attention of the Court any issues regarding Lexington's alleged unresponsiveness to discovery requests. The fault must be laid at plaintiff's own door because the Court must always be allowed to enforce the cut-off dates of discovery. *Landis v. N. Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936) (the court has power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.")

B. Insufficient Evidence of Numerosity under Rule 23(a).

Plaintiff has not met his burden to establish the numerosity requirement of Rule 23(a)(1), which requires that the class be "so numerous that joinder of all members is impracticable."FED. R. CIV. P. 23(a)(1). In establishing numerosity, plaintiffs "are not required to specify the exact number of persons in the class, but cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity."*Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir.1989) (internal citations omitted).

In this case, plaintiff contends that Lexington had 80,000 clients for credit repair during the years of the proposed class period. (Pl.'s Obj. at 4.) Plaintiff then opines that because the alleged CROA violations involve defendant's standard contract and business procedures, the number of potential class members must exceed the forty generally required to satisfy the numerosity requirement. (*Id.*) However, plaintiff has made no factual showing that any of Lexington's other 80,000 clients were subjected to any of these same alleged CROA violations. At best, plaintiff compiles inference upon inference to argue that

[i]f an even number of clients were signed up every year, Lexington had over 13,000 clients per year. Thus, even if Lexington made material changes to the pages in dispute in its contract and/or website, every singe day, there would be at least 36 people who saw the same website and entered the same contract as Mr. Iosello did.

(*Id.* at 7.) Although this Court may rely on common sense assumptions or reasonable inferences in determining numerosity for class certification, *Ringswald v. County of DuPage,* 196 F.R.D. 509, 512 (N.D.Ill.2000), plaintiff's speculative calculations as to the number of potential class members who *may* have viewed the same web pages on any given day or *may* have signed the same contract are insufficient to satisfy his burden of establishing numerosity, *see Jenkins v. Mercantile Mortgage Co.,* 231 F.Supp.2d 737, 744 (N.D.Ill.2002). In *Jenkins,* the plaintiff argued that defendant was "a business of substantial size that uses printed form documents to engage in the practice of retaining funds for government distribution, and that this use of forms allows [the Court] to infer the existence of a sufficiently large class of plaintiffs."*Id.* The *Jenkins* court rejected this argument as too speculative to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2007147 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2007147)**

support class certification stating that although defendant used a form with the plaintiff and other customers, it did not inherently follow that a number of plaintiffs in the proposed class must exist. *Id.*

**\*5** A plaintiff's failure to put forth sufficient or even minimal evidence of numerosity is enough to deny a motion for class certification. *See Retired Chi. Police Ass'n v. City of Chi.,* 7 F.3d 584, 596 (7th Cir.1993) (stating all four elements of Rule 23(a) must be satisfied in order to certify the class). However, even if plaintiff were able to establish numerosity, which he does not, the Court would still deny the motion to certify the class because he has not established typicality or commonality. The Court will address those elements as well.

C. Insufficient Evidence of Typicality and Commonality under Rule 23(a).

Plaintiff objects to Magistrate Judge Mason's recommendation regarding the absence of typicality as required under Rule 23(a)(3). Under Rule 23(a), the class representative is required to show that either his claims or defenses are typical of those of the class. FED. R. CIV. P. 23(a)(3)."A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."*De La Fuente v. Stokely-Van Camp. Inc.,* 713 F.2d 225, 232 (7th Cir.1983). Typicality may be found even where "there are factual distinctions between the claims of the named plaintiffs and those of other class members."*Id.*"Instead, we look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3)."*Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). A plaintiff's claims are not typical if "proving them does not necessarily prove all the proposed class members' claims."*Calkins v. Fid. Bond & Mortgage Co.,* No. 94 C 5971, 1998 WL 719569, at \*2 (N.D.Ill. Oct.8, 1998). Moreover, general allegations in support of a motion for certification are presumed true, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), but a litigant may not rest on mere conclusory allegations, and must make a minimal factual showing that the conditions for certification exist, *Young v. Lehigh Corp.,* No. 80 C 4376, 1989 WL 117960, at \*16 (N.D.Ill. Sept.28, 1989).

In this case, plaintiff purports to define the classes as *all consumers* who paid or were charged a fee by Lexington for the purpose of challenging inaccurate, misleading or unverifiable negative items on their credit reports. Although plaintiff alleges these violations are representative of Lexington's standard business procedures, there is no attempt to limit the proposed class to Lexington clients who entered the same (even a substantially similar) contract or viewed the same web pages as the plaintiff.

This Court finds, for all of the reasons that Magistrate Judge Mason did, that plaintiff has failed to meet his burden to put forth sufficient evidence of typicality. Plaintiffs have not sufficiently established that the allegations of systematic disclosure violations, false or misleading representations, and payment violations apply to the proposed class of *all* Lexington consumers. Further, this Court agrees with Magistrate Judge Mason that

**\*6** [i]t is entirely possible that members of the proposed class entered into contracts which did not contain any of the CROA violations alleged in plaintiff's complaint. As a result, it is impossible to determine whether plaintiff's claims arise from the same practice or course of conduct as the class members' claims.

*Iosello v. Lawrence,* No. 03 C 987, 2004 WL 2304548, at \*2 (N.D.Ill. Oct. 12, 2004). In short, plaintiff has failed to show that he is typical of *all* Lexington consumers.

Additionally, plaintiff objects to Magistrate Judge Mason's recommendation regarding the absence of commonality as required under Rule 23(a)(3). Under Rule 23(a)(2), there must be questions of law or fact common to the class.FED. R. CIV. P. 23(a)(2).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2007147 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2007147)

However, "[n]ot all factual or legal questions raised in the litigation need to be common so long as at least one issue is common to all class members."*McDonald v. Washington Mut. Bank,* No. 99 C 6884, 2000 WL 875416, at *2 (N.D.Ill. June 26, 2000). Generally, the commonality requirement is met when there is a common nucleus of operative fact. *Rosario,* 963 F.2d at 1018.

For similar reasons as to why plaintiff failed to meet the requirement of typicality, this Court finds that plaintiff failed to set forth any factual showing that Lexington's alleged violations were imposed on the proposed class. Plaintiff argues that the common question, predominating all other issues, is whether Lexington's standard operating procedures violated the CROA or ICFA. Indeed, the use of form contracts does create an ideal situation for certifying a class action. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action ....") (internal quotations omitted). In *Keele v. Wexler,* the court certified a class action based on form letters for debt collection under the Fair Debt Collection Practices Act. *Id.* at 592.However, the class in *Keele* was defined as "all Colorado residents who have *received collection letters from defendants* within the relevant time period."*Id.* (emphasis added). Again, however, plaintiff has not established any factual support for the contention that *all* Lexington consumers who paid or were charged a fee for the purpose of challenging inaccurate, misleading, or unverifiable negative items on their credit reports were subjected to the same or substantially similar contract, relied on or viewed the same web pages as the plaintiff, or were subjected to any of the alleged CROA violations. Therefore, plaintiffs has failed to establish commonality regarding the classes as defined, as required under Rule 23(a)(2).

## CONCLUSION

For the foregoing reasons, the Court adopts the Re-

port and Recommendation of Magistrate Judge Michael T. Mason in full and therefore denies plaintiff's motion for class certification [doc. no. 126-1].

*7 SO ORDERED

N.D.Ill.,2005.
Iosello v. Lawrence
Not Reported in F.Supp.2d, 2005 WL 2007147 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 845336 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 845336)

Page 1

**H**
Duffin v. Exelon Corp.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Kenneth DUFFIN, Teresa Duffin, Paul Orloff, Joann Orloff, Victor Rodriguez, Barbara Rodriguez, individually and on behalf of all others similarly situated, Plaintiffs,
v.
EXELON CORPORATION, Commonwealth Edison Company, and Exelon Generation Company, LLC, Defendants.
**No. CIV A 06 C 1382.**

March 19, 2007.

Nicholas Evans Sakellariou, McKeown, Fitzgerald, Zollner, Buck, Hutchison & Ruttle, Joliet, IL, Brian Lacien, Powers, Rogers & Smith, Chicago, IL, Douglas McNamara, James J. Pizzirusso, Richard S. Lewis, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Esther E. Berezofsky, Williams Cuker Berezofsky, Cherry Hill, NJ, Gerald J. Williams, Williams Cuker Berezofsky, Philadelphia, PA, for Plaintiffs.
Jeffrey D. Colman, David Eric Jimenez-Ekman, Shannon P. Bartlett, Jenner & Block LLP, Chicago, IL, John G. Harkins, Jr., Marianne Consentino, Philadelphia, PA, Richard B. Herzog, Simon A. Steel, Harkins Cunningham LLP, Washington, DC, for Defendants.

*MEMORANDUM OPINION AND ORDER*

CONLON, J.

*1 Kenneth and Teresa Duffin, Paul and Joann Orloff, and Victor and Barbara Rodriguez brought this putative class action against the Exelon Corporation, owner of the Braidwood nuclear power plant, and its subsidiaries, Exelon Generation Company, LLC and Commonwealth Edison Company (collectively, "Exelon"). Plaintiffs allege Exelon committed negligence, public and private nuisance, trespass, and fraud by releasing water containing hazardous tritium into communities surrounding the plant. The court denied Exelon's motion to dismiss. *Duffin v. Exelon Corp.,* No. 06 C 1382, 2006 WL 1710597, at *3 (N.D.Ill. June 16, 2006) (Conlon, J.). Plaintiffs now move for class certification. For the reasons set forth below, the motion is denied.

BACKGROUND

Exelon operates the Braidwood Generating Station, a nuclear power plant located approximately 60 miles southwest of Chicago. Am. Compl. at ¶¶ 2, 16. Within five miles of the plant are three towns-Braidwood, Godley, and Braceville-with a combined population of approximately 6,500. *Id.* at ¶ 17; Opp'n at Ex. 2. Exelon is authorized to discharge water containing tritium, a radioactive isotope, into the nearby Kankakee River where it is diluted. *Id.* at ¶¶ 18, 50.The tritiated water runs to the river through an underground pipe known as the "blowdown line." *Id.* at ¶ 18.Exelon is not authorized to otherwise release tritiated water because tritium poses a health threat in large doses. *Id.* at ¶¶ 54, 59.

According to the complaint, six million gallons of tritiated water were spilled along the blowdown line from 1996 to 2000. *Id.* at ¶¶ 2, 26, 28.The spills occurred primarily on Exelon land. *Id.* at ¶¶ 2, 26.Through evaporation and soil seepage, tritium entered the surrounding communities' air and groundwater. *Id.* Specifically, the spills caused a groundwater "plume" containing elevated tritium levels. *Id.* at ¶ 26.The plume extends outside Exelon's property. *Id.* Pools of standing tritiated water evaporated, causing tritium to enter the air. *Id.* Plaintiffs allege the air and groundwater are contaminated for miles surrounding the plant. *Id.* at ¶¶ 3, 26, 33, 34, 60.They contend tritium contamination has disrupted the use and enjoyment of their property and caused an "economic stigma" lower-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 845336 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 845336)**

ing their property values. *Id.* at ¶¶ 64, 65.Plaintiffs seek class certification for claims of negligence, public and private nuisance, trespass, and fraud. *Id.* at ¶¶ 79, 87-147.

### DISCUSSION

#### I. Legal Standards

The court has broad discretion whether to grant class certification. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998). Certification is appropriate if plaintiffs demonstrate the proposed class satisfies all four requirements of Fed.R.Civ.P. 23(a)-numerosity, commonality, typicality, and adequacy of representation-and one condition of Rule 23(b).*Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006); *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). The court must not consider the case's merits. *Allen v. Chicago Transit Auth.,* No. 99 C 7614, 2000 WL 1207408, at *5 (N.D.Ill. July 31, 2000) (Conlon, J.) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). However, the court may "prob[e] behind the pleadings" to determine if the proposed class members' interests are fairly encompassed within the named plaintiffs' claims.*Id.* (citing *General Tel. Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)); *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 675-76 (7th Cir.2001). The court does not "talismanically accept" plaintiffs' factual allegations as true when determining certification. *Hyderi v. Washington Mut. Bank,* 235 F.R.D. 390, 395 (N.D.Ill.2006) (Filip, J.). A class action should be certified only if the court is satisfied "after a rigorous analysis" that Rule 23 is met. *Id.* (quoting *Falcon,* 457 U.S. at 161).

#### II. Analysis

**\*2** Plaintiffs propose the following class:

All present owners of property (not including the

Defendants) located within the towns or villages of Godley, Braidwood, and Wilmington or unincorporated areas surrounding those towns, and located within the boundaries of I-55 on the west; West Coal City Road on the north; the southern tip of the Exelon cooling pond or McGuire Road on the south; and the Kankakee River on the east.

Class Memo. at 5.[FN1] Plaintiffs contend the class meets the requirements of Fed.R.Civ.P. 23(a) and (b)(3). Plaintiffs rely primarily on five mass tort contamination cases where this court granted class certification. *See Cannata v. Forest Pres. Dist.,* No. 06 C 2196, Slip op. (N.D.Ill. Oct.11, 2006) (Hibbler, J.); *Muniz v. Rexnord Corp.,* No. 04 C 2405, 2005 WL 1243428 (N.D.Ill. Feb.10, 2005) (Darrah, J.); *Ludwig v. Pilkington North Am., Inc.,* No. 03 C 1086, 2003 WL 22478842 (N.D.Ill. Nov.4, 2003) (Zagel, J.); *Mejdreck v. Lockformer Co.,* No. 01 C 6107, 2002 WL 1838141 (N.D.Ill. Aug.12, 2002) (Hibbler, J.), *aff'd,*319 F.3d 910 (7th Cir.2003); *LeClercq v. Lockformer Co.,* No. 00 C 7164, 2001 WL 199840 (N.D.Ill. Feb.28, 2001) (Leinenweber, J.). Exelon argues certification is not appropriate because plaintiffs lack standing, the proposed class is overbroad, and Rule 23's requirements are not met. Plaintiffs counter that Exelon's arguments impose an improperly high evidentiary threshold to obtain class certification.

> FN1. Plaintiffs' amended complaint proposed a class much larger in scope: residents and property owners "within a 10-mile radius of the Plant including, but not limited to, Godley, Braidwood, and Wilmington."Am. Compl. at ¶¶ 76, 77. The class certification motion encompasses the towns of Godley, Braidwood, and Braceville, which together contain approximately 6,500 residents and 2,500 properties. Opp'n at Ex. 2.

#### A. Standing

Exelon initially contends that class certification is not appropriate because plaintiffs lack standing.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exelon argues that plaintiffs have failed to show an injury commensurate with the class because they live over a mile from the alleged groundwater plume and tritium is not present on their property in detectable levels. Although this appears to be an argument under Rule 23(a), it is addressed separately because it implicates the court's jurisdiction. *See Smith v. Wisconsin Dep't of Agric., Trade & Consumer Prot.,* 23 F.3d 1134, 1142 (7th Cir.1994) ("[s]tanding and ripeness are jurisdictional prerequisites").

For Article III standing, plaintiffs must allege they sustained "personal injury[-in-fact] fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."*Johnson v. Allsteel, Inc.,* 259 F.3d 885, 887 (7th Cir.2001) (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (injury-in-fact is concrete, particularized, and actual or imminent harm). Plaintiffs allege their property was contaminated when Exelon spilled millions of gallons of water containing potentially harmful radioactive chemicals. Am. Compl. at ¶¶ 2-4. According to plaintiffs, the alleged contamination has interfered with the use and enjoyment of their property and diminished their home values. *Id.* at ¶ 4. Plaintiffs further contend they relied on Exelon's misrepresentations regarding the plant's safety and the spills' potential health risks. *Id.* at ¶¶ 139-147.These allegations are adequate to confer Article III standing. *See Family & Children's Ctr., Inc. v. School City of Mishawaka,* 13 F.3d 1052, 1058 n. 3 (7th Cir.1994) (standing inquiry exclusively addresses whether plaintiffs alleged facts satisfying constitutional and prudential limitations; the complaint's merits are not relevant).

**\*3** Once standing is established by the named plaintiffs, there is no separate class standing requirement "in the constitutional sense." *In re General Motors Corp. Dex-Cool Prods. Liab. Litig.,*

No. MDL-03-1562-GPM, 2007 WL 522300, at \*4 (S.D.Ill. Feb. 16, 2007) (Murphy, C.J.); 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2:5 (4th ed. 2002 & Supp.2006) (collecting cases). Rather, class standing is satisfied if plaintiffs demonstrate they meet Rule 23(a)'s requirements. *Payton v. County of Kane,* 308 F.3d 673, 681 (7th Cir.2002); *Irving Trust Co. v. Nationwide Leisure Corp.,* 95 F.R.D. 51, 57 n. 6 (S.D.N.Y.1982) ("Generally, when the Rule 23(a) prerequisites are met, there will be standing, since those prerequisites demand that the plaintiff alleged injury resulting from a class wrong.").

### B. Overbreadth

Exelon argues against class certification because the proposed class is "grossly overbroad." Opp'n at 5. Exelon contends the class definition, which is described strictly in geographic terms, has no relation to actual tritium contamination. According to Exelon, even accepting plaintiffs' contamination models as true, only three properties outside the plant's boundaries are contaminated by the groundwater plume. None are contaminated by airborne tritium. Exelon contends there is no evidence to support a proposed class encompassing over 2,500 properties and 6,500 residents. Plaintiffs respond that their expert evidence sufficiently demonstrates that all the proposed class members' properties have been contaminated by tritium.

A well-recognized prerequisite to class certification is that the proposed class must be sufficiently definite and identifiable. *Guillory v. American Tobacco Co.,* No. 97 C 8641, 2001 WL 290603, at \*2 (N.D.Ill. Mar.20, 2001) (Guzman, J.) (citing *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir.1977)). Overbroad class descriptions violate the definiteness requirement because they "include individuals who are without standing to maintain the action on their own behalf."*Oshana,* 225 F.R.D. at 580. When determining overbreadth, courts inquire whether the class is defined by the defendants' activities. *Daigle v. Shell Oil Co.,* 133

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.R.D. 600, 602 (D.Col.1990) (citing *Rochford,* 565 F.2d at 978).

The proposed class is plainly overbroad. The class area is defined in geographic terms unrelated to evidence of actual tritium contamination. The boundaries of the class-Interstate 55, West Coal City Road, McGuire Road, and the Kankakee River-create a trapezoid outlining the plant. Class Memo. at Ex. 7; Opp'n at Ex. 5. But the groundwater plume and other locations with appreciably elevated tritium levels are located closely around the Exelon pond and the blowdown line, which are miles from the outer boundaries of the defined class properties. *Id.* Moreover, the groundwater plume constitutes a fraction of the class area. Opp'n at 6, Ex. 3 at ¶ 11 (plume area is less than 2% of class area). Although plaintiffs contend "tritium levels are elevated above background throughout the [class] area," they provide no supporting evidence. Instead, they cite to the complaint, which refers to tritium levels in the plume or along the blowdown line. Class Memo. at 4; Am. Compl. at ¶ 62. Plaintiffs rely on an expert report by Dr. Paul Rosenfeld, an soil chemistry and air dispersion modeling expert. Reply at Ex. 1, ¶ 1. But the report and attached charts do not identify appreciably elevated tritium levels in locations other than near the plume or the blowdown line. *Id.* at Ex. 1, ¶ 3; App. C. Plaintiffs' reliance on the scope of Exelon's bottled water program is misplaced; providing bottled water is not probative evidence of the geographic scope of contamination. Class Memo. at 3; Opp'n at Ex. 5.

**\*4** Plaintiffs' airborne contamination evidence is not related to the class area. Even assuming the highest tritium concentration and evaporation rates, the models do not coincide with class boundaries. Sur-reply at Ex. 1 (Rosenfeld Tr. at 44, 178, 185-86), Ex. 3 (concentric circles emanating outward from plant). The models do not justify plaintiffs' proposed class area of over 25 square miles. *Id.* at 4 (approximately 26% of class area is outside 5000 meter outer contamination circle).

There is simply no correlation between plaintiffs' evidence concerning the location of contaminated air and groundwater, and the "arbitrarily drawn lines on a map" constituting plaintiffs' proposed class. *See Daigle,* 133 F.R.D. at 602-03 (rejecting geographically described class area where plaintiff failed to "identify any logical reason relating to the defendants' activities").

Plaintiffs argue the proposed class is consistent with other certified property contamination cases employing geographic boundaries. Although plaintiffs do not identify the cases, they rely on five mass tort certification decisions throughout their motion. However, only two of those cases addressed purely geographic classes. *See Cannata,* No. 06 C 2196, at 2-3 (class defined by residents' addresses); *Ludwig,* 2003 WL 22478842, at \*1 (class defined by owning property or residing in town of Naplate). In both cases, the proposed classes were smaller in scope and more closely tied to the geographic boundaries. *Id.* (80 home class in *Cannata;* 600 resident class in *Ludwig* ); Opp'n at Exs. 10, 11. Further, there was a showing of class-wide contamination in both cases. *Id.* Plaintiffs do not cite authority supporting certification of a geographically-based, 6,500 member class where there is no evidence of area-wide contamination. *See e.g., Mejdreck,* 2002 WL 1838141, at \*2 (class defined as those residing in contamination plume whose property had been impacted); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Lit.,* MDL 1358(SAS), 2007 WL 541954, at \*1 (S.D.N.Y. Feb. 20, 2007) (class defined as those living in vicinity of contamination whose property was contaminated). Plaintiffs' class definition is overbroad and they have failed to identify a sufficiently definite class. *Guillory,* 2001 WL 290603, at \*2.[FN2]

> FN2. Plaintiffs "economic stigma" argument fails for the same reason: there is no connection between the proposed class boundaries and evidence of a stigma caused by tritium contamination. Plaintiffs' expert fails to offer any evidence demon-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                      Page 5
Slip Copy, 2007 WL 845336 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 845336)**

strating how and to what extent the alleged economic stigma warrants the extremely broad class area. Sur-reply at 8-9; Ex. 5 (Kilpatrick Tr. at 21-27, 45, 103-04, 186).

Plaintiffs invite the court to narrow the class definition to cure its overbreadth. Because class certification is inappropriate under Rule 23, the court declines to redraft the class definition. *See Culver v. City of Milwaukee,* 277 F.3d 908, 912 (7th Cir.2002) (declining to divide overbroad class into subclasses when Rule 23(a)'s requirements not met); *Oshana,* 225 F.R.D. at 581 (refusing to redraft class description).

C. Rule 23(a)

1. Numerosity

Rule 23(a) requires the class be so numerous that joinder of its members is impracticable. FED. CIV. P. 23(a)(1). Impracticability does not mean impossibility; plaintiffs need only prove it would be inconvenient and difficult to join the proposed class members. *Bethards v. Bard Access Sys., Inc.,* No. 94 C 1522, 1995 WL 75356, at *3 (N.D.Ill. Feb.22, 1995) (Guzman, J.). Although Rule 23(a)(1) contains no threshold requirement, generally 40 or more members are adequate to establish numerosity. *Hyderi,* 235 F.R.D. at 396. Plaintiffs argue numerosity is easily met because thousands of people live within the class area.

**\*5** Given the overbroad class definition, the court cannot accept plaintiffs' numerosity argument. Plaintiffs have failed to provide evidence that tritium contamination is present throughout the class area. The evidence shows that only three non-Exelon properties touch the largest groundwater plume and none touch the smaller plumes. Opp'n at 6-7, Ex. 4. Less than ten properties are contiguous to the affected properties. *Id.* Only 27 properties within the proposed class area (out of 450 tested) show tritium levels above 200 pCi/l; only four of those show levels above 400 pCi/l. *Id.* at Ex. 3, ¶

14. Most of the class' property falls well within safe groundwater standards acknowledged by plaintiffs. Am. Compl. at ¶ 23 (EPA regulations indicate 20,000 pCi/l constitutes safe tritium levels in groundwater). It is inappropriate for the court to determine the tritium level that constitutes contamination or the contamination level that constitutes property damage for the purposes of this motion. However, plaintiffs provide no evidence that tritiated groundwater has contaminated properties throughout the proposed class area. The graphs of plaintiffs' expert show appreciably heightened tritium levels only around the plume and along the blowdown line. Reply at Ex. 1, App. C. According to plaintiffs, "dozens" of residents live in those areas. Class Memo. at 7. That rough estimate is speculative and insufficient to fulfill Rule 23(a)(1)'s numerosity requirement. *Hyderi,* 235 F.R.D. at 396.

Plaintiffs' air contamination evidence also fails to support numerosity. The models plaintiffs rely on estimate airborne tritium levels shortly after 1998 and 2000 spills. Reply at Ex. 1, ¶¶ 5-9. The models do not offer evidence of tritium deposits, which are defined as the "concentration of any tritium that was on the ground or any other surface."Sur-reply at 4, Ex. 1 (Rosenfeld Tr. at 245-46). In other words, plaintiffs provide no evidence that properties within the class area were actually contaminated by airborne tritium. Plaintiffs fail to provide evidence that specific properties were affected by contaminated air. Without class-wide contamination evidence, plaintiffs are left with a speculative class. *Allen,* 2000 WL 1207408, at *7. Conclusory allegations and speculation do not satisfy Rule 23(a)(1).*Id.* Plaintiffs' argument that numerosity will be shown after additional discovery is unavailing. It is plaintiffs' burden to establish the appropriateness of class certification; they have had months to produce evidence supporting their motion. *Retired Chicago Police Ass'n,* 7 F.3d at 596.

2. Commonality and Typicality

The "key question" in determining commonality is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether there is at least one core issue of "law or fact common to the class."FED. R. CIV. P. 23(a)(2); *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). Put another way, "[a] common nucleus of operative facts" is usually enough to satisfy the requirement. *Keele,* 149 F.3d at 594. Exelon does not contest commonality. Plaintiffs identify at least six issues common to the class, including whether Exelon violated federal and state regulations by spilling tritiated water. The commonality requirement is satisfied. *Rosario,* 963 F.2d at 1018;*Oshana,* 225 F.R.D. at 581.

*6 Plaintiffs' claims are typical of the class if they arise from the same event, practice, or course of conduct giving rise to class members' claims, and the claims are based on the same legal theory. FED. R. CIV. P. 23(a)(3); *Oshana,* 472 F.3d at 514. Typicality is focused on the characteristics of the named plaintiffs relative to the class. *Hill v. Gateway 2000, Inc.,* No. 96 C 4086, 1996 WL 650631, at *4 (N.D.Ill. Nov.7, 1996) (Conlon, J.). Plaintiffs contend typicality is met because Exelon's conduct is central to all proposed class members' claims. Plaintiffs argue that "like the other prospective class members, [they] live in the area contaminated or stigmatized by Exelon's unauthorized releases of tritium."Class Memo. at 8. Exelon disputes typicality because the named plaintiffs' properties are outside the groundwater plume and there is no evidence of contamination.

Although the overbroad class definition muddies the issue, plaintiffs have demonstrated typicality. The central event in all the proposed class members' claims is Exelon's unauthorized release of tritiated water. There is no dispute the tritium spills occurred. Answer at ¶ 2. The class members' factual and legal theories are based on tritium contamination emanating from those spills. Am. Compl. at ¶¶ 87-147. Exelon is correct that significant factual variations exist between class members. Tritium levels vary drastically between properties inside and those outside the plume. In fact, according to plaintiffs' evidence, many properties have little or

no contamination at all. But factual inconsistencies between the class are not enough not defeat typicality.*Rosario,* 963 F.2d at 1018;*Ludwig,* 2003 WL 22478842, at *3 (typicality met where class members' complaints arose from defendants alleged improper disposal of arsenic, even though differing levels and sources of contamination). Accordingly, Rule 23(a)(3)'s requirements are met.

3. Adequacy of Representation

Rule 23(a) requires the named plaintiffs to fairly and adequately represent the proposed class' interests. FED. R. CIV. P. 23(a)(4); *Retired Chicago Police Ass'n,* 7 F.3d at 598. The adequacy determination has two elements: (1) plaintiffs' attorney must be qualified, experienced, and able to conduct the litigation; and (2) the named plaintiffs' interests must not be antagonistic to the class members' interests. *Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1982); *Oshana,* 225 F.R.D. at 582. Plaintiffs contend they meet both elements because they retained experienced class counsel and they assert claims identical to the class.

Exelon does not dispute the adequacy of class counsel. The court finds no reason to question the ability of plaintiffs' counsel to conduct this litigation. Rule 23(a)(4)'s competency requirement is met. *Hyderi,* 235 F.R.D. at 396.

Exelon does dispute that plaintiffs can adequately represent the class. Exelon argues plaintiffs are inadequate because their properties are located outside the plume and are uncontaminated. The level of plaintiffs' property contamination factually differentiates them from class members living in or near the plume. The same is true for the majority of the proposed class. But that does not render plaintiffs unable or unlikely to fully represent the class' interests. *Oshana,* 225 F.R.D. at 582;*Mejdreck,* 2002 WL 1838141, at *5. The entire class, including the named plaintiffs, asserts the same legal theories based on the same general nucleus of operative facts. Am. Compl. at ¶¶ 87-147. There is no

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

indication plaintiffs are antagonistic to the class or will face defenses inapplicable to other class members. *Oshana,* 225 F.R.D. at 582 (antagonistic interests defeat adequacy); *Allen,* 2000 WL 1207408, at *11 (adequacy compromised if named plaintiffs face defenses inapplicable to the proposed class). Under these circumstances, Rule 23(a)(4) is met.

D. Rule 23(b)

**\*7** Because plaintiffs fail to meet all Rule 23(a)'s requirements, their class certification motion fails. *See Retired Chicago Police,* 7 F.3d at 596 (all Rule 23(a) elements must be met before court certifies class). Even if plaintiffs could meet all of Rule 23(a)'s requirements, the motion still fails because they cannot satisfy Rule 23(b). Plaintiffs contend the proposed class is maintainable under Rule 23(b)(3), which requires: (1) that "questions of law or fact common to members of the class predominate over any questions affecting only individual members;" and (2) the "class action is superior to other available methods for resolving the controversy."FED. R. CIV. P. 23(b)(3); *Hyderi,* 235 F.R.D. at 398. Predominance concerns whether the named plaintiffs can offer proof on a class-wide basis through their individualized claims. *Id.* This requirement is distinct from Rule 23(a)(2)'s commonality element and "far more demanding." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Superiority is established when a class action would achieve "economies of time, effort, and expense," and promote uniformity of decisions without sacrificing procedural fairness. *Id.* at 615.

Rule 23(b)'s superiority element cannot be met given the court's numerosity determination. *See* sec. II(C)(1), *supra.* The evidence plaintiffs present indicates the only properties with appreciably elevated tritium levels are near the plume or along the breakdown line. Only three private properties touch the plume; just a handful more are contiguous to those properties. Class Memo. at 7; Opp'n at Ex. 4. At most, plaintiffs have shown a few dozen prop-

erty owners are affected by possible tritium contamination. A class action is not necessary to address the claims of so few. *Hyderi,* 235 F.R.D. at 396 (generally, 40 or more plaintiffs required to certify a class). Judicial economy and efficient litigation management would not be maximized by certifying a limited class, especially considering the onerous class action notice requirements. *See*FED. R. CIV. P. 23(c)(1)(B) (requiring detailed notice to all class members).

Even assuming superiority, plaintiffs have not shown common questions of the class predominate over questions affecting individual members. Plaintiffs support their predominance argument by analogizing this case to recent contamination cases in this court. *See Cannata,* No. 06 C 2196, Slip op.;*Muniz,* 2005 WL 1243428;*Ludwig,* 2003 WL 22478842;*Mejdreck,* 2002 WL 1838141;*LeClercq,* 2001 WL 199840). As explained above, those cases are factually distinguishable. None address an overbroad class where no evidence is offered establishing class-wide contamination. Plaintiffs' evidence shows substantial factual differences between class members whose properties touch the plume and those that do not. Significant trial time would be devoted to determining separate issues of liability regarding individual properties.*Diagle,* 133 F.R.D. at 604.While this concern did not mandate rejecting plaintiffs' typicality argument, the predominance element is more demanding.*Amchem,* 521 U.S. at 623-24. Accordingly, plaintiffs fail to demonstrate a class action is maintainable under Rule 23(b).

CONCLUSION

**\*8** Plaintiffs have not met their burden proving a class action is appropriate. The class definition is overbroad and indefinite, and the requirements of Rule 23 are not met. The motion for class certification must therefore be denied.

N.D.Ill.,2007.
Duffin v. Exelon Corp.
Slip Copy, 2007 WL 845336 (N.D.Ill.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 845336 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 845336)**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1146110)

**H**
Pruitt v. City of Chicago, Dept. of Aviation
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Bernard PRUITT, Leeannetta Baggett, Billy Bor-
um, David Davenport, Everett Fisher, Leander
Gibbs, William Olascoaga, Elaine Preston, Lamar
Rodez, and Willie Rolling, on behalf of themselves
and all others similarly situated, Plaintiffs,
v.
CITY OF CHICAGO, DEPARTMENT OF AVI-
ATION, Defendant.
**No. 03 C 2877.**

May 20, 2004.

Uche O. Asonye, Nydia Molina, Asonye and Asso-
ciates, Chicago, IL, for Plaintiffs.
Laura Shroyer Liss, Daniel A. Kaufman, Regina
Worley Calabro, Michael Best & Friedrich, LLC,
Chicago, IL, for Defendant.

*MEMORANDUM OPINION*

DERYEGHIAYAN, J.
**\*1** This matter is before the court on Bernard
Pruitt's, Leeannetta Baggett's, Billy Borum's, David
Davenport's, Everett Fisher's, Leander Gibbs', Wil-
liam Olascoaga's, Elaine Preston's, Lamar Rodez's,
and Willie Rolling's ("Plaintiffs") motion for class
certification as to Count I of their Class Action
Complaint filed against Defendant City of Chicago,
Department of Aviation ("Defendant"). Plaintiff
has also filed a motion to strike and/or exclude
statements procured by Defendant from putative
class members. In addition, Defendant has filed a
motion to strike certain portions of Plaintiffs' reply
to their amended motion for class certification.

For the reasons stated below, we deny Plaintiffs'
amended motion for class certification, as well as
Plaintiffs' motion to strike and/or exclude state-

ments procured by Defendant from putative class
members. Additionally, Defendant's motion to
strike is denied as moot.

BACKGROUND

Plaintiffs are African-American and Hispanic
laborers who are employed by the City of Chicago,
Department of Aviation. Plaintiffs allege that from
1992 to 2002, they were subjected to racial and na-
tional origin discrimination and harassment. Gener-
ally, Plaintiffs allege that harassing statements were
made to them by their supervisors and that they
were subjected to unfair working conditions be-
cause of their race and national origin. Plaintiffs
have mainly accused a former foreman of Defend-
ant named Anthony Jason ("Jason") for allegedly
making harassing statements.

Plaintiffs allege a pattern and practice of racial and
national origin harassment against African-Amer-
ican and Hispanic laborers prohibited by Title VII
of the Civil Rights Act of 1964 ("Title VII"), 42
U.S.C. § 2000*eet seq.*, and 42 U.S.C. § 1981 ("Sec-
tion 1981"). Plaintiffs seek class certification as to
Count I of their class action complaint for a class of
"all African-American and Hispanic employees,
classified as laborers, for the City of Chicago, De-
partment of Aviation at the O'Hare International
Airport Facility ("O'Hare") from 1992 to 2002 who
have been subjected to various forms of racial har-
assment because of Defendant's ineffective anti-
harassment policy."

LEGAL STANDARD

A plaintiff must first satisfy the requirements of
Rule 23(a) of the Federal Rules of Civil Procedure
in order to be granted a class certification.Rule
23(a) provides as follows:

One or more members of a class may sue or be sued
as representative parties on behalf of all only if (1)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 2
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1146110)

the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Failure by a plaintiff to satisfy any one of the above requirements precludes certification as a class. *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). If a plaintiff is able to satisfy all of the requirements of Rule 23(a), the district court must then determine whether a plaintiff's action can be maintained as a class action by meeting one of the requirements of Rule 23(b) of the Federal Rules of Civil Procedure. *See Williams v. Chartwell Fin. Servs., Ltd.,* 204 F.3d 748, 760 (7th Cir.2001)(explaining Fed.R.Civ.P. 23(b)(1)(2)(3)).

*2 In order to determine whether a class should be certified, a court may make factual and legal inquires necessary under Rule 23. *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 675-76 (7th Cir.2001). A court need not accept a plaintiff's assertions as conclusive, but may receive any evidence necessary to make a decision on class certification. *See id.*(explaining why the court accepts a complaint's factual allegations when ruling on motions to dismiss under Rule 12(b)(6) but does not when ruling on class certification motions under Rule 23).

## DISCUSSION

### I. Plaintiffs' Motion to Strike

Plaintiffs filed a motion to strike and/or exclude statements procured by Defendant from putative class members. Plaintiffs allege that Defendant's attorneys (1) participated in *ex parte* communications with putative class members; (2) have been undermining the express purpose of Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to de-

termining whether a class should be certified; and that as such (3) have committed violations of the ethical rules of professional conduct. The court finds that these allegations are without merit.

In this case, Plaintiffs have not supported their contention that any abuse took place as a result of Defendant's communications with the alleged putative class members. Plaintiffs claim that Defendant improperly contacted putative class members. This raises issues concerning whether or not the court needs to issue a protective order prohibiting communications between the parties and putative class members. The purpose of a protective order is to ensure that the putative class members' rights are protected and that the intent of Rule 23 is not undermined. The Seventh Circuit has stated that each side of an action generally has a "right" to send a communication to class members. *E.E.O.C. v. Mitsubishi Motor Mfg. of America, Inc.,* 102 F.3d 869, 870 (7th Cir.1996). While a court has limited "power to restrict communications between defendants and putative class members before the class is even certified ... such control is designed to prevent abuse of the class action process" such as "[c]ommunications that undermine the purposes of Rule 23 includ[ing] misleading communications and communications which affect a putative class members' decision to participate in the class action."*Wiginton v. Ellis,* 2003 WL 22232907, at *2 (N.D.Ill.2003)(citing *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99-100 n. 12, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981)). Generally, a Court issues "an order limiting discovery communications between parties and potential class members" only if such an order is warranted "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."*Williams,* 204 F.3d at 759. There is no evidence that Defendant abused the class action process or was involved in misleading communications. In addition, Plaintiffs have failed to supply this court with any evidence-except for three paragraphs of speculation-that any of the putative class members' rights were in any way

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1146110)

Page 3

threatened by such communication. Pl.'s Mot. To Strike pages 4-5. Plaintiffs also claim that Defendant's attorneys have committed violations of the ethical rules of professional conduct. Such an allegation is a serious allegation and needs to be supported with sufficient evidence. Plaintiffs have failed to provide sufficient evidence to support their claims.

**3** It appears that Plaintiffs' counsel's real motive in moving to strike the statements is to exclude evidence which might eventually be prejudicial to Plaintiffs' case. For instance, one of the documents that Plaintiffs are attempting to exclude is an affidavit from a Hispanic laborer at the Department of Aviation who not only states: "I have not been subject to, or seen anyone else subjected to any race discrimination, racial harassment, national origin discrimination or harassment, retaliation or any other improper treatment during my employment with the City," but also states: "I know the 10 people who filed this lawsuit and had heard that a discrimination suit had been filed against the City. I believe that they are all in the suit 'for the ride.' They're getting on the train and hoping to get money for it."(Def.'s App. Vol. III: Marquez). Another affidavit that Plaintiffs seek to strike is from an African-American minister who is a laborer at the Department of Aviation. The affiant states that he had not been subjected to race discrimination or harassment and further states: "I have not seen or heard of any African-American or Hispanic employees including any of the people who filed this lawsuit being treated unfairly by anyone at the City related to working assignments, or other terms and conditions of employment."The affiant also states: "Jason was a good guy to work for and we respected each other. Jason treated all employees equally and I did not observe him single out or treat unfairly any African-American, Hispanic, or any other employee."(Def.'s App. Vol. III: Fluker). Another example is an affidavit by an African-American laborer who stated that he was asked by Plaintiff Pruitt to join this lawsuit but that he told Pruitt that he would not get involved because he has not been

discriminated against. The affiant further states: "I could not take part in this lawsuit because that would make me a liar."(Def.'s App. Vol. III: Lacy).

There are numerous other affidavits by African-American and Hispanic laborers at the Department of Aviation indicating that they were not the subject of race discrimination or racial harassment and that they did not see Jason or other supervisors harassing other employees nor have they heard about such harassment. We emphasize in commenting on Plaintiffs' motives for seeking to exclude the affidavits and other materials that we are not ruling upon the merits of Plaintiffs' claims. Based upon the foregoing, we deny Plaintiffs' motion to strike and/or exclude statements procured by the Defendant from any putative class members.

## II. Class Definition

In their amended motion for class certification, Plaintiffs have defined their proposed class as consisting of: "all African-American and Hispanic employees, classified as laborers, for the City of Chicago, Department of Aviation at the O'Hare International Airport Facility ("O'Hare") from 1992 to 2002 who have been subjected to various forms of racial harassment because of Defendant's ineffective anti-harassment policy."Pl.'s Amend. Mem. pages 1-3; *See also Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir.1977)(explaining that: "whether the description of a class is sufficiently definite to permit ascertainment of the class members must, of necessity, be determined on a case-by-case basis.")

**4** In their complaint, Plaintiffs almost exclusively allege harassing conduct by Jason, who is no longer employed by the Defendant, and only in passing make references to a few other supervisors or foremen relating to isolated statements by such supervisors or foremen. For example, Plaintiffs have mentioned the names of five foremen, but Plaintiffs have made no allegations against them. Plaintiffs have mentioned the names of two foremen, one of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1146110)

whom is no longer employed by Defendant, and one supervisor and have attributed only one isolated alleged derogatory statement to each. After discovery, Plaintiffs have not introduced or revealed any new names of supervisors or new allegations against any supervisors that were involved in any harassing conduct. Plaintiffs also have failed to offer evidence or even make allegations regarding the conduct of any supervisors other than Jason, who no longer is employed by Defendant. Other than alleging one isolated derogatory statement made by a foreman and a supervisor, Plaintiffs have offered no additional evidence of supervisory harassment. Since the allegations are against a former foreman and Plaintiffs have made only allegations of one or two isolated statements attributed to two current foremen/supervisors, the class definition appears to be inappropriate for purposes of class certification. In addition, the proposed class definition includes employees that never worked for Jason or the few other supervisors mentioned and there is no reason why the proposed class should consist of employees of supervisors other than the ones named by Plaintiffs. Therefore, a class action is not appropriate.

In an attempt to justify their claim against Defendant and to seek class certification, Plaintiffs have merely made allegations against one former foreman and have attempted to impute his alleged behavior on the rest of the supervisors by making isolated references to two foremen who may have been present when certain alleged derogatory statements were made. It appears that Plaintiffs have attempted to artificially justify their proposed class. There is a dispute whether certain derogatory statements were made in the first instance, and if they were made, whether such statements or conduct constitutes unlawful racial discrimination or harassment. This in no way should be construed to mean that derogatory statements are acceptable behavior. To the contrary, even one derogatory statement or comment aimed at a racial or ethnic group is one too many. However, whether or not the allegations and evidence in this case support class certification is an en-

tirely different question and is examined under the appropriate standard.

The bulk of Plaintiffs' class allegations are based upon unsupported and vague contentions that the City's management engaged in racial discrimination and harassment. To allow Plaintiffs to certify a class to include employees who work for other supervisors against whom there is no evidence or even allegations of harassment and to allow discovery pertaining to those supervisors would be to condone the ultimate fishing expedition.

### III. Rule 23(a) Prerequisites to a Class Action

**\*5** In order to obtain class certification a plaintiff must first satisfy all of the requirements of Rule 23(a) as articulated earlier in this opinion. Fed.R.Civ.P. 23(a); *Retired Chicago Police Ass'n,* 7 F.3d at 596.

### A. Numerosity

In Plaintiffs' amended memorandum in support of their motion for class certification, Plaintiffs state that it is virtually impossible to provide the court with an exact number of potential members of the class at this time, but maintain that a good faith estimate of ninety-nine persons is sufficient. P.'s Amend. Mem. p. 5. Plaintiffs contend that "Defendant's murky production of employee records has made it nearly impossible to provide the Court with an accurate number."Pl.'s Reply p. 3. Plaintiffs' contention is completely disingenuous. Even though Defendant has tendered to Plaintiffs voluminous lists of all laborers employed by Defendant at O'Hare from 1992 until the present, Def. Resp. to Pl.'s Amend. Mem. p. 4., Plaintiffs have been demanding lists of employees who hold other positions at O'Hare totally unrelated to the proposed class. Pl.'s Reply pages 3-4.

Plaintiffs also contend that Defendant has not produced a report indicating the percentage of "all" African-American and Hispanic employees at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1146110)

O'Hare. Pl.'s Reply at fn. 4. However, the proposed class definition Plaintiff wishes this court to certify does not include "all" African-American and Hispanic employees at O'Hare, but instead, includes a class of "all African-American and Hispanic employees, classified as laborers, for the City of Chicago, Department of Aviation at the O'Hare International Airport Facility ("O'Hare") from 1992 to 2002 who have been subjected to various forms of racial harassment because of Defendant's ineffective anti-harassment policy."P.'s Amend. Mem. pages 1-3.

### 1. Proposed Class Members

Plaintiffs have provided this court with two separate lists that collectively identify ninety-nine proposed class members. Pl.'s Ex. 4: African-American Employee # 's 1-75; Hispanic Employee # 's 1-24. One list identifies potential African-American class members and the other list identifies potential Hispanic class members. Plaintiffs maintain that these two lists reflect the proposed class because they encompass "all African-American and Hispanic employees, classified as laborers, for the City of Chicago, Department of Aviation at the O'Hare International Airport Facility ("O'Hare") from 1992 to 2002 who have been subjected to various forms of racial harassment because of Defendant's ineffective anti-harassment policy ."Pl.'s Amend. Mot. pages 1-3. Plaintiffs seek to certify this class under Count I of the complaint which alleges violation under both Title VII and Section 1981. Pl.'s Amend. Mem. p. 1.

### 2. Title VII

Title VII requires that a charge of discrimination be filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days "after the alleged unlawful employment practices occurred."*Tinner v. United Ins. Co. of America,* 308 F.3d 697, 707 (7th Cir.2002)(citing 42 U.S.C. § 2000e-5(e)(1)). The statute provides that the time

period for the filing of the charge may be extended if the aggrieved person initially institutes proceedings with a state or local agency. *Id.* In the state of Illinois, the time period for filing of the charge of discrimination is 300 days. *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C,* 277 F.3d 882, 893 (7th Cir.2001).

*6 Plaintiffs have included in their proposed class the names of employees who no longer are employed as laborers for Defendant and who never filed an EEOC charge in the first place. The Supreme Court of the United States recently held that "[i]n the context of a request to alter the timely filing requirements of Title VII, this Court has stated that 'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." ' *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 108, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)(quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)). Notwithstanding this holding, Plaintiffs contend that these former laborers should be included in this proposed class under the continuing violation theory. In addressing class claims, the Seventh Circuit has stated "[i]t is not necessary that each class member have filed a charge with the EEOC; however, only those who could have filed a charge at or after the time a charge was filed by the class representative can be included in the class." *Movement for Opportunity and Equality v. General Motors Corp.,* 622 F.2d 1235, 1248 (7th Cir.1980) (citations omitted).

Plaintiffs, acting as class representatives, filed their earliest charge of discrimination with the EEOC on July 1, 2002. Accordingly, the filing period for a Title VII claim by the named Plaintiffs in this action is within 180 days prior to July 1, 2002 (*i.e.* between January 2, 2002 and July 1, 2002). Therefore, any individual who was not employed as a laborer by Defendant between January 2, 2002 and July 1, 2002 (the "Title VII filing period") could not have filed a charge in the first instance. As

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1146110)

such, forty-eight of the ninety-nine individuals listed in the proposed class that were not employed as laborers by Defendant during the Title VII filing period may not be considered part of the proposed class for Title VII relief. Pl.'s Ex. 4.

The court notes that of the remaining fifty-one proposed class members under Title VII, twelve have signed statements in which each laborer has individually declared that he or she has not been subjected to, or seen anyone else subjected to, any race discrimination, racial harassment, national origin discrimination or harassment, retaliation or any other improper treatment during his or her employment with the City. Also, each laborer has provided in the statement details about his or her individual experiences indicating the absence of any discrimination or harassment. Pl.'s Ex. 4; Def.'s App. Vol. I R.26; Vol. III. In addition, eight other individuals have declared or testified that they would not want to become members of the lawsuit brought by Plaintiffs in this case. Pl .'s Ex. 4; Def.'s App. Vol. R.26, 27; Vol. II(A)(B); Vol. III. As such, these twenty individuals may not be considered part of the proposed class for Title VII relief.

The court also notes that of the remaining thirty-one proposed class members under Title VII, four were not employed as laborers by Defendant at O'Hare between 1992 to 2002. Pl.'s Ex. 4; Def.'s App. Vol I, R. 13. In addition, one individual identified as a proposed class member in this motion is barred from this case because he previously filed and settled a lawsuit against the same Defendant asserting the same allegations as the named Plaintiffs in this action. Pl.'s Ex. 4; Def.'s App. Vol. I, Ex. 18.

*7 Thus, for purposes of numerosity under Title VII, the proposed class contains only twenty-six members as opposed to the original ninety-nine set forth in the motion.

*3. Section 1981*

For Section 1981 claims Congress has enacted a

statute of limitations which provides: "a civil action arising under an Act of Congress enacted after the date of enactment of this section may not be commenced later than 4 years after the cause of action accrues."28 U.S.C. § 1658(a). In *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) the United States Supreme Court stated: "We conclude that a cause of action 'aris [es] under an Act of Congress enacted' after December 1, 1990-and therefore is governed by § 1658's 4-year statue of limitations-if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." *Jones,* 541 U.S. at ----, 124 S.Ct. at 1845. In this case, as in *Jones,* Plaintiffs' Section 1981 claim arises under the 1991 Act and therefore was made possible by a post-1990 enactment. *Id.* Therefore, the 4-year statute of limitations applies in this case.

Plaintiffs, acting as class representatives, filed this case with this court on April 29, 2003. Accordingly, any cause of action that could have been filed by Plaintiffs in this case would have had to occurred within the four years preceding April 29, 2003 (*i.e.* between April 29, 1999 and April 29, 2003). Therefore, any individual who was not employed as a laborer by Defendant between April 29, 1999 and April 29, 2003 (the "Section 1981 filing period") could not have filed a case in the first instance. As such, twenty-seven of the ninety-nine individuals listed in the proposed class that were not employed as laborers by Defendant during the Section 1981 filing period may not be considered part of the proposed class for Section 1981 relief. Pl.'s Ex. 4.

The court notes that of the remaining seventy-two proposed class members under Section 1981, thirteen have signed statements in which each individually declared: "I have not been subjected to, or seen anyone else subjected to, any race discrimination, racial harassment, national origin discrimination or harassment, retaliation or any other improper treatment during my employment with the City."Pl.'s Ex. 4; Def.'s App. Vol. I R.26; Vol. III. In addition, eight other individuals have declared or testified

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that they would not want to become members of the lawsuit brought by Plaintiffs in this case. Pl.'s Ex. 4; Def.'s App. Vol. R.26, 27; Vol. II(A)(B); Vol. III. As such, these twenty-one individuals may not be considered part of the proposed class for Section 1981 relief.

The court also notes that of the remaining fifty-one proposed class members under Section 1981, eleven were never employed as laborers by Defendant at O'Hare between 1992 and 2002. Pl.'s Ex. 4; Def.'s App. Vol I, R. 13. In addition, one individual identified as a proposed class member in this motion is barred from this case because he previously filed and settled a lawsuit against the same Defendant asserting the same allegations as the named Plaintiffs in this action. Pl.'s Ex. 4; Def.'s App. Vol. I, Ex. 18.

*8 Thus, for purposes of numerosity under Section 1981, the proposed class contains only thirty-nine members as opposed to the original ninety-nine set forth in the motion.

Plaintiffs have failed to establish that this proposed class, under both Title VII and Section 1981, is so numerous that joinder is impracticable in this matter. Plaintiffs have identified thirty-nine proposed class members, thirteen of which cannot proceed under Title VII. Therefore, at best, the proposed class only consists of twenty-six members who might be able to proceed under both Title VII and Section 1981. In addition, the court notes that joinder in these circumstances is not impracticable inasmuch as Plaintiffs have failed to establish that certification of such a small class would be warranted due to the lack of resources of the proposed class, fear of retaliation, or in the interest of judicial economy. Instead, Plaintiffs have filed their motion with speculation and conflicting testimony from proposed class members. Def.'s App. Ex. R. 20.

A plaintiff seeking class certification has a "burden of demonstrating the numerosity requirement of a class action, and 'mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1).' " *Roe v. Town of Highland,* 909 F.2d 1097, 1100 (7th Cir.1990)(quoting 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1762 at 164 (2d ed.1986)). A plaintiff seeking class certification "cannot rely on 'conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity .' " *Id.* (quoting *Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir.1989). In this case, Plaintiffs have attempted to give the false impression that the proposed class consists of 99 individuals. However, Plaintiffs have failed miserably in their attempt in view of the fact that the vast majority of Plaintiffs' proposed class of 99 members, as discussed above, are not eligible or willing to participate in a class action. At best, Plaintiffs have identified 16 individuals, in addition to the named Plaintiffs, that may join their action, and it is not clear whether those 16 additional individuals were harassed. This court also notes that Plaintiffs' class definition is also too broad.

Plaintiffs have failed to establish that the proposed class in this case is so numerous and that joinder of all of the potential members would be impracticable.

*B. Commonality and Typicality*

Even if Plaintiffs were able to meet the numerosity requirement of Rule 23(a)-which they have not met-they have failed to meet the commonality and typicality requirements as discussed below.

The commonality and typicality requirements of the Federal Rules "ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class."*Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 341 (7th Cir.1997). For effective representation of a class, the named representatives' claims must "have the same essential characteristics as the claims of the class at large."*Retired Chicago Police Ass'n,* 7 F.3d at 596 (quoting *De La Fuente v. Stokley-an Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.