Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1146110)

Page 8

**\*9** As demonstrated in the numerosity analysis above, if a class was certified consisting of thirty-nine class members, only twenty-six would be able to seek relief under both Title VII and Section 1981 in accordance with the class definition. The remaining thirteen would only be able to advance under Title VII. Consequently, the legal and factual arguments would vary with respect to the different legal standards and necessary facts to be proved should the individuals be grouped as a class.

Moreover, even if this court were to certify all thirty-nine individuals as a class, the claims of the individuals are not common or typical of the claims of the class as a whole. For instance, in their amended motion for class certification, Plaintiffs do not allege that they were subject to a common form of racial harassment while they were employed as O'Hare laborers from 1992 until 2002. Instead, Plaintiffs admit that the O'Hare laborers endured "various forms of racial harassment" while they were employed from 1992 until 2002. Pl.'s Amend. Mem. pages 1-3. Plaintiffs also admit that different types of alleged harassing statements were made to them. Therefore, each alleged harassing statement would need to be individually examined by the trier of fact. In addition, Plaintiffs have alleged different forms of harassment such as being worked too hard by Jason and being made to stay outside when it was extremely cold or hot. Also, Plaintiffs have made virtually all of their allegations of harassment against Jason and not against other supervisors. Plaintiffs make it clear that Jason's shift was particularly difficult and thus there will be differences in each class member's claim depending on which shifts the class member worked on and which supervisor covered the shift. The differences in the treatment of each employee is well illustrated by the many affidavits of employees introduced by Defendant that specifically state that they were not the subject of racial discrimination or harassment by Jason or any other supervisor.

In addition, Plaintiffs have alleged dozens of separate claims by the proposed class members against the Defendant. Pl.'s Amend. Mem. pages 6-11. Although these claims are carefully clumped together in the motion so as to appear that they were constant and occurred simultaneously, a closer review of the depositions suggests that each of the charges are distinct in content and vary with respect to the time and setting in which they allegedly occurred. Pl.'s Ex.'s 17-39. Furthermore, the facts asserted by the class representatives carry with them a myriad of allegations and possible defenses which this court would have to individually construe and ultimately apply for or against the proposed class as a whole. *Id.* Hence, Plaintiffs have failed to establish that there are questions of law or fact common to the proposed class or that the claims and defenses of the representative parties are typical of the claims or defenses of the proposed class.

*C. Adequacy of Representation*

**\*10** Even if Plaintiffs were able to establish all of the other requirements of Rule 23(a)-which they have not-their attempt to certify this class would still fail under the adequacy requirement discussed below.

Plaintiffs in this matter believe they can fairly and adequately protect the interests of their proposed class. Yet, the level of inadequacy the Plaintiffs have demonstrated in the filing of this motion for class certification casts serious doubt on their ability to represent an entire class of individuals. Plaintiffs have done a poor job in preparing their motion for class certification and supporting documents. For instance, the ten named Plaintiffs, in their amended motion for class certification, claimed that they were African-American or Hispanic laborers for the City at O'Hare who have been employed "from at least 1992 to 2002."However, Plaintiffs' own exhibits in support of their motion reveal that four of the ten named Plaintiffs were not employed by the City "from at least 1992 to 2002."Pl.'s Ex. 4. In addition, Plaintiffs in their Reply have attempted to buttress their argument for class certification by asking the court to consider a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1146110)

completely irrelevant article. Pl.'s Reply p. 1; Pl.'s Reply Ex. 2. Furthermore, Plaintiffs' attempt to include in their class an individual who had already filed and settled an action against Defendant alleging the same facts and allegations does not demonstrate good faith. The Court also notes that Defendant has correctly pointed to numerous discrepancies of facts that Plaintiffs have alleged and maintained throughout their briefs. Def.'s App. Ex. R.20. One example why Plaintiffs would not be able to adequately represent a class is the method in which the Plaintiffs have tried to meet the numerosity requirement by poorly identifying a proposed class of ninety-nine individuals in the hope that some of the names might survive. However, as noted above, the vast majority of the proposed class identified by the Plaintiffs cannot survive.

In addition, Plaintiffs' counsel's attempt to portray themselves as experienced litigators of class actions is unconvincing. A closer look at the facts based upon Plaintiffs' representations relating to class litigation experience and Defendant's briefs reveals that Plaintiffs' counsel previously were involved in two cases touching on class certification. In one case the class was not certified and in the other case the case was settled before trial. Therefore, Plaintiffs' counsel have not met their burden of showing to the court that they are experienced with class action matters. Plaintiffs have failed to meet the adequacy of representation requirements.

Based upon the foregoing, we conclude that Plaintiffs have failed to satisfy all of the requirements of Rule 23(a) and therefore, a class action is not appropriate.

*II. Rule 23(b) Class Actions Maintainability*

A plaintiff who meets Rule 23(a) requirements would still have to establish that the action is maintainable under Rule 23(b).*See Williams,* 204 F.3d at 760(discussing Fed.R.Civ.P. 23(a)). In view of the fact that Plaintiffs have failed to meet the rule 23(a) requirements and this court has determined that a

class action is not appropriate, we need not address whether the class action is maintainable under Rule 23(b).

CONCLUSION

**\*11** Based upon the foregoing, we deny Plaintiffs' motion for class certification. In addition, we deny Plaintiffs' motion to strike and/or exclude statements procured by the Defendant from putative class members. Defendant's motion to strike is also denied as moot.

N.D.Ill.,2004.
Pruitt v. City of Chicago, Dept. of Aviation
Not Reported in F.Supp.2d, 2004 WL 1146110 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 1029503 (E.D.Wis.)
(Cite as: Slip Copy, 2007 WL 1029503)

Page 1

**C**
Forrest v. Shenandoah Valley Nat. Park
E.D.Wis.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Wisconsin.
Mary FORREST, Plaintiff,
v.
SHENANDOAH VALLEY NATIONAL BANK,
Defendants.
No. 06-C-11.

March 28, 2007.

Scott J. Schnurer, Jason Altman, John D. Blythin,
Robert K. O'Reilly, Richard A. Lilly, Ademi &
O'Reilly LLP, Cudahy, WI, for Plaintiff.
Eugene J. Kelley, Jr., Jeffrey D. Pilgrim, Nathan O.
Lundby, Sharilee K. Smentek, Arnstein & Lehr
LLP, Chicago, IL, Michael J. Ganzer, Hodan
Doster & Ganzer, Milwaukee, WI, for Defendants.

**DECISION AND ORDER**

RUDOLPH T. RANDA, Chief Judge.
*1 This putative class action brought by Mary For-
rest ("Forrest") against the Defendant Shenandoah
Valley Bank ("Bank") under the Fair Credit Report-
ing Act, 15 U.S.C. § 1681 *et seq* ("FCRA"), is be-
fore the Court on Forrest's motion for class certific-
ation. With the exception of the disposition of the
class certification motion, the matter is stayed until
the United States Supreme Court issues a decision
in *GEICO Gen. Ins. Co. v. Edo,* 06-100, 127 S.Ct.
36 (Sept. 26, 2006) (granting pet. for cert. and con-
solidating case) and in *Safeco Ins. of Am. v. Burr,*
06-84, 127 S.Ct. 36 (Sept. 26, 2006) (granting pet.
for cert. and consolidating case).

Forrest alleges that the Bank accessed her consumer
credit report, without her consent or any other law-
ful reason, to send her a loan solicitation in viola-
tion of the FCRA. She maintains that the mailing
violates 15 U.S.C. § 1681b by not offering a "firm
offer of credit" within the meaning of the FCRA,

which is essential when a potential creditor ac-
cesses a consumer's credit report without that per-
son's consent.

**Motion for Class Certification**

Forrest seeks certification of a class pursuant to
Federal Rule of Civil Procedure 23(a) and (b)(3).
The proposed class is all persons with Wisconsin
addresses to whom the Bank has sent solicitations
in the form of Exhibit A attached to the Declaration
of Jason Altman in support of the plaintiff's motion
for class certification.

The Bank opposes the motion contending that For-
rest does not meet all the requirements for certifica-
tion of the class. Specifically, the Bank maintains
that Forrest is not a fair and adequate representat-
ive, she has not established that class issues pre-
dominate over individualized issues or that a class
action is superior to other methods of adjudication.

This Court may certify a class of plaintiffs if the
putative class satisfies all four requirements of Fed-
eral Rule of Civil Procedure 23(a)-numerosity,
commonality, typicality, and adequacy of represent-
ation-and any one of the conditions of Rule
23(b).*Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513
(7th Cir.2006) (citing Fed.R.Civ.P. 23; *Williams v.
Chartwell Fin. Servs., Ltd .,* 204 F.3d 748, 760 (7th
Cir.2000).) Rule 23(b)(3) adds the requirement
"that questions of law or fact common to the mem-
bers of the class predominate over any questions af-
fecting only individual members, and that a class
action is superior to other available methods for the
fair and efficient adjudication of the contro-
versy."The plaintiff has the burden of proving the
class should be certified. *Oshana,* 472 F.3d at 513.

In evaluating a motion for class certification, the al-
legations made in support of certification are taken
as true and, as a general matter, the court makes no
inquiry into the merits of the suit. *Retired Chi. Po-
lice Ass'n. v. City of Chi.,* 7 F.3d 584, 598 (7th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1029503 (E.D.Wis.)
**(Cite as: Slip Copy, 2007 WL 1029503)**

Cir.1993); The court may approve class actions only after conducting a "rigorous analysis" to ensure that the prerequisites of Federal Rule of Civil Procedure 23 have been satisfied.*General Telephone Co. of the S.W. v. Falcon,* 457 U.S. 147, 161 (1982).

**\*2** However, in evaluating a motion for class certification, it is sometimes necessary to "probe behind the pleadings" to determine whether "the interests of absent parties are fairly encompassed within the named [plaintiff's] claims."*Falcon,* 457 U.S. at 160. Indeed, to protect absent class members and defendants, this Court has an affirmative obligation to "resolv[e] factual and legal disputes that strongly influence the wisdom of class treatment."*Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir.2001). Thus, instead of assuming that whatever the plaintiff alleges is true, as it would in testing the legal sufficiency of a complaint under Rule 12(b)(6), the Court may "look[ ] beneath the surface of [the] complaint to conduct the inquiries in [Rule 23] and exercise the discretion it confers."*Id.* Here, in addition to the allegations of the Complaint, the Court considers the affidavits that have been submitted by the parties.

### Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."Forrest states that she will obtain the exact number and identities of the class members through discovery.

A class action may proceed "upon estimates as to the size of the proposed class."*In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 325 (S.D.N.Y.1982). While the number of the proposed class is not always dispositive, generally, the numerosity requirement is met if there are forty or more members. *See Chandler v. S.W. Jeep-Eagle, Inc.,* 162 F.R.D. 302, 307 (N.D.Ill.1995). The loan solicitation letter is a form letter. It is reasonable to believe that the form loan solicitation letter re-

ceived by Forrest was mailed to hundreds, if not thousands, of individuals in Wisconsin, as part of a mass mailing campaign. *See e.g., Evans v. United States Pipe & Foundry,* 696 F.2d 925, 930 (11th Cir.1983) (courts may make "common sense assumptions in order to find support for numerosity"). Nor does the Bank, the source of the solicitations, contest the numerosity of the potential class. Accordingly, the Court finds that the proposed class is so numerous that joinder would be impracticable.

### Commonality

Rule 23(a)(2) requires that there be questions of law and fact common to the class. A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992) (citing *Franklin v. City of Chi.,* 102 F.R.D. 944, 949-50 (N.D.Ill.1984)). Common nuclei of fact are typically manifest where the defendant has engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents. *See Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998) (regarding commonality of alleged violations of the Fair Debt Collection Practices Act and Colorado Fair Debt Collection Practices Act) (citing cases). Forrest and other proposed class members received the same or substantially similar solicitation from the Bank. Forrest's legal claim is same as that of other members of the proposed class. Thus, Forrest shares the commonality of facts and legal claims with other members of the proposed class.

### Typicality

**\*3** Whether Forrest's claims are typical of those of the class members she represents is closely related to the commonality inquiry. *See Rosario,* 963 F.2d at 1018 ("The question of typicality in Rule 23(a)(3) is closely related to the ... question of commonality."). A "plaintiff's claim is typical if it arises from the same event or practice or course of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1029503 (E.D.Wis.)
**(Cite as: Slip Copy, 2007 WL 1029503)**

conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."*De La Fuentes v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (citations and internal quotation omitted). Forrest's claim falls within this definition. By mailing the form loan solicitation letter, the Bank engaged in the same course of conduct towards Forrest and the members of the proposed class. These individuals are now suing the Bank under the FCRA, alleging violations of the same statutory section under the same legal theory. Forrest meets Rule 23's typicality requirement. *See Keele,* 149 F.3d at 595.

### Adequacy of Representation

Rule 23(a)(4) provides that the representative parties must "fairly and adequately protect the interests of the class."Rule 23(a)(4)'s adequacy of representation requirement has two elements: " 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest[s]' of the class members."*Retired Chi. Police Ass'n.,* 7 F.3d at 598 (quoting *Sec. of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986)). Thus, "[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims."*Sec. of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986)).

A class must have a "conscientious representative plaintiff." *Rand v. Monsanto Co.,* 926 F.2d 596, 599 (7th Cir.1991). The class representative must "understand the basic facts underlying [her] claims."*In re Discovery Zone Sec. Litig.,* 169 F.R.D. 104, 109 (N.D.Ill.1996)."General knowledge and participation in discovery are sufficient to meet this standard."*Id.* (citations omitted)."[I]n demonstrating a class representative's adequacy, the burden is not a heavy one."*Sledge v. Sands,* 182 F.R.D. 255, 259 (N.D.Ill.1998) (citation omitted.)

The Bank maintains that there has been no demonstration that Forrest has a sufficient interest in the outcome of the case to ensure vigorous advocacy. The Bank states that Forrest's failure to testify at her deposition that she had filed 11 other lawsuits demonstrates a lack of credibility, a lack of reliability and a lack of interest. The Bank does not dispute the adequacy of Forrest's counsel.

The Court is familiar with Forrest's attorneys, Ademi & O'Reilly, who have litigated and are currently litigating several FCRA actions in this Court. Counsel further represent that they have litigated several FCRA cases in federal court as class counsel. There is no question that counsel is competent because it appears that this type of litigation is the bulk of their practice. The Court finds that Ademi & O'Reilly are experienced and qualified to serve as class counsel in this matter.

*4 However, the Bank has raised a significant concern regarding the adequacy of Forrest as a class representative. For example, at Forrest's deposition, in response to the inquiry regarding whether she had sued anybody Forrest answered, "No." (Ganzer Decl. ¶ 2 FN1 Ex. C (Forrest Dep.) 8.) When the Bank's counsel reminded her of this lawsuit, she responded "Yeah." (*Id.*) When asked, "Any others?," Forrest responded, "No" (*id.*)-although she filed a total of 11 other cases in this district between December 20, 2005, and April 6, 2006. (Ganzer Decl. ¶ 4 Ex. D.) No followup comment or clarification was offered by her attorney. (Ganzer Decl. ¶ 2 Ex. C.) Forrest's counsel represents her in the 11 other actions. (Ganzer Decl. ¶¶ 5-15 Ex. E-O.)

> FN1. Paragraph 2 of the Ganzer Declaration incorrectly states that the Forrest deposition transcript is attached as exhibit B. It is attached as exhibit C.

When asked to look at Exhibit A to the complaint-the loan solicitation letter-and state what it is Forrest responded "looks like a loan." (Ganzer Decl. ¶ 2 Ex. C at 8-9.) When asked by both the Bank's attorney and her own attorney whether she recollected the loan solicitation letter, Forrest testified "no." (*Id.* at 9.) When asked the status of this law-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suit, Forrest responded "I don't know." (*Id.*)

Review of the entire Forrest deposition transcript causes her to appear too much like a shadow plaintiff; one disinterested or unconcerned. Most troublesome is Forrest's response to the "prior lawsuit questions." Regardless of whether Forrest did not remember, made a mistake, or was not being truthful, she is not a fitting representative for the class.

Based upon Forrest's deposition testimony, the Court concludes that Forrest lacks adequate knowledge and understanding of the case and has enough of a credibility problem that she cannot adequately represent the class. *See Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir.1983); *Kaplan v. Pomerantz,* 132 F.R.D. 504, 510-11 (N.D.Ill.1990). Therefore, Forrest's motion for class certification is denied.

Given the Court's conclusion, it need not resolve the remaining question under Rule 23(b)(3), which provides that for a class to be certified, the Court must find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."However, satisfaction of that requirement would not be problematic in this case. *See Murray v. GMAC Mortg. Corp.* 434 F.3d 948, 953 (7th Cir.2006).

### *Conclusion*

The case was stayed with the exception of the ruling on the class certification motion. With the issuance of this Court's ruling, it is now appropriate for the Court to direct the Clerk of Court to close this action for statistical purposes until one or both of the parties provides notice to the Court by electronic filing promptly upon receipt of the Supreme Court's ruling in *GEICO Gen. Ins. Co. and Safeco Ins. Co.*

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Forrest's motion for class certification (Docket

No. 18) is **DENIED.**

**\*5** 2. The Clerk of Court is instructed to submit a JS-6 form to the administrative office thereby closing the case for statistical purposes; and,

3. Nothing in this order shall be considered a dismissal or disposition of this matter and one or both of the parties shall provide notice to the Court by electronic filing promptly upon receipt of the Supreme Court's ruling in *GEICO Gen. Ins.Co. v. Edo,* 06-100, 127 S.Ct. 36, 165 L.Ed.2d 1014 (Sept. 26, 2006) and *Safeco Ins. Co. of Am. v. Burr,* 127 S.Ct. 36, 165 L.Ed.2d 1014 (Sept. 26, 2006).

E.D.Wis.,2007.
Forrest v. Shenandoah Valley Nat. Park
Slip Copy, 2007 WL 1029503 (E.D.Wis.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)**

**H**

Weiner v. Quaker Oats Co.
N.D.Ill.,1999.

United States District Court, N.D. Illinois, Eastern Division.
Myron WEINER, Nicholas Sitnycky, Ronald Anderson and Robert Furman, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
THE QUAKER OATS COMPANY and William D. Smithburg, Defendants.
**No. 98 C 3123.**

Sept. 30, 1999.

MEMORANDUM OPINION AND ORDER

PALLMEYER, District J.
*1 Plaintiffs Myron Weiner ("Weiner"), Nicholas Sitnycky ("Sitnycky"), Ronald Anderson ("Anderson") and Robert Furman ("Furman") bring this action against Defendants The Quaker Oats Company ("Quaker") and William D. Smithburg ("Smithburg") alleging violations of federal securities law. Plaintiffs contend that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and the Securities and Exchange Commission's Rule 10b-5, by continuing to announce or let stand certain projected figures for earnings growth and debt-to-equity ratio which Defendants allegedly knew had become inaccurate in light of Quaker's planned, highly leveraged, acquisition of Snapple Beverage Corp. ("Snapple"). Now before the court is Plaintiffs' Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek certification of a class consisting of all purchasers of Quaker common stock during the period of August 4, 1994 through and including November 1, 1994 (the "class period"). Defendants oppose class certification solely on the basis of their concern that the proposed class representatives will not adequately protect the interests of the remainder of the class as required by Federal Rule of Civil Procedure 23(a)(4). For the reasons set forth below, the court hereby grants Plaintiffs' motion, but disqualifies Ronald Anderson from serving as a class representative.

In addition to considering the adequacy of the class representatives, the court addresses the issue of the proper breadth of the "class period." Defendants argue that Plaintiffs' proposed class period of August 4, 1994 to November 1, 1994 should be shortened. Specifically, Defendants urge that the class period commence on the later date of September 23, 1994, the date they allege the first potentially actionable affirmative misrepresentation occurred. For the reasons set forth below, the court overrules this objection and concludes that the class period should begin on August 4, 1994.

FACTUAL BACKGROUND

*Parties*

Defendant Quaker is a corporation with its corporate charter issued by the state of New Jersey. (Second Amended Class Action Complaint at ¶ 8.) Quaker is a worldwide producer of brand name packaged goods. (*Id.*) Its primary products include cereals, breakfast syrups, pancake mixes, snack foods, frozen pizzas, cat foods and dog foods. (*Id.*) Gatorade Thirst Quencher is Quaker's largest single product. (*Id.*) Gatorade holds approximately 80 percent of the sports drink market with annual sales of about $1.2 billion. (*Id.*) Quaker's stock is publicly traded on the New York Stock Exchange ("NYSE"). During the time period relative to this case, the average daily trading volume of Quaker's stock exceeded 560,000 shares.

Co-Defendant Smithburg is the Chairman, President and CEO of Quaker. Plaintiffs allege that during all relevant times Smithburg was a " 'controlling person' of Quaker within the meaning of Section 20

Not Reported in F.Supp.2d                                                                                         Page 2
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)

of the Exchange Act and had the power and influence to control Quaker."(*Id.* ¶ 9-10.)Specifically, Plaintiffs allege Smithburg had the power to control the content of press releases, Security and Exchange Commission ("SEC") filings, and other disclosures to securities analysts and the investing public during the class period. (*Id.*) Along with the power to determine which information would be publicly disseminated, Plaintiffs allege Smithburg had access to adverse, non-public information concerning matters alleged in the Complaint. (*Id.*)

**\*2** All four Plaintiffs purchased stock during the proposed class period.(*Id.* ¶ 7.) On September 22, 1994, Weiner purchased 300 shares of Quaker common stock at a price of $80 3/8 per share and 700 shares at a price of $80 7/8 per share. (*Id.*) On September 23, 1994, Sitnycky purchased 500 shares of Quaker common stock at a price of $78 3/4 per share and on September 27, 1994, purchased an additional 2000 shares at a price of $80 1/4 per share. (*Id.*) On September 29, 1994, Anderson purchased 200 shares of Quaker common stock at a price of $78 1/8 per share. (*Id.*) On October 12, 1994, Furman purchased 1000 shares of Quaker common stock at a price of $77 1/8 per share. (*Id.*) Although the Complaint names four Plaintiffs, only three-Sitnycky, Furman, and Anderson-seek certification as class representatives. The remaining Plaintiff, Weiner, is not seeking class representative status.

With respect to two of the proposed class representatives, Sitnycky and Furman, Defendants have offered evidence that they believe impugns their qualifications. Specifically, both Sitnycky and Furman were targets of investigations resulting in their entry into consent decrees for alleged violations of federal securities laws. Sitnycky was employed from 1970 to 1972 as a stock broker and branch manager for the now-defunct brokerage firm, Kenneth Bove and Company ("Bove"). (*See* Sitnycky Dep., at 7-8.) For activity which occurred during his employment at Bove, the Security and Exchange Commission ("SEC") found that Sitnycky had engaged in conduct which if ultimately proved

would have violated Sections 10(b) and 17(a) of the Exchange Act and Sections 5 and 17(a) of the Securities Act. *See In re Murray,* 1975 SEC LEXIS 1080 (Aug. 5, 1975). In a 1975 agreement with the SEC, without admitting or denying the charges, Sitnycky consented to certain findings of misconduct. *Id.* at \*1. As a condition of the consent decree, Sitnycky was "barred from association with any broker, dealer or investment company with the proviso that, after 18 months, [he] may apply to the Commission to become associated with a broker or dealer in a non-supervisory, nonproprietary capacity upon showing that he will be adequately supervised."*Id.* at \*8. Sitnycky left Bove in 1973, and two years later embarked on an eighteen-year career at Xerox Corp. ("Xerox") working in the company's sales, management, international management and operations divisions. (*See* Sitnycky Dep., at 17.) During his tenure at Xerox, Sitnycky purchased a restaurant in New York City.(*Id.* at 20-21.)Upon his retirement from Xerox in 1991, Sitnycky devoted himself full time to this restaurant. (*Id.*)

In a somewhat similar proceeding, in 1983, Furman entered into a Stipulation of Facts and Consent to Penalty with the New York Stock Exchange for alleged violations of federal securities laws. *See In re Furman,* 1983 NYSE Disc. Action LEXIS 111, at \*1-3 (May 5, 1983). As a condition of the consent decree, Furman was censured and barred from the securities industry for eight months, his registration as a registered competitive market maker was permanently revoked, and he was ordered to pay a $10,000 fine. *Id.* at \*18.Currently, Furman is a member in good standing of both the New York Stock Exchange and the National Association of Securities Dealers. (*See* Furman Dep., at 49.)

*Chronological Sequence of Alleged False and Misleading Statements*

**\*3** In the Second Amended Class Action Complaint, Plaintiffs assert that Defendants misled the investing public by making a series of false and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)

misleading statements concerning Quaker's debt-to-total capitalization ratio. (Second Amended Class Action Complaint at ¶ 6.) Six critical events are of primary significance to this allegation:

(1) October 4, 1993-Quaker's 1993 annual report issued to public

(2) November 1993-Quaker's Form 10-Q filed with SEC,

(3) Spring 1994-Quaker's commencement of acquisition negotiations with Snapple,

(4) August 4, 1994-Quaker's public report and meeting,

(5) September 23, 1994-Quaker's 1994 annual report issued to public

(6) November 2, 1994-Quaker's public announcement of Snapple acquisition.

A more detailed look at each of these six events follows.

On October 4, 1993, in its Annual Report for the fiscal year ending June 30, 1993, Quaker included the following statement regarding its debt-to-total capitalization ratio:

One way to measure debt is to compute the ratio of [total] debt as a percent of total debt plus preferred and common shareholders' equity... Our debt-to-total capitalization ratio at June 30, 1993 was 59 percent, up from 49 percent in fiscal 1992. Quaker's total debt remained essentially even... For the future, our guideline will be in the upper-60 percent range.

(*Id.* ¶ 22.)Smithburg reiterated the debt-to-total capitalization "guideline" in a letter contained in the same annual report:
[O]ur Board of Directors [has] authorized an increase in our leverage guideline, along with a share repurchase program of up to 5 million shares. Our guideline for leverage in the future will be to main-

tain a total debt-to-total capitalization in the upper-60 percent range.

(Id.¶ 23.)

In November of 1993, Quaker filed its Form 10-Q with the SEC. In this document Quaker repeated the total debt-to-total capitalization ratio guideline:

Short-term and long term debt (total debt) as of September 30, 1993, increased $98.6 million from June 30, 1993. The total-debt-to total capitalization ratio ... was 63.5 percent and 59.0 percent as of September 30, 1993 and June 30, 1993, respectively... The Company has decided to increase its guideline for leverage in the future to the upper-60 percent range.

(*Id.* ¶ 24.)

In early spring of 1994, Quaker apparently began negotiations for the prospective acquisition of the beverage company Snapple.[FN1]Quaker did not, at this time, nor at any time prior to the November 1994 announcement of the acquisition of Snapple, make public statements or public filings that amended or qualified the above quoted recitals from the 1993 Annual Report and Form 10-Q.

> FN1. On November 2, 1994, Smithburg commented on the negotiations to Bloomberg Business News, "[R]ight after some discussions started, it was so obvious that [Snapple] had an interest and we had an interest and these two great brands, Gatorade and Snapple, [would] benefit from a put-together, and it just snowballed from then..."(Id.¶ 29.)

On August 4, 1994, Quaker issued a company statement in a published report and meeting for securities analysts and financial reporters. (*Id.* ¶ 27.)Quaker's statements addressed the earnings growth projections and did not revise or alter the previously announced debt-to-total capitalization guideline. (*Id.*) At or near this same time period, Quaker had advised Snapple that it was interested

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in pursuing a merger of the two companies and had commenced a due diligence investigation. (*Id.* ¶ 29.)

*\*4* On September 23, in its 1994 Annual Report, Quaker again made statements regarding its guideline for debt-to-total capitalization ratio. Specifically, the report stated that

[a]t the end of fiscal 1994, our total debt-to-total capitalization ratio was 68.8 percent on a book value basis, in line with our guideline in the upper-60 percent range.

(*Id.* ¶ 32.)

On November 2, 1994, Quaker and Snapple publicly announced that an agreement had been reached in which Quaker would acquire Snapple in a tender offer and merger transaction for $1.7 billion in cash. (*Id.* ¶ 34.)In order to finance the acquisition, Quaker obtained $2.4 billion in revolving credit facilities from a banking group led by NationsBank Corp. (*Id.* ¶ 35.)As a result of the Snapple acquisition, Quaker's debt nearly tripled, from approximately $1 billion to approximately $2.7 billion. (*Id.*) The acquisition also increased Quaker's total debt-to-total capitalization ratio to approximately 80%.[FN2](*Id.*) Subsequent to the announcement of the acquisition, the price of Quaker stock fell $7.375 per share-almost 10% of the stock's value in a single day. (*Id.* ¶ 34.)

> FN2. In a report issued on November 18, 1994, T. Bivens of Argus Research Corporation, stated that Quaker was "saddled with a staggering debt load" that "seriously limits Quaker's ability to respond to competitive challenges."(*Id.* ¶ 37.)

On November 10, 1994, purchasers of Quaker common stock filed two actions, which were later consolidated, in federal court in New Jersey.[FN3]Plaintiff stock purchasers maintained that Defendants Quaker and Smithburg had violated sections 10(b) and 20(a) of the Securities Exchange

Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5. (*Id.* ¶ 40.)The gravamen of Plaintiffs' Complaint is that when the Snapple negotiations went into high gear, Quaker and Smithburg must have known that a total debt-to-capitalization ratio in the upper 60 percent range was no longer a realistic possibility. At that moment, Plaintiffs contend, Defendants had a duty to correct the previously announced commitment to a total debt-to-capitalization ratio in the 60% range. Plaintiffs contend that had they been availed to material information regarding the Snapple acquisition, they would not have purchased Quaker's common stock at all or, alternatively, they would not have paid the artificially inflated prices they did. (*Id.* ¶ 46.)As a result of the Defendants' failure to make a timely disclosure concerning the Snapple negotiations, Plaintiffs contend that they were misled into purchasing stocks with inflated prices and on the account of such purchases suffered damages. (*Id.* ¶ 49.)

> FN3. The initial Complaint was filed on November 10, 1994. By an order, dated January 17, 1995, the action was consolidated with *Anderson v. Quaker Oats,* Civil Action No. 94-5418, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. On January 20, 1995, Plaintiffs filed an Amended Complaint. A Second Amended Complaint was filed on May 2, 1995.

On May 23, 1996, Judge Lechner for the United States District Court for the District of New Jersey granted Defendants' motion to dismiss for failure to state a claim, *Weiner v. Quaker Oats Co.,* 928 F.Supp. 1372, 1388 (D.N.J.1996), concluding that Quaker's earnings growth projections and stated "guideline" for the debt-to-total capitalization ratio were not actionable misrepresentations. *Id.* at 1385-86.Plaintiffs appealed the dismissal and in an opinion issued on November 6, 1997, the Third Circuit affirmed the lower court's dismissal with re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

spect to earnings growth projections, but reversed the dismissal of the claim regarding Quaker's debt-to-total capitalization guideline. *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 321 (3rd Cir.1997). With respect to this guideline, the court held:

**\*5** [D]efendants have failed to establish that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. The complaint alleges facts on the basis of which a reasonable factfinder could determine that Quaker's statements regarding its total debt-to-total capitalization ratio guideline would have been material to a reasonable investor, and hence that Quaker had a duty to update such statements when they become unreliable.

*Id.* at 318.

On remand, District Court Judge Lechner signed an May 1, 1998 order granting the Defendants' Motion to Transfer to the Northern District of Illinois. (May 4, 1998 Order Granting Motion to Transfer .) Plaintiffs filed this Motion for Class Certification on September 15, 1998. On October 26, 1998, the case was reassigned to this court, and this motion was fully briefed on July 9, 1999.

## DISCUSSION

### I. Standard of Review

This court has broad discretion to determine whether certification of a class action lawsuit is appropriate. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998) (citations omitted)."For purposes of determining class certification, the allegations made in support of certification are taken as true and the merits of the case are not examined."*Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974)).*But cf. Blair v. Equifax Check Servs., Inc.,* 181 F.3d 832, 835 (7th Cir.1999) ("Disputes about class certification cannot be divorced from the merits[.]"). Plaintiffs bear the burden of proving that

each of the requirements for class certification has been satisfied. *Id.* (citations omitted). This court also notes that there is a strong public policy favoring class certification in securities fraud litigation. *Frietch v. Refco, Inc.,* No. 92 C 6844, 1994 WL 10014, at \*2 (N.D. Ill. Jan 13, 1994) (citation omitted); *Riordan,* 113 F.R.D. at 62 (citation omitted).

### II. Rule 23 Class Certification

Federal Rule of Civil Procedure 23 sets out a two-pronged analysis to determine whether a class action is appropriate. First, Plaintiffs must meet the four prerequisites outlined in Rule 23(a): (1) numerosity (the class must be so large "that joinder of all members is impracticable"); (2) commonality (there must exist "questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses must be "typical ... of the class"); and (4) adequacy of representation (the representative must be able to "fairly and adequately protect the interests of the class").*Keele,* 149 F.3d at 594 (citing *Amchem Prods., Inc. v.. Windsor,* 521 U.S. 591, 613 (1997)); *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir.1993); *see*FED. R. CIV. P. 23(a). Second, Plaintiff must satisfy one of the three subsections of Rule 23(b)(1)-(3). Subsection (3), on which the Plaintiffs rely, permits certification (a) when questions of law or fact common to class members predominate over questions affecting only individual members, and (b) when a class action is a superior vehicle for fairly and efficiently adjudicating the controversy. FED. R. CIV. P. 23(b)(3).

**\*6** Defendants' only challenge to class certification is the contention that the proposed named Plaintiffs are not adequate representatives under Rule 23(a)(4). The court therefore limits the scope of its analysis to this issue.

Class representatives fill the critical role of "fairly and adequately protect [ing] the interests of the class."FED. R. CIV. P. 23(a)(4). The adequacy of representation requirement has three elements: (1)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 6
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)**

the chosen class representatives must have no claims that are antagonistic to or conflicting with claims of other members of the class; (2) the named representatives must have sufficient interest in the outcome to ensure vigorous advocacy; and (3) counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously. *In re CBC Cos., Inc. Collection Letter Litig.,* 181 F.R.D. 380, 382 (N.D.Ill.1998).

In arguing that the Plaintiffs are not adequate class representatives, Defendants set forth essentially three arguments: (A) the NYSE and SEC consent proceedings involving Sitnycky and Furman raise credibility problems which render them inadequate to represent the interests of the class, (B) proposed class representatives' filing of a complaint containing "false allegations" raises credibility problems which renders them inadequate to represent the interests of the class, and (C) proposed class representatives have not adequately participated in or exercised effective oversight over the litigation. The court addresses each argument in turn.

A. Sitnycky's and Furman's Involvement in Prior Regulatory Discipline

Defendants argue that Sitnycky and Furman have credibility deficiencies which render them inadequate to represent the interests of the class. With respect to Sitnycky, Defendants cite the consent decree entered in 1975 in which the SEC made certain preliminary allegations that if proven would have amounted to violations of Sections 10(b) and 17(a) of the Exchange Act and Sections 5 and 17(a) of the Securities Act. *See In re Murray,* 1975 SEC LEXIS 1080 (Aug. 5, 1975). Specifically, the SEC alleged that Sitnycky had engaged in the following misconduct: Sitnycky made material misstatements concerning "transactions in customer accounts"; Sitnycky "wilfully violated Sections 5(a), 5(b) and 5(c) of the Securities Act in that [he] offered, sold and delivered after sale certain securities when no registration statements under the Act had been filed

or were in effect as to such securities, and delivered after sale certain other securities without being accompanied or preceded by prospectuses meeting the requirements of Section 10 of the Act"; and Sitnycky "wilfully aided and abetted violations of the record keeping provisions of Section 17(a) of the Exchange Act and Rules 17a-3 and 17a-4 thereunder."*Id.*

Similarly, in an attempt to attack Furman's credibility, Defendants cite a 1983 consent decree between Furman and the NYSE in which the NYSE made certain allegations that if proven would have amounted to violations of the NYSE rules as well as Exchange Act Rules 17a-3 and 17a-4. *In re Furman,* 1983 NYSE Disc. Action LEXIS 111 (May 5, 1983). Specifically, the NYSE alleged that Furman engaged in the following misconduct: Furman violated Exchange Act Rule 107(B)(2) "in that his dealings as a Registered Competitive Market-Maker were inconsistent with the maintenance of a fair and orderly market"; Furman violated Exchange Act Rule 107.30 "in that he failed to accurately report purchases initiated by him for his own account"; and Furman violated Exchange Act Rules 17a-3 and 17a-4 "in that he directly or indirectly transmitted orders to the Floor of the Exchange without making and preserving an adequate record of the terms of such orders and the times of their transmittal."*Id.*

\*7 With full appreciation of the severity of the allegations brought against Sitnycky and Furman, the court nonetheless concludes that the consent decrees are of minimal relevance to the issue of credibility in the current action. Sitnycky's 1975 consent decree involved activity which occurred between 1970-72. Furman's consent decree involved activity which occurred in 1979. Since the entering of each individuals' respective consent decree, neither individual has had any other charges levied against them. The consent decrees are thus remote in time, and, as described above, involve conduct unrelated to the facts of the current action.

It is critical to note that a consent decree is nothing more than a formalized settlement agreement. Thus,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)

the facts, allegations or conclusions contained in the consent decrees are not to be considered as admissions or denials. Whatever tarnish such proceedings may have on Sitnycky's and Furman's credibility, the court finds it insufficient to disqualify them as class representatives.

**B. Proposed Class Representatives' Statements Regarding Reliance in the Complaint**

Defendants contend that proposed class representatives lack the required credibility for class certification because they permitted the filing of a complaint containing a false allegation. Defendants assert that

the Complaint alleges that the plaintiffs were 'relying ... [on] the statements disseminated by the defendants concerning the Company's leverage ratio guideline in purchasing Quaker common stock .'

(Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification quoting Second Amended Class Action Complaint.) Defendants contend that the Complaint, as they have quoted it, contradicts the deposition testimony of each proposed class representative in that each proposed class representative denied ever having read the Company's leverage ratio guideline. Defendants, however, have considerably altered the meaning of the statement in the Complaint by failing to cite the statement in its entirety. The excerpt from the Complaint actually reads:

In ignorance of the adverse facts concerning Quaker's business and future prospects, and relying *upon the integrity of the marketplace and/or* the statements disseminated by the defendants, plaintiffs and the members of the Class purchased the Company's common stock at artificially high prices and were damaged thereby. Defendants' conduct as alleged has damaged plaintiffs and members of the Class.

(Second Amended Class Action Complaint at ¶ 45, emphasis added.) By omitting the phrase "upon the

integrity of the marketplace and/or" the Defendants have significantly altered the meaning of the Complaint.

When comparing the proposed class representatives' statements with what was actually claimed in the Complaint, the court finds that the Complaint does not contain a false allegation.[FN4] Rather, the Complaint contains a valid alternative statement which is a form of pleading specifically permitted under Rule 8. *See* FED. R. CIV. P. 8(e)(2). Thus, Defendants' attack on the proposed class representatives' credibility must fail.

> FN4. It is possible that some members of the class did in fact rely "upon ... the statements disseminated by the defendants," even if the class representatives themselves did not. Of course, if Plaintiffs are unable to prove reliance or that any of Defendants' statements caused their injuries, then Defendants may well prevail on the merits of the claims.

**C. Proposed Class Representatives' Participation In and Knowledge Of the Case**

*8 A class must have a "conscientious representative plaintiff." *In re CBC Companies, Inc. Collection Letter Litigation,* 181 F.R.D. 380, 382 (N.D.Ill.1998) (quoting *Rand v. Monsato Co.,* 926 F.2d 596, 599 (7th Cir.1991)). The burden in demonstrating that the class representative meets this standard is not difficult. *Id.* (citation omitted). An understanding of the basic facts underlying the claims, some general knowledge and a willingness and ability to participate in discovery are sufficient to meet this standard.*Id.* (citations omitted). Technical expertise is not required. As one court has observed, in "legally complex actions such as securities fraud litigation, a plaintiff need not have expert knowledge of all aspects to qualify as an class representative."*In re Discovery Zone Sec. Litig.,* 169 F.R.D. 104, 110 (N.D.Ill.1996) (citations omitted); *see also Frietsch,* 1994 WL 10014, at *6 ("The vast majority of judges of this Court and others recog-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)

nize that plaintiffs in securities fraud class actions need not have a detailed understanding of their complaint and may rely on the knowledge and expertise of their attorneys in prosecuting their securities fraud claims.") (internal quotes and citation omitted). As discussed below, this court concludes that proposed class representatives Sitnycky and Furman have exhibited the minimum participation and knowledge necessary to adequately protect the interests of the class. In this court's view, however, Plaintiff Anderson has not demonstrated that he meets the minimum requirements necessary for class representative status. Anderson will, of course, remain a member of the class eligible for relief.

*Sitnycky and Furman*

Defendants urge that Sitnycky and Furman can not act as class representatives because they have failed to satisfy their "basic oversight function." Specifically, Defendants suggest that Sitnycky's and Furman's lack of familiarity with the Complaint should disqualify them as class representatives. To the contrary, the court finds that both Sitnycky and Furman possess the minimally sufficient interest required to ensure vigorous advocacy. Sitnycky has read the Complaint, (Sitnycky Dep., at 74), and has also shown he has a firm grasp of the claims asserted in this action.

Q: Can you tell me your understanding of the claims asserted in the action?

A: It states that Mr. William Smithburg and Quaker Oats made statements that number 1 were-the disclosures were incorrect, misleading that the debt ratio to total capitalization which was a precept or an objective of a company were not followed.

Q: What information do you think should have been disclosed or that was falsely disclosed?

A: I believe that there should have been a disclosure that the company's direction and change of direction were being discussed within Quaker Oats but

not disclosed to the public in terms of its pursuit of the purchase of a-of any company. And in particular, Snapple, in this case.

*9 Q: Do you understand you're acting as a fiduciary?

A: Yes.

Q: Can you tell me what your understanding is of your duties as a fiduciary?

A: Well, it's the responsibility to the class to represent the class, to make sure that I'm knowledgeable enough in the matter and that we communicate with the class and that there is communication between myself and the attorneys and that all conversations, all discussions are communicated to the class.

(Sitnycky Dep., at 75-77.)

Similarly, Furman has demonstrated that he possesses sufficient interest and understanding required to ensure vigorous advocacy. Furman has kept continuous contact with his attorneys and possesses a firm grasp of the claims asserted in this matter.

Q: Did you meet with your attorneys before the complaint was filed?

A: I don't remember whether we met or we just spoke on the telephone. I don't remember.

Q: Can you tell me what the claims are that you are alleging in this case?

A: Basically that the company, president of the company, the company, lied in terms of the debt level that it was going to take on, which in effect-as I said to you, one of the things that I did look at was a balance sheet of the company before I bought it. Not necessarily from a company document but through Standard and Poors and Value Line. And the company had aggressive, but not unmanageable, debt burdens. What I gathered, from the documents, had I read them, the president in his letters or the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)

company, literally came out and made representations that they would not exceed a certain level.

Q: What do you understand your responsibilities to be [as class representative]?

A: My responsibilities are to see that the litigation goes forward, that I have obligations to testify, and obviously I am here, I am fulfilling my obligations. To see that Mr. Soicher continues to make progress in the case and that it just doesn't sit there and dawdle.

(Furman Dep., at 31, 44-45.) Sitnycky and Furman appear capable of adequately protecting the interests of the class. Indeed, other courts in this district have found plaintiffs who exhibited far less knowledge and participation sufficiently qualified to be class representatives. For example, in *CBC Companies,* the court found adequate a plaintiff who had not engaged in conversations with her lawyers, admitted she had no idea what a "defendant" was and who she had sued in the lawsuit, and could not remember dates she had received correspondence from her lawyers. *In re CBC Cos., Inc. Collection Letter Litig.,* 181 F.R.D. 380, 383-84 (N.D.Ill.1998). Because she basically knew what the case was about and had a minimal understanding of the role of a class representative and because "this case as all class actions is prosecuted by lawyers[,]" the court concluded that she was an adequate class representative. *Id.* at 384.In the instant case, both Sitnycky and Furman have duly demonstrated that they understand the nature of the claims, willingly participated in the discovery process, and effectively monitored their counsel's activities. Thus, the court finds that Sitnycky and Furman will adequately protect the remainder of the class and thereby grants them class representative status.

*Anderson*

**\*10** Defendants argue that Anderson lacks an understanding of his role as a class representative, or

of the claim alleged. Indeed, Anderson's testimony raises concerns regarding his adequacy, even in light of the low threshold for the adequacy requirement. In explaining the grounds for the case, Anderson testified in the following way:

Q: Can you tell me why you brought the lawsuit?

A: Because I lost money.

Q: Can you tell me your understanding of the claims that are asserted in this action?

A: Basically I felt that I was-I had been wronged by the company and I was just trying to recoup my loses.

Q: Right. But you have said you answered it, but I want to hear again because I'm not clear what you claim Quaker did wrong.

A: I said that Quaker Oats when I bought them they were a very substantial, very good company, had good earnings, okay. And when they went out and went into this venture of purchasing Snapple, they dropped down dramatically, okay. And that's when I got out and that's when I lost-I lost money on the deal. And they said that their earnings were going to stay very strong. But doing an acquisition like they did, that's when everything fell apart.

(Anderson Dep., at 30-31, 38-42.) This testimony suggests Anderson believes that a securities fraud claim arises whenever an investor loses money in the stock market. Even when prompted, Anderson did not appear to grasp the nature of the claim before the court. For example:

Q: Do you recall prior to the time you purchased Quaker stock that Quaker ever made a statement regarding its total debt to total capitalization ratio?

A: The total debt to their what?

(Anderson Dep., at 29.) Anderson's failure to not only understand, but even recognize, the term debt-to-capitalization undermines this court's confidence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)**

in his adequacy as class representative. Taken as a whole, even recognizing the low threshold of knowledge required of an adequate class representative, Anderson appears to lack even a minimal grasp of the facts and legal basis of the case. Although he will remain a member of the class, entitled to relief fi the class prevails, the court declines to certify Anderson as a class representative.

### III. Proper Breadth of the Class Period

Finally, Defendants object to the class period proposed by Plaintiffs. At the outset the court notes that in determining the proper breadth of the class period, the court will not consider claims regarding Quaker's earnings growth projections. Such claims were previously dismissed as non-actionable as a matter of law. *See Weiner v. Quaker Oats Co.,* 129 F.3d 310, 320 (3rd Cir.1997). For the purposes of determining the class period, the court will focus its inquiry on the only remaining claim-Defendants' alleged misrepresentations regarding its debt-to-total capitalization ratio.

Plaintiffs propose a class period from August 4, 1994 through and including November 1, 1994. (Second Amended Class Action Complaint ¶ 12.) Defendants urge the court to shorten the period and commence the class period on the later date of September 23, 1994. Defendants argue that the first potentially actionable misstatement was not made until September 23, 1994 and thus this is when the class period should begin. As noted earlier, on September 23, only 9 days before Quaker publicly announced the Snapple acquisition, Quaker issued its 1994 Annual Report. In this report, Quaker reiterated its guideline for debt-to-total capitalization ratio. Quaker stated that

**\*11** [a]t the end of fiscal 1994, our total debt-total capitalization ratio was 68.8 percent on a book value basis, in line with our guideline in the upper-60 percent.

(*Id.* ¶ 32.) Indeed, Defendants' statements in the

1994 Annual Report could serve as the commencement date for the class period if the period were to begin when the "first affirmative potentially misleading statement [is] made."As the Third Circuit held in its opinion in the case, however, once material statements which are "alive" in the market place become unreliable to a reasonable investor, an affirmative duty to update arises. *See Weiner v. Quaker Oats Co.,* 129 F.3d 310, 318 (3rd. Cir.1997). Thus the date on which the class period should commence is the first date on which there is an identifiable breach of the duty to update unreliable information.

In the instant case, the critical inquiry for determining when the class period should commence is when did Defendants' duty to update arise? Specifically, when did Defendants' statements regarding their upper 60 percent guideline for debt-to-total capitalization ratio become unreliable in light of the pursuit and consummation of the Snapple acquisition? Although the record is scant as to exactly when the Quaker/Snapple negotiations were in high gear, Plaintiffs allege that "[b]y early August 1994, Quaker advised Snapple that it was interested in pursuing an acquisition of Snapple and commenced a due diligence investigation."(Second Amended Class Action Complaint, ¶ 29.) Until a date can be furthered defined, and for purposes of granting Plaintiffs' Motion for Class Certification, the court will use the date of August 4, 1994 as a proxy for when the Quaker/Snapple acquisition was sufficiently evident that an alteration or revision to the previously stated debt-to-total capitalization was required.

### CONCLUSION

For the reasons stated above, the court hereby grants Plaintiffs' Motion for Class Certification and certifies a class of purchasers of Quaker Common Stock from August 1994 through November 1, 1994, such class to be represented by Plaintiffs Nicholas Sitnycky and Robert Furman.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 1999 WL 1011381 (N.D.Ill.), Fed. Sec. L. Rep. P 90,701
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 1011381)**

N.D.Ill.,1999.
Weiner v. Quaker Oats Co.
Not Reported in F.Supp.2d, 1999 WL 1011381
(N.D.Ill.), Fed. Sec. L. Rep. P 90,701

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 1155251 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1155251)**

**H**
Anderson v. New Dimension Financial Services, L.P.
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Todd and Terri ANDERSON, and John and Sheila
Teichman, each individually and on Behalf of oth-
ers similarly situated, Plaintiffs,
v.
NEW DIMENSION FINANCIAL SERVICES,
L.P., et al. Defendants.
No. 00 C 3725.

Sept. 28, 2001.

*MEMORANDUM OPINION AND ORDER*

GUZMAN, J.
**\*1** This consumer lending case is before this Court
on plaintiffs' objections [FN1] to Magistrate Judge
Nolan's Report and Recommendation in which she
recommended that plaintiffs' motion for class certi-
fication be denied. Plaintiffs' claim, filed pursuant
to the Real Estate Settlement Procedures Act
("RESPA"), 12 U.S.C. § 2607(b) and the Uniform
Deceptive Acts and Practices ("UDAP"), involves
the purchase of new homes in Algonquin Hills and
loans used to purchase these homes. For the follow-
ing reasons, the Court denies plaintiffs' motion to
certify the class and adopts the Report and Recom-
mendation of Magistrate Judge Nolan.

> FN1.Federal Rule of Civil Procedure 72
> does not contemplate reply briefs, and be-
> cause plaintiffs' were not granted leave of
> court to file one, the brief submitted has
> not been considered by the Court.

I. Background

Plaintiffs Sheila and John Teichman and Terri and
Todd Anderson were looking to purchase new

homes in 1998 in a subdivision in Algonquin,
Illinois. The developers of the subdivision, Kimball
Hill ("Kimball"), referred both couples to New Di-
mension Financial Services ("New Dimension") to
assist them in the financing. Plaintiffs were asked
to sign an Affiliated Business Disclosure Form, re-
quired by RESPA, regarding the referral to New
Dimension. Plaintiffs assert that the estimates on
the disclosure forms were incorrect, although Kim-
ball had access to the actual fees charged by New
Dimension. Plaintiffs were also asked by New Di-
mension to sign a "Loan Interest Rate Agreement"
and a "Loan Brokerage Disclosure Statement and
Agreement" providing for a penalty should the cli-
ent request another lender and giving New Dimen-
sion exclusive rights to arrange the terms of the loan.

Plaintiffs claim that CTX Mortgage ("CTX"), a
lender, has a close relationship with New Dimen-
sion. Plaintiffs assert that New Dimension assigns
most of its loans to CTX, including plaintiffs' loans.
Plaintiffs also assert that CTX is not interested in
maintaining and servicing mortgage loans, but
rather in providing the original funding and collect-
ing the initial interest payments. Plaintiffs contend
that unlike the "Affiliated Business Disclosure"
form they were asked to sign by Kimball regarding
the referral to New Dimension, New Dimension did
not give plaintiffs a similar form to sign regarding
the referral of the mortgage to CTX.

These allegations prompted plaintiffs to file three
claims against defendants. In response to these
claims, defendants claim that New Dimension may
act as a lender or a broker depending on several
factors. When New Dimension does not fund the
loan, it acts as a broker to another lender. When
New Dimension funds the loan, it has a line of
credit with Bank One, which it uses for funding,
and it then sells the loan to CTX pursuant to a
Mortgage Loan Purchase Agreement. Plaintiffs
have sought to certify a class of 786 members who
bought a Kimball Hill home, were referred by Kim-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1155251 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1155251)**

Page 2

ball Hill to New Dimension for financing, and made initial mortgage payments to CTX.

## II. Discussion

Federal Rule of Civil Procedure ("Rule") 72 provides for the referral of pretrial matters to a magistrate judge. Under the Rule, the magistrate's order may be subject to review by a district court judge. However, pursuant to 28 U.S.C. § 636(b)(1)(A), a motion for class certification may not be decided independently by a federal magistrate judge. Accordingly, the District Court has the authority to make the final determination on the motion, and is required to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."28 U.S.C. § 636(b)(1).

### A. Class Certification Under Rule 23

**\*2** To certify a class, the plaintiff must meet the following four requirements: 1) class is too numerous to join; 2) common questions of law or fact; 3) claims or defenses of representative parties are typical of those of the class members, and 4) the representative parties will fairly and adequately represent the class. Fed.R.Civ.P. 23(a). Once these requirements are satisfied, the plaintiffs must meet one of the requirements of Rule 23(b).*Retired Police Ass'n v.. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). Plaintiffs in this case have moved to certify the class under Rule 23(b)(3), which requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3).

Plaintiffs have only objected to Magistrate Judge Nolan's findings and holdings regarding the absence of Rule 23(b)(3) predominance. Therefore, this Memorandum Opinion and Order will address those objections.

To qualify for certification under Rule 23(b)(3), plaintiffs must show "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3). Plaintiffs moving for certification under Rule 23(b)(3) must show that they are seeking to remedy a common legal grievance. *Doe v. Guardian Life Ins. Co. of Am.,* 145 F.R.D. 466, 475 (N.D.Ill.1992). However, it is not necessary for the common issues to be dispositive of the entire litigation. *Doe,* 145 F.R.D. at 475;*Riordan v. Smith Barney,* 113 F.R.D. 60, 65 (N.D.Ill.1986). Plaintiffs must also show that class action is the superior method for adjudication of the case. Fed.R.Civ.P. 23(b)(3). The purpose of requiring predominance and superiority is to determine whether certifying the class will have practical utility. *Doe,* 145 F.R.D. at 474.

### B. Analysis

Plaintiffs' first objection is in response to the method of measuring damages suggested by Magistrate Judge Nolan. Plaintiffs argue that the only individual inquiry is into the amount of damages, but the method of formulating damages is uniform for each plaintiff, and therefore the common issues predominate. Defendants assert that to adjudicate plaintiffs' RESPA claim, an "individualized inquiry into each Plaintiff's loan and services provided by New Dimension pursuant to that loan" would be necessary. (R. & R. at 11). Section 8 of RESPA prohibits the payment of kickbacks or referral fees for settlement services. 12 U.S.C. § 2607(a). However, section 8(c) provides that "the payment to any person of a bona fide salary or compensation or other payment for good or facilities actually furnished or for services actually provided" is not prohibited. 12 U.S.C. § 2607(c). This issue was clarified by the U.S. Department of Housing and Urban Development (HUD) in RESPA Policy Statement 1999-1, finding that payments of yield spread premiums by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3
Not Reported in F.Supp.2d, 2001 WL 1155251 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1155251)**

lenders to mortgage brokers are not per se illegal and that courts may make individualized inquiries into whether payments are related to the receipt of goods or services. *See* 24 C.F.R. §§ 3500.2, 3500.7, 3500.14. Therefore, the only way to determine whether or not each plaintiff was charged unfairly would be to examine each individual case, which would not be amenable to a class action.

**\*3** The second objection raised by plaintiffs is based on Magistrate Judge Nolan's finding that there is no evidence to show that "the amounts charged to borrowers were unrelated to the types of services provided."(R. & R. at 14). Plaintiffs assert that they were overcharged by New Dimension for services provided by CTX Mortgage on behalf of New Dimension and that these amounts were unrelated to services performed. However, the plaintiffs have not cited any case law which supports this theory. Plaintiffs cite *Dujanovic v. Mortgage America, Inc.,* 185 F.R.D. 660, 665 (B.D.Ala.1999), in which the district court certified a class of plaintiffs who had alleged that the yield spread premium paid to a broker was determined by the interest rate of the loan, which was unrelated to the services provided. This is not the case before this court. Plaintiffs claim that CTX charges a flat rate to services it performs for New Dimension, however the amount charged by New Dimension for services to home owners does vary. However, this does not establish on its own that the fees were unrelated. Whether or not each individual plaintiff was charged a reasonable fee may depend on several factors and cannot be determined on a class wide basis. *See, e.g., Sicinski v. Reliance Funding Corp.,* 82 F.R.D. 730 (S.D.N.Y.1979); *Hinton v. First American Mortgage,* 1998 WL 111668,*5 (N.D.Ill. March 4, 1998).

Plaintiffs also argue that the requirement of examining individual documents for each class member does not preclude certification of the class. (Plantiffs' Obj. at 9-10). Plaintiffs claim that Magistrate Judge Nolan's finding contradicts *Heastie v. Comm. Bank of Greater Peoria,* where the court

held that because individual issues were relatively simple, common issues to the class would still predominate. *See* 125 F.R.D. 669, 675 n. 6 (N.D.Ill.1989). However, the *Sicinski* court refused to certify a class because the court would be required to determine what services were rendered in each separate transaction to decide whether fees were "reasonably related" to services provided. 82 F.R.D. at 733. Subsequent decisions have supported this conclusion finding that class certification was inappropriate where the court was required to determine whether or not a kickback had occurred on a class wide basis. *See Taylor v. Flagstar Bank, FSB,* 181 F.R.D. 509, 523 (M.D.Ala.1998); *see also, e.g., Golon v. Ohio Savings Bank,* 1999 WL 965593,*6 (N.D.Ill. Oct. 15, 1999). Therefore, an individual inquiry would be necessary to determine liability.

The plaintiffs' final objection is regarding the class certification of their unfair and deceptive trade practices statutes ("UDAP") claims. Plaintiffs argue that if this Court certifies the RESPA claims, they must also certify the UDAP claims. (Plaintiffs' Obj. at 10-11). This court has determined that the RESPA claims are not suitable for class certification and plaintiffs have failed to provide any other support as to why the UDAP claims are suitable for certification, therefore certification is not appropriate.

III. Conclusion

**\*4** This Court adopts the Report and Recommendation of Magistrate Judge Nolan and denies the Plaintiffs' motion to certify the class.

N.D.Ill.,2001.
Anderson v. New Dimension Financial Services, L.P.
Not Reported in F.Supp.2d, 2001 WL 1155251 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 2261688 (D.Minn.)
**(Cite as: Slip Copy, 2007 WL 2261688)**

Page 1

**C**
Gardner v. Equifax Information Services, LLC
D.Minn.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Minnesota.
Joan Lockhart GARDNER and Susan Bofferding,
on behalf of themselves and all others similarly
situated, Plaintiffs,
v.
EQUIFAX INFORMATION SERVICES, LLC, Defendant.
**Civil No. 06-3102 ADM/AJB.**

Aug. 6, 2007.

Thomas J. Lyons, Jr., Esq., Consumer Justice Center, P.A., Vadnais Heights, MN, on behalf of Plaintiffs.
Barry Goheen, Esq., King & Spalding LLP, Atlanta, GA, on behalf of Defendant.

**MEMORANDUM OPINION AND ORDER**

ANN D. MONTGOMERY, U.S. District Judge.

**I. INTRODUCTION**

*1 On June 20, 2007, oral argument before the undersigned United States District Judge was heard on Plaintiffs Joan Lockhart Gardner ("Gardner") and Susan Bofferding's ("Bofferding") (collectively, "Plaintiffs") Motion for Class Certification [Docket No. 15]. In their Amended Complaint [Docket No. 27], Plaintiffs, on behalf of themselves and all other individuals similarly situated, allege a claim for violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681i, against Defendant Equifax Information Services, LLC ("Equifax").

**II. BACKGROUND**

**A. Motion for Class Certification**

Plaintiffs seek class certification on behalf of them-

selves and others similarly situated for a claim based on Equifax's alleged violations of the FCRA. Am. Compl. ¶ 44; Gardner Decl. [Docket No. 20] ¶ 4; Bofferding Decl. [Docket No. 21] ¶ 16. Specifically, Plaintiffs allege Equifax violated the FCRA by failing to fulfill its statutorily imposed duty to reinvestigate alleged inaccuracies in consumer credit reports upon receipt of a dispute communicated by Plaintiffs. Am. Compl. ¶ 44; Gardner Decl. ¶ 3; Bofferding Decl. ¶ 15; *see*15 U.S.C. § 1681i (2006). Both Bofferding and Gardner seek to represent the proposed class. Gardner Decl. ¶ 7; Bofferding Decl. ¶ 19. Plaintiffs request relief in the form of statutory damages, attorney fees, and costs resulting from the violations alleged. Am. Compl. at 7. The class proposed for certification by Plaintiffs is defined as follows:

A nationwide class of consumers who (a) live in U.S. Postal zip codes allegedly owned by Equifax's affiliate CSC Credit Services, but whose credit files are stored on the Equifax database; (b) have communicated a dispute pursuant to 15 U.S.C. § 1681i directly to Equifax; (c) within the past two years from the date of filing of this complaint; (d) which disputes have not been investigated by Equifax.

*Id.* ¶ 31.

**B. The Named Plaintiffs**

**1. Joan Lockhart Gardner**

On May 31, 2005, Gardner purchased her credit report from Equifax. *Id.* ¶ 5. On November 28, 2005, Gardner sent a dispute letter to Equifax, stating she was a victim of identity theft and disputing several inaccuracies on her credit report. *Id.* ¶ 6. Equifax acknowledged receipt of Gardner's dispute letter in a reply to her, sent December 15, 2005, which further stated her correspondence was forwarded to CSC Credit Services Inc. ("CSC"), the company that researches disputes arising in the zip code in which Gardner's address is located.[FN1]*Id.* ¶¶

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2261688 (D.Minn.)
**(Cite as: Slip Copy, 2007 WL 2261688)**

8-9.The reply instructed Gardner to contact CSC directly should she have any further questions or issues regarding her credit file.*Id.* ¶ 9. Equifax also sent a letter to Gardner on December 16, 2005, stating a "fraud alert" had been placed on her credit file. *Id.* ¶ 10.On February 28, 2006, Gardner sent another dispute letter to Equifax, to which Gardner did not receive a reply. *Id.* ¶¶ 12-14.

> FN1. Equifax and CSC are consumer reporting agencies. Fluellen Decl. (Def.'s Ex. [Docket No. 38] A) ¶¶ 4, 7. CSC licenses from Equifax the computer system used to manage consumer credit files. *Id.* ¶ 7. Despite using the same system, Equifax and CSC maintain independent files for consumers based on the consumers' zip codes, and one company cannot access the other company's files without permission. *Id.* ¶ 15;*see generally Morris v. Equifax Info. Servs., LLC,* 457 F.3d 460, 466 (5th Cir.2006) (providing extensive description of the credit reporting industry and the commercial relationship between Equifax and CSC).

**2. Susan Bofferding**

*\*2* In December 1998, Bofferding leased a car and financed the lease through Wells Fargo Auto Finance. *Id.* ¶ 17.In July 2003, Bofferding returned the car to the dealership and paid the lease in full. *Id.* ¶ 18.The dealership was late in making payments on the vehicle lease after the car was returned, and Wells Fargo reported the car as repossessed. *Id.* ¶¶ 20-21.

In June 2006, Bofferding received letters denying her application for a student loan on behalf of her son. *Id.* ¶ 22.One of the denial letters stated that the credit decision was based on information obtained in a credit report from Equifax-CSC Credit Services. *Id.* ¶ 23.The letter explained her right as a consumer to dispute any inaccuracies contained in her credit report and to direct any communication regarding such disputes to Equifax. *Id.* ¶ 24.Being

apprised of her rights, Bofferding communicated an alleged inaccuracy in her credit report to Equifax in a dispute letter sent on June 30, 2006, to which Bofferding did not receive a reply. *Id.* ¶¶ 27-28.

**C. Equifax's Policy Upon Receipt of a Dispute Letter**

Equifax generally does not perform reinvestigation of disputes initiated by consumers located in CSC's zip codes.[FN2]Fluellen Decl. ¶¶ 12-15. Equifax does, in certain circumstances, reinvestigate a dispute on a CSC file, but typically only with the advance permission and at the direction of CSC. *Id.* ¶¶ 16-17; Poch Dep. (Def.'s Ex. B; Lyons Aff. [Docket No. 44] Ex. A) at 49. Therefore, Equifax's general policy upon receiving a dispute letter regarding a CSC-owned file is to forward the dispute to CSC. Fluellen Decl. ¶ 19; Poch Dep. at 5.

> FN2. The file of a consumer is "owned" by a credit reporting agency if that consumer lives in a zip code that is overseen by that credit reporting agency. *See Morris,* 457 F.3d at 466 n. 9.

**III. DISCUSSION**

**A. Rule 23 of the Federal Rules of Civil Procedure**

The requirements for class certification are set forth in Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"). The proposed class must satisfy the four explicit requirements of Rule 23(a), including: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"), (2) commonality ("there are questions of law or fact common to the class"), (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"), and (4) adequacy ("the representative parties will fairly and adequately protect the interests of the class").Fed.R.Civ.P. 23(a); *Donaldson v. Pillsbury Co.,* 554 F.2d 825, 829 (8th Cir.1977).Rule 23 also

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2261688 (D.Minn.)
(Cite as: Slip Copy, 2007 WL 2261688)

Page 3

implicitly requires that named parties be members of the objectively ascertainable class they seek to represent.*See Powell v. Nat'l Football League,* 711 F.Supp. 959, 966 (D.Minn.1989). Additionally, a plaintiff must fulfill the requirements of a Rule 23(b) category in order to obtain certification for the proposed class.Fed.R.Civ.P. 23(b); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163 (1974).

The plaintiff bears the burden of proving both the threshold requirements of Rule 23(a) and fulfillment of one of the three subsections set forth in Rule 23(b).*Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir.1994). When considering a motion for class certification, the court takes the substantive allegations in the plaintiff's complaint as true, as the issue is resolved, not by an investigation into the merits of the claim, but rather by consideration of the class certification criteria. *Thompson v. Am. Tobacco Co.,* 189 F.R.D. 544, 549 (D.Minn.1999); *Lockwood Motors, Inc. v. Gen. Motors Corp.,* 162 F.R.D. 569, 573 (D.Minn.1995). Nonetheless, a motion for class certification "generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 (1978) (citation omitted). Only after a rigorous analysis of the proposed class and the requirements of Rule 23 may a court grant class certification. *See Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982). Furthermore, a district court retains discretion in the decision to certify a class. *See In re St. Jude Med. Inc.,* 425 F.3d 1116, 1119 (8th Cir.2005).

**B. Rule 23(a) of the Federal Rules of Civil Procedure**

1. Implicit requirements of Rule 23(a)

*3 In addition to the explicit requirements enumerated in Rule 23(a), an implicit requirement is that a proposed class be definable .[FN3]*Powell,* 711 F.Supp. at 966. Plaintiffs must establish that the class, as proposed, is objectively ascertainable and a precise definition of the class must be given. *Ro-*

*man v. ESB, Inc.,* 550 F.2d 1343, 1348 (4th Cir.1976).

> FN3. An additional implicit requirement is that the named parties be members of the proposed class. *See Powell,* 711 F.Supp. at 966. Defendant does not appear to challenge that both Gardner and Bofferding are members of the proposed class.

Equifax challenges Plaintiffs' fulfillment of the objectively ascertainable class requirement, stating the determination of class membership requires individual inquiry and is not capable of ready identification. Def.'s Opp'n Mem. [Docket No. 36] at 13 (citing *Buford v. H & R Block, Inc.,* 168 F.R.D. 340, 346 (S.D.Ga.1996)). Equifax points to occasions in which it does investigate CSC-owned files, and the question of whether a class member "directly" communicated a dispute to Equifax, as examples of individual assessments that would be necessary to define the class. *Id.* at 14-16.

The Court finds the class, as proposed, is objectively ascertainable. Whether or not Equifax followed its general business practice in a particular instance would likely be readily determined with a cursory look at the records Equifax purportedly possesses. *See* Lyons Aff. Ex. E at 3-5. Also, determining if Equifax "directly" received a communication from a potential class member regarding a dispute can be considered objectively. There would be no "difficult determination ... of who is in the class and who is not," like there was in *Foster v. St. Jude Medical, Inc.,* 229 F .R.D. 599, 607 (D.Minn.2005). Because the proposed class is objectively ascertainable, the Court turns to the enumerated requirements of Rule 23(a).

**2. Explicit Requirements of Rule 23(a)**

**a. Numerosity**

The first requirement of Rule 23(a) is that the potential class members be so numerous that joinder is impracticable. Fed.R.Civ.P. 23(a). Impracticabil-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2261688 (D.Minn.)
(Cite as: Slip Copy, 2007 WL 2261688)

Page 4

ity of joinder is a question to be determined by the court "based upon all the circumstances surrounding a case."*Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50, 55 (8th Cir .1977). Possible considerations include the nature of the action, number of class members, and the size of the potential individual claims. *Sonmore v. CheckRite Recovery Servs., Inc.,* 206 F.R.D. 257, 261 (D.Minn.2001). Equifax does not challenge Plaintiffs' fulfillment of this requirement and the Court finds the requirement sufficiently satisfied. The potential class members are spread across a wide geographic area based on the zip codes owned by CSC, ranging from Texas to Minnesota. Poch Dep. at 8. More important is the large number of potential class members, with an early estimate of potential class members greater than 100,000. Am. Compl. ¶ 32. Given the sizable number and wide geographic dispersion of potential class members, the Court finds joinder to be impracticable, fulfilling the numerosity requirement.

**b. Commonality**

Rule 23(a)(2) requires common questions of law or fact to be present for class certification to be approved. Fed.R.Civ.P. 23(a)(2). This requirement is fulfilled upon a showing that "the legal question linking the class members is substantially related to the resolution of the litigation."*DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1174 (8th Cir.1995) (citations and quotation marks omitted). This requirement is a relatively easy threshold inquiry, requiring only some common questions of law or fact amongst the class members.*In re Hartford Sales Practices Litig.,* 192 F .R.D. 592, 603 (D.Minn.1999).

**\*4** Plaintiffs argue the potential class members all have claims stemming from Equifax's failure to re-investigate a communicated dispute. The success of these claims, Plaintiffs argue, hinges upon the determination of the legality of what is alleged to be Equifax's common business practice. Pls.' Mem. [Docket No. 17] at 10. The Court finds the commonality requirement of Rule 23(a)(2) to be satis-

fied. A determination of the legality of Equifax's allegedly regular business practice is necessary to the resolution of the claims all the proposed class members could bring individually under the FCRA. This common question is the only one identified by Plaintiffs in their Amended Complaint, but is sufficient to meet the commonality requirement under standards enunciated by the Eighth Circuit Court of Appeals. *See* Am. Compl. ¶ 38; *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir.1982); *see also Thompson,* 189 F.R.D. at 549. A proposed class may satisfy the commonality requirement but still fail under the "far more demanding" predominance requirement of Rule 23(b)(3).*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 624 (1997). Nonetheless, the Court finds that common issues of law or fact exist such that the commonality requirement of Rule 23(a)(2) is fulfilled.

**c. Typicality**

Rule 23(a) further requires "the claims or defenses of the representative parties are typical of the claims or defenses of the class."Fed.R.Civ.P. 23(a)(3). Typicality is present "when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members."*In re Potash Antitrust Litig.,* 159 F.R.D. 682, 690 (D.Minn.1995) (quotations omitted). So long as other class members have claims similar to the named plaintiff, typicality is fairly easily established.*DeBoer,* 64 F.3d at 1174.

Plaintiffs argue typicality is established because the named representatives' claims arise from the same conduct as the claims of other members of the putative class; namely, Equifax's alleged failure to re-investigate consumer disputes. Pls.' Mem. at 12. Equifax does not challenge Plaintiffs' fulfillment of the typicality requirement. *See* Def.'s Opp'n Mem. at 13-24. The Court finds that Plaintiffs have fulfilled the burden of establishing the typicality requirement. The claims of the representative Plaintiffs arise from an alleged violation of the FCRA, 15 U.S.C. § 1681i, as do the claims of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2261688 (D.Minn.)
**(Cite as: Slip Copy, 2007 WL 2261688)**

potential members of the proposed class. All the claims, therefore, would necessarily involve proving a violation of a requirement imposed by § 1681i. The low bar for fulfillment of this requirement allows for the existence of some factual differences, and the Court finds the underlying legal issue in the class members' claims similar enough to satisfy the typicality requirement.

**d. Adequacy**

The fourth enumerated condition, with its focus on protecting the interests of absent class members, requires "the representative parties [to] fairly and adequately protect the interests of the class."Fed.R.Civ.P. 23(a)(4). While related to the typicality requirement, adequacy of representation is distinct and present when "(1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge."*In re GenesisIntermedia, Inc. Sec. Litig.,* 232 F.R.D. 321, 330 (D.Minn.2005).[FN4] The adequacy requirement inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent."*Amchem,* 521 U.S. at 625.

> FN4. Plaintiffs assert their counsel of record is adequate in light of previous experience litigating class actions as well as individual cases under the FCRA. Pls.' Mem. at 13; *see* Lyons, Sr. Decl. [Docket No. 18]; Lyons, Jr. Decl. [Docket No. 19]. Equifax does not challenge this assertion.

**\*5** Equifax argues the named Plaintiffs' election to forego actual damages or a negligence claim renders them inadequate representatives of the class. Def.'s Opp'n Mem. at 18. Furthermore, Equifax avers that opt-out and notice procedures insufficiently protect absent class members from the loss of potential claims for actual damages. *Id.* at 23-24.Plaintiffs, however, contend that their failure

to pursue actual damages or a negligence claim does not render them inadequate representatives and that notice and opt-out procedures allow any potential members to retain claims for actual damages if they so desire. *See* Pls.' Reply Mem. [Docket No. 43] at 7-11 (*citing Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 953 (7th Cir.2006)).

Plaintiffs rely on *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948 (7th Cir.2006), for the proposition that failure to pursue actual damages does not preclude a finding of adequacy. Pls.' Reply Mem. at 9. The proposed class in *Murray* sought statutory damages for violations of 15 U.S.C. §§ 1681b(c)(1)(B)(i) and m(d)(1)(D), resulting from a potential lender's failure to make a "firm offer of credit" upon accessing a consumer's credit file without the consumer's consent and failure to provide clear disclosure of the consumer's right to close her credit information to parties lacking prior consent. 434 F.3d at 951. In examining the propriety of seeking only statutory but not compensatory damages, the *Murray* court stated: "Yet individual losses, if any, are likely to be small-a modest concern about privacy, a slight chance that information would leak out and lead to identity theft."*Id.* at 953. *Murray* is not binding authority on this Court. But if it were, this Court finds that in the instant case, it is not clear "[t]hat actual loss is small and hard to quantify."*Id.* Requiring class members to affirmatively opt-out to preserve actual damage claims is not justified based on the size and quantification issue of damages in this case.

Plaintiffs argue actual damages are unlikely to be imposed, based on a deposition of an Equifax employee. Pls.' Reply Mem. at 9 (*citing* Fluellen Dep. (Lyons Aff. Ex. B) at 16).[FN5] However, Plaintiffs offer no other argument for the claim that actual damages are unlikely to occur as a result of a 15 U.S.C. § 1681i violation. Gardner claims to have suffered actual damages and both representatives will relinquish their respective claims for actual damages in favor of the class action, despite it being a potential disadvantage to themselves. Gardner

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2261688 (D.Minn.)
**(Cite as: Slip Copy, 2007 WL 2261688)**

Page 6

Dep. (Def.'s Ex. C) at 33, 37; Bofferding Dep. (Def.'s Ex. D) at 65. If the named representatives are truly representative of the class, as Plaintiffs assert, then absent class members would suffer this same disadvantage and lose claims for actual damages should they fail to opt-out of the class action.

> FN5. In her deposition, Fluellen states: "[b]ut I personally view that there is no violation; and my personal view is that there wouldn't be any damages."Fleullen Dep. at 16.

The Court finds the Plaintiffs to be inadequate representatives. In order to ensure the cohesion necessary to avoid conflict within the class, the Plaintiffs seek to place a burden on members of the potential class to opt-out if they wish to retain their legal claim for actual damages. This places a burden on too many absent class members who may have a significant actual damage claim and the Court is unwilling to effectively bar absent class members' future legal claims because of the failure of those parties to opt-out. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 805 (1985) (discussing the effects of res judicata). While the Court acknowledges the existence of the opt-out mechanism as a viable method to avoid *some* conflict within a class, opt-out is not a sufficient cure for the inadequacy of representation in this case. *See Clark v. Experian Info. Solutions, Inc.,* 2001 WL 1946329, at *4 (D.S.C. Mar. 19, 2001) (denying class certification motion on adequacy grounds because of named Plaintiffs' failure to pursue actual damages); *Thompson,* 189 F.R.D. at 551 ("This possible prejudice to class members is simply too great for the Court to conclude that the named Plaintiffs' interests are aligned with those of the class.").

**\*6** The Plaintiffs rely on the decision in *Egge v. Healthspan Services Co.,* 208 F.R.D. 265 (D.Minn.2002), in arguing that adequacy of representation is fulfilled. *See* Pls.' Reply Mem. at 7-10. In *Egge,* a class sought certification for claims resulting from a violation of the Fair Debt Collection Practices Act. 208 F.R.D. at 266. Both statutory and

actual damages were sought by the class. *Id.* at 271.An adequacy issue in *Egge* was whether a named party that had not suffered actual damages could provide adequate representation of a class seeking to recover actual damages. *Id.* at 269.In *Egge,* there was no concern of absent class members losing future claims for actual damages, which is the concern regarding the adequacy of the named parties in the instant case. The Court in *Egge* states: "The possibility that putative class members would be entitled to greater recovery should they pursue claims on their own arises in every class action, but it is not grounds for denying class certification, if the other criteria are met."*Id.* at 272.In the instant case, the other criteria for class certification are not all met, further distinguishing this case from the *Egge* case on which Plaintiffs rely. The opt-out mechanism is not meant to ensure lack of conflict within the class by forcing a large number of individuals to affirmatively retain their legal rights or lose their claims. If this were the case, any person would be an adequate representative of a proposed class so long as there was an opt-out procedure, and there would be no need for an adequacy requirement.

## C. Rule 23(b) of the Federal Rules of Civil Procedure

Plaintiffs seek to have the proposed class certified under Rule 23(b)(3), which requires common questions of law or fact to predominate over individual questions as well as a determination that the class action mechanism is superior to any alternative form of litigation for the same claims.Fed.R.Civ.P. 23(b)(3).

### 1. Superiority

Rule 23(b)(3) requires class certification to be ordered only in the event of a finding that the class action mechanism is superior to alternative forms of litigation. Fed.R.Civ.P. 23(b)(3).Rule 23(b)(3) offers the following factors for courts to consider in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2261688 (D.Minn.)
(Cite as: Slip Copy, 2007 WL 2261688)

Page 7

the superiority analysis:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Plaintiffs contend the interest of class members in controlling individual litigation is lacking, stating that "the expense and burden of individual litigation make it difficult, if not impossible, for members of the class to redress the wrongs done to them individually," Pls.' Mem. at 21, and "[a]bsent a class action it is unlikely that most putative class members would bring individual suits against the Defendant."Pls.' Reply Mem. at 21. However, the costs and attorney's fees provisions of the FCRA provide sufficient incentive for bringing individual claims. *See*15 U.S.C. § 1681n(a)(3). The attorney's fees provision, allowing harmed individuals to pursue meritorious claims without incurring financial detriment, weighs against a finding of class action superiority over other litigation mechanisms. *See Jones v. CBE Group, Inc.,* 215 F.R.D. 558, 570 (D.Minn.2003) (finding no lack of incentive for individuals to pursue actions under the Fair Debt Collection Practices Act, which "provides for actual damages, statutory damages of $1,000 plus costs and attorney's fees") (*citing*15 U.S.C. § 1692k); *cf. Alberts v. Nash Finch Co.,* Civ. No. 05-0887 PJS/ JJG, 2007 WL 628388, at *9 (D.Minn. Feb. 15, 2007) (distinguishing mandatory from permissive fee-shifting provisions in finding superiority of class action mechanism despite presence of permissive fee-shifting provision).

*7 The Court also has manageability concerns regarding the class action as proposed by Plaintiffs because of the individual nature of the issues involved in this case. Issues such as the reasonableness of Equifax's conduct along with a determina-

tion of the willfulness of the violation are of such an individual nature that maintenance of a class action would become unwieldy. *See*Fed.R.Civ.P. 23(b)(3)(D).

The Motion for Class Certification fails primarily because the class action mechanism is not a superior method of resolving the claims at issue. Nonetheless, in the interest of completeness, a discussion of the predominance requirement will be undertaken as well.

**2. Predominance**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."*Amchem,* 521 U.S. at 623. In examining this requirement, the Court is to "conduct a limited preliminary inquiry, looking behind the pleadings ... to determine whether, given the factual setting of the case, if the plaintiffs general allegations are true, common evidence could suffice to make out a prima facie case for the class."*Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005) (internal citation omitted)."The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual."*Id.*

Plaintiffs assert "[t]he legal question of whether Defendant's act of failing to investigate consumer disputes violates the FCRA is common to all class members, and there will be no individualized legal questions."Pls.' Mem. at 16. Plaintiffs also argue the factual evidence necessary for resolution of the class action is common to all members of the class and declare that individual determinations of fact are "unnecessary" for the resolution of the action.*Id.*

Establishing Equifax's liability for a violation of 15 U.S.C. § 1681i is an inappropriate question for resolution on a class-wide basis due to the individual nature of the reasonableness and willfulness standards. Undoubtedly, an issue common to all mem-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2261688 (D.Minn.)
(Cite as: Slip Copy, 2007 WL 2261688)

Page 8

bers of the proposed class is whether Equifax violated the FCRA by forwarding disputes emanating from CSC-owned zip codes to CSC rather than re-investigating the disputes itself. However, the issue cannot be resolved on class-wide basis without substantial individual inquiry.

Plaintiffs allege Equifax violated § 1681i, which requires a consumer reporting agency, upon receipt of notice from a consumer, to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate."15 U.S.C. § 1681i(a)(1)(A). In order to recover the statutory damages sought, Plaintiffs would have to prove Equifax acted "willfully" in violating the reasonable reinvestigation requirement of § 1681i. See15 U.S.C. § 1681n(a); Safeco Ins. Co. of Am. v. Burr, 127 S.Ct. 2201, 2206 (2007). The Eighth Circuit has stated: "To show willful noncompliance with the FCRA, the plaintiff must show that the defendant 'knowingly and intentionally committed an act in conscious disregard for the rights of others.' " Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir.1998) (quoting Cushman v. Trans Union Corp., 115 F.3d 220, 226 (3d Cir.1997) (citations omitted)). Furthermore, the Supreme Court has recently interpreted "willfully" in 15 U.S.C. § 1681n(a) to include violations resulting from a reckless disregard of a statutory duty imposed by the FCRA. Safeco, 127 S.Ct. at 2216.

*8 Determination on the reasonableness or willfulness of Equifax's actions requires examination of each particular dispute letter, Equifax's response, and subsequent communication and actions taken in response to that individual dispute. The forwarding of a consumer dispute to another consumer reporting agency may be considered reasonable in some instances and not in others, depending upon the nature of the communicated dispute and the type of inquiry necessary to sufficiently investigate that dispute. Also, an inquiry into the willfulness of Equifax's behavior "examines the totality of the circumstances involved in a consumer's interaction with a credit reporting agency."Barnett v. Experian

Info. Solutions, No. Civ. A. 2:00CV175, 2004 WL 4032909, at *5 (E.D.Tex. Sept. 30, 2004). Accordingly, any willfulness investigation will inherently involve individualized issues. A totality of the circumstances inquiry necessary to determine the reasonableness and willfulness of Equifax's behavior cannot occur on a class-wide basis.

Plaintiffs argue the possibility of subclasses remedies the problem of individualized issues. Pls.' Reply Mem. at 20. The creation of subclasses is an inappropriate remedy for this problem. See Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90, 98 (W.D.Mo.1997). In order to properly place the class members into subclasses, an in-depth inquiry into the dispute letters and what they communicated, in addition to Equifax's response, would have to be undertaken. Such an in-depth inquiry to properly develop subclasses removes one of the benefits of the class action mechanism in the first place, which is the avoidance of individual inquiry.

The issues demanding individualized inquiry predominate over common legal and factual issues in this case. Although a class-wide common question exists, the issues of liability and damages are questions that are individual in nature and therefore, not suitable for resolution as a class action. Therefore, the Motion for Class Certification fails on these additional grounds.[FN6]

> FN6. After oral argument was heard on this matter, Plaintiffs submitted a letter [Docket No. 49] calling attention to the recent decision of Jancik v. Calvary Portfolio Services, LLC, Civ. No. 06-3104 MJD/ AJB, 2007 WL 1994026 (D.Minn. July 3, 2007). The Jancik case, however, is not particularly instructive given its factual and legal differences. The plaintiff in Jancik sought both statutory and actual damages for violations of the Fair Debt Collection Practices Act on behalf of 9,697 putative class members. Jancik, 2007 WL 1994026 at *1. The Court also finds that in the instant case, the attorney's fees provi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2261688 (D.Minn.)
**(Cite as: Slip Copy, 2007 WL 2261688)**

sion provides sufficient incentive for indi-
vidual plaintiffs to bring suit, should they
feel aggrieved by a violation of the FCRA.

### IV. CONCLUSION

Based upon the foregoing, and all the files, records,
and proceedings herein, **IT IS HEREBY
ORDERED** that Plaintiffs' Motion for Class Certi-
fication [Docket No. 15] is **DENIED.**

D.Minn.,2007.
Gardner v. Equifax Information Services, LLC
Slip Copy, 2007 WL 2261688 (D.Minn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.