# EXHIBIT 1

Case 1:08-cv-00453    Document 33-2    Filed 05/05/2008    Page 1 of 8

Page 13

1 dealerships.
2  Q. Which in particular?
3  A. The Chevy store, there in Midlothian,
4 their motor sports, which consisted of Yamaha,
5 Suzuki, Kawasaki and then used car locations, they
6 had like four used car locations, as the capacity of
7 controller, corporate controller.
8  Q. Were you given an agency where you were
9 or were you controller for the whole organization?
10  A. Yeah, looked over all his stores. It was
11 a newly created position, corporate controller, for
12 whatever, two and a half years, two years.
13  Q. Okay.
14  A. Then I think I went to Colorado for 11
15 months actually total, Mercedes-Benz of Littleton,
16 part of the Brayman organization out of Miami.
17  Q. And your position there?
18  A. Comptroller.
19  Q. And that would be roughly 2004, 2005?
20  A. Yeah, the end of 2004, November 2004.
21 You're following along there. It's a lot of jumping
22 around. You kept on pace.
23  Q. And when did you finish up in Colorado?
24  A. Well, I came back in November, the end of

Page 14

1 November.
2  Q. 2004?
3  A. Yeah.
4  Q. Okay.
5  A. And started out there in January.
6  Q. Okay. And since November of 2004?
7  A. Primarily just been working for myself as
8 an independent contractor for various dealerships
9 and businesses throughout the United States.
10  Q. I invite you to give me a little more
11 specificity about that.
12  A. I don't remember which one is first. I
13 mean, I'll go for short-term. Sometimes it's a
14 couple of days, be it out to three and a half weeks
15 in a Hawaii dealership, dealership out in Honolulu.
16  Q. Mostly it's auto dealerships?
17  A. All auto dealerships with the exception
18 of currently the last six months, a business down in
19 Louisiana.
20  Q. Okay. What's that business?
21  A. Well, the guy owns six convenience store
22 gas stations. I just do the bookkeeping and
23 accounting work for it.
24  Q. How did you hook up with him?

Page 15

1  A. He used to be in a car dealership and I
2 went to do an evaluation on the dealership down in
3 Louisiana when he was there, about two years ago or
4 a year and a half ago. And then some of the other
5 dealers in Louisiana I worked for intermittently at
6 different times and let's see where else. Wisconsin
7 I went to once, several in Illinois, couple in --
8 two in Hawaii, and then a few sporadic little things
9 out in the East Coast, Pennsylvania, New Jersey,
10 Florida.
11  Q. And how do you get these jobs?
12  A. Just referrals, word of mouth, going to
13 the National Auto Dealers Convention the last couple
14 of years.
15  Q. And what kind of work do you perform when
16 you're working with these dealerships?
17  A. Whatever they need. I mean, primarily
18 it's accounting related, bookkeeping related,
19 operations, operational, evaluations of performance,
20 productivity, training of the office staff.
21     And there was, let's see, about a year
22 ago, I took an internal position at a CPA firm --
23 well, it was -- I mean, it ended up being internal
24 but they sold the firm. It was Devalk & Associates.

Page 16

1  Q. D --
2  A. D-e-v-a-l-k, probably about six months
3 before they sold the firm.
4  Q. Where was it located?
5  A. Downtown Chicago.
6  Q. Where?
7  A. I don't know. Over by union station. I
8 can't remember whether it was a Canal address or
9 Monroe or Randolph. Oh, it was a Riverside Plaza
10 address, now that I think of it. And that was
11 primarily tax work, accounting work for a few
12 dealership clients that they had, also.
13  Q. Did you take any accounting classes at
14 Gordon Tech?
15  A. Yeah, one in Gordon and a couple in
16 college, mostly hands-on experience from the bank is
17 where it all started.
18  Q. What kind of work did you do at the bank?
19  A. I started at 16 on the teller line for
20 about six months. And the bank president took me
21 under his wings and moved me through all the facets
22 of bookkeeping. By the time I was 18, I was doing
23 the board reports and financial reporting
24 investments. And that kind of consisted of the same

**Page 17**

1  period, he went out to Golf Mills State Bank and
2  then I went out there with him, kind of doing the
3  same type of duties at that time, doing all the FDIC
4  regulatory reporting and the board reports.
5      Q.   He had been president of that
6  All-American and became president at Golf?
7      A.   Right, then he went out to Golf Mills
8  State Bank.
9      Q.   What was his name?
10     A.   Raymond Wojnar.
11     Q.   How do you spell that?
12     A.   W-o-j-n-a-r.
13     Q.   You were a comptroller at various auto
14 dealerships. What does the comptroller at an auto
15 dealership do?
16     A.   Depending on the size and the operation
17 and if it's a holding company, it does vary -- it
18 can consist of just running the full financial
19 reporting for the single dealership. But in a few
20 of those where they were multiple dealerships, I had
21 people do that and I just reviewed the reports and
22 kind of made sure they did their jobs. But I would
23 do all the financial reporting, regulatory issues
24 affecting the dealership, keeping up to date and

**Page 18**

1  informed on those items, cash management. In the
2  small one, it might have included payroll or doing
3  the full spectrum of all the payroll reports.
4      Q.   Interaction with retail customers?
5      A.   Very little but yeah, I mean definitely
6  if you've got a complaint, you, you know, interject
7  and try to handle them, but primarily not.
8      Q.   People --
9      A.   Not at the forefront. I was more at the
10 back end if issues would occur, if people had
11 titling problems that weren't getting addressed by
12 the billers let's say doing the title work for them,
13 purchasing their vehicles, then I might get the call
14 and try to interject and get the matters handled or
15 resolved.
16     Q.   Or approval of credit for --
17     A.   No, I really didn't -- I mean, that
18 wasn't my main -- that's what a finance manager
19 would do.
20     Q.   Would the finance manager report to you?
21     A.   No, he would report to the general
22 manager or owner.
23     Q.   Mr. Thomas, this morning we're taking
24 your deposition. What did you do to prepare for

**Page 19**

1  this deposition, if anything?
2      A.   Nothing specific.
3      Q.   Did you meet with Mr. Keogh to prepare
4  for this deposition?
5      A.   Just briefly before coming over here.
6      Q.   How long?
7      A.   Ten minutes, if that.
8      Q.   Have you done anything else for
9  preparation?
10     A.   No. I mean, reviewed the documents that
11 were forwarded to me at different times.
12     Q.   What documents did you review in
13 preparation for the deposition?
14     A.   Copies of the filing.
15     Q.   Mr. Thomas, do you subscribe to any
16 newspapers?
17     A.   No, not really.
18     Q.   Magazines?
19     A.   Nothing recently.
20     Q.   Last two years?
21     A.   No.
22     Q.   What are your principal sources of
23 information for news?
24     A.   Well, nowadays with the Internet when you

**Page 20**

1  log on, you have the news sector of the websites and
2  that.
3      Q.   msn.com?
4      A.   Yeah, or whatever comes up on AOL when I
5  log on, primarily otherwise the news obviously on
6  TV, CNN, that kind of stuff.
7      Q.   Did you happen to bring any documents
8  with you today other than the receipt that your
9  counsel provided me?
10     A.   Just the receipt, yeah.
11         MR. KEOGH: Just make sure you don't talk
12 over each other is what I was going to interject.
13         MR. WILLIAMS: Other than the receipt,
14 Mr. Keogh, are there any documents that you've
15 brought with you today with respect to this
16 deposition for Mr. Thomas?
17         MR. KEOGH: You're asking me a question?
18         MR. WILLIAMS: Yeah, just to see.
19         MR. KEOGH: No, I don't have any
20 documents.
21         MR. WILLIAMS: Fine. Thanks.
22 BY MR. WILLIAMS:
23     Q.   Mr. Thomas, you're the plaintiff in this
24 lawsuit, the guy who is bringing the complaint.

Page 29

1  Q.  Your complaint was filed earlier this
2  year, Mr. Thomas. As I recall, it was February but
3  I could be mistaken.
4  A.  **Time flies too fast for me to remember.**
5  Q.  Okay. How did you come to see Mr. Keogh
6  and his firm professionally for the purpose of this
7  case? What led you to him?
8  A.  **In conversation with my cousin.**
9  Q.  Did you consult any other lawyers?
10  A.  **No.**
11  Q.  And before today in connection with this
12  lawsuit, you dealt with Mr. Keogh on the telephone?
13  A.  **Yes, and e-mail.**
14  Q.  I've asked the reporter to mark as
15  Exhibit 1 a copy of the complaint in this action.
16  Would you take a look at it, sir.
17      Do you recognize it as the complaint in
18  this lawsuit?
19  A.  **Yes, I do.**
20  Q.  Have you read the complaint?
21  A.  **Yes.**
22  Q.  Did you read the complaint before it was
23  filed?
24  A.  **I may have. I believe I did. It was one**

Page 30

1  **of the e-mails that I received and read.**
2  Q.  Did you see it in draft form before it
3  was filed?
4  A.  **Yeah, I'm sure I saw it in draft form.**
5  Q.  Did you make any changes to it?
6  A.  **No, I did not.**
7  Q.  Other than today, how many visits have
8  you made to the Keogh Burke law offices?
9  A.  **None.**
10  Q.  Did Mr. Keogh or Mr. Burke come to visit
11  you?
12  A.  **No.**
13  Q.  Have you received any compensation from
14  Mr. Keogh, Mr. Burke or their law firm?
15  A.  **No.**
16  Q.  Do you expect to?
17  A.  **No.**
18  Q.  What are your goals with respect to this
19  lawsuit?
20  A.  **Other than hopefully, you know, business**
21  **and people, you know, following the things that**
22  **continue to protect people's identity from being**
23  **stolen and creating problems for the individuals.**
24  Q.  Anything else?

Page 31

1  A.  **No.**
2  Q.  I asked the reporter to mark as
3  Exhibit No. 2 a receipt which you had before you,
4  Mr. Thomas. Is that a receipt, copy of a receipt,
5  for a credit card transaction that you made at a
6  Ritz Camera Center store location?
7  A.  **Yes, it was.**
8      MR. KEOGH: And if I could interject for
9  one second, we previously produced this receipt and
10  produce it again today with the understanding that
11  it be kept confidential, that if anything is going
12  to be attached to the court records, the expiration
13  dates will be redacted. I believe Suzanne of your
14  office agreed to it. Eventually I'm sure we'll get
15  a protective order in place.
16      MR. WILLIAMS: I hope so. The only
17  information that you're receding confidentiality for
18  on the receipt is the expiration date, correct?
19      MR. KEOGH: That's correct.
20      MR. WILLIAMS: Well, that's our
21  agreement.
22  BY MR. WILLIAMS:
23  Q.  Mr. Thomas, let's talk about this
24  transaction and Ritz for a minute. Where did you

Page 32

1  make a purchase from Ritz Camera?
2  A.  **Which location?**
3  Q.  Yes.
4  A.  **The Woodfield Shopping Center.**
5  Q.  And where is Woodfield Shopping Center?
6  A.  **Schaumburg, I believe, Hoffman Estates,**
7  **Schaumburg.**
8  Q.  And at the time that you made that
9  purchase, what's the date on that receipt?
10  A.  **December 20, 2006.**
11  Q.  December 20, 2006. Does that square with
12  your recollection of when you made the purchase at
13  the Woodfield Mall from Ritz?
14  A.  **Yes, it was just before Christmas.**
15  Q.  Is that a Ritz Camera location or some
16  other brand name?
17  A.  **I believe it's Ritz Camera.**
18  Q.  Okay.
19  A.  **Some of the chains here are called Wolf,**
20  **but I believe it was a Ritz Camera.**
21  Q.  And at that point in time, you were
22  living on Brookbank Road in Darien?
23  A.  **Yeah, if not Lemont. I think I bought**
24  **the house but I didn't move into the house right**

**Page 33**

1  away. I was in Lemont for a while, actually through
2  the holidays because I did remodeling at the house
3  on Brookbank before moving into it, from my
4  recollection.
5      Q.    How far distance is Lemont from Woodfield
6  Mall in Schaumburg?
7      A.    25, 30 minutes, depending on traffic.
8      Q.    How many miles would you say?
9      A.    15 maybe, 20.
10     Q.    How far is Darien from Schaumburg?
11     A.    Probably close to the same, maybe a
12 couple miles less than that because it's from a
13 little different direction.
14     Q.    12, 15?
15     A.    15.
16     Q.    15 miles?
17     A.    Yep.
18     Q.    So what took you to the Woodfield Mall on
19 December 20?
20     A.    Christmas shopping.
21     Q.    Why that mall? Good news about Chicago
22 is there's a slew of malls.
23     A.    More selection, more stores in a shorter
24 amount of time running around.

**Page 34**

1      Q.    So like me, you're not big on shopping if
2  you can avoid it?
3      A.    Yeah, especially around Christmas.
4      Q.    Okay. Had you shopped at that Ritz
5  location before?
6      A.    I believe I've been in and out of it. I
7  don't believe I bought anything at that specific
8  location before.
9      Q.    Have you bought anything there since?
10     A.    Not at that location.
11     Q.    The top line on that receipt, Exhibit 2,
12 makes reference to a Fuji Finepix. Do you see that?
13     A.    Yes, digital camera I purchased.
14     Q.    It has the notation and handwriting
15 returned?
16     A.    I returned it to a Ritz in -- I believe
17 it was Downers Grove for a different camera.
18     Q.    So if I understand, you purchased the
19 camera on this date, December 20, at the Ritz in
20 Schaumburg?
21     A.    Yes.
22     Q.    And there came a later time when you
23 returned that camera?
24     A.    Correct.

**Page 35**

1      Q.    To a different Ritz store?
2      A.    To my knowledge, yeah.
3      Q.    And the store you returned it to was a
4  Ritz location in Downers Grove?
5      A.    Yeah, I believe so.
6      Q.    Approximately when did you return that
7  camera?
8      A.    I don't remember specifically. It was
9  around that time, shortly around that time.
10     Q.    So within a month or two after you bought
11 it?
12     A.    Less than a month probably.
13     Q.    Less than a month?
14     A.    Yeah.
15     Q.    And what caused you to return the Fuji
16 camera?
17     A.    I don't remember specifically whether it
18 was an option or didn't work or whatever and got a
19 different Fuji camera.
20     Q.    So when you returned it -- when you
21 returned the Fuji camera referred to on this receipt
22 to the Ritz Camera store in Downers Grove, in
23 exchange for that return you got another Fuji
24 camera?

**Page 36**

1      A.    Correct.
2      Q.    Same model, different model?
3      A.    I don't recall. I don't have it anymore.
4      Q.    You no longer have the Fuji camera you
5  got and returned?
6      A.    Correct.
7      Q.    What happened to it?
8      A.    I don't remember specifically. I have
9  the box still. I ran across it not too long ago
10 actually. I think one of my kids borrowed it and
11 left it somewhere.
12     Q.    You mentioned you have a daughter. How
13 old is she now?
14     A.    She'll be 21 in July.
15     Q.    Congratulations. Do you have any other
16 children?
17     A.    A son, 16. That's it.
18     Q.    Any other children?
19     A.    No.
20     Q.    You returned that camera to a Downers
21 Grove location for Ritz. Have you shopped at the
22 Downers Grove location before that time?
23     A.    I don't believe so, afterwards buying
24 film, returning film, maybe a frame or something

Page 57

several years ago.
Q. Before your identity theft or after?
A. Oh, no, before. Again, part of what I do, part of my jobs in the dealerships kind of pertain to the Fair Credit Act to some extent and some of the safeguard and safekeeping or safeguarding, whatever that law is called, that as far as proper documentation, driver's license, things with Social Security numbers being shredded in the location and stuff like that. So I become abreast of those issues at that point in time from my job.
Q. What kind of documents do you shred at your home that are personal documents, not business?
A. Generally all the lousy credit card applications that you keep getting in the mail, like every single day you get one, those seem to be the main ones. Other than that, just generally if I'm going to be throwing out receipts, I shred those. But like I said, I generally save my receipts.
Q. For three years?
A. Generally, yes, although my daughter is starting to tell me dad, you don't need to keep all these papers, you got to throw some of them out.

Page 58

Q. In the complaint on the same page, paragraph 20, it says you received a receipt from Ritz that is a 2255 West 95th Street store in Chicago. That statement is not correct?
A. Yes. I don't know where that -- I didn't recall seeing that there.
Q. But it is correct that you did not get a receipt from such a store?
A. No, I don't know of any such store, unless that -- well, I don't recall any of these stores. I mean, one of the purchases that they had found from that fraud case was at a 95th Street address, one occurrence, and then also in Bridgeview. Whether it's related or not, I don't know, now that I see that. But I don't even recall seeing that previous time that I read this as far as the 95th Street address in Chicago. But as I'm reading it now, I know there was one of those times where they caught the guy in Bridgeview, but it also pertained to some purchase on 95th Street in the city. If there is such a location, I don't know.
Q. You don't have a recollection of visiting a Ritz store yourself on 95th Street?
A. No, like I said, I don't even know if

Page 59

there is a specific location there on 95th Street.
Q. And you wouldn't be surprised if I told you there isn't?
A. Not at all. Because I don't know if that's Chicago even, 2200 on 95th Street. I think it's closer to Evergreen Park.
Q. That was what I thought.
A. Only from my buddies on the Evergreen fire department, I know kind of the location there.
Q. That's where I was born.
MR. KEOGH: I think most people know Little Company of Mary. My grandma lived on 87th and California.
MR. WILLIAMS: Yes.
BY MR. WILLIAMS:
Q. Mr. Thomas, in this lawsuit, you complain about a federal statute called FACTA for short, Fair Accurate Credit Transactions Act, and it's an amendment to the Fair Credit Reporting Act that you just mentioned. When did you first become aware that there was a statute dealing with expiration date display on credit cards?
A. I think it was brought up actually and really didn't dawn on me effectively in February

Page 60

when I was at the National Auto Dealers Convention in Las Vegas. And I say I don't recall that because when it was brought back up again this year at the NADA convention in San Francisco, they referred to last year talking about it, and I know I was in on that class.
Q. So you're referring to a class you participated in on the subject of FACTA at the National Auto Dealers Association annual convention in Las Vegas, February 2007?
A. Yes. I had to pause for the year, but yes, it was February '07 was Las Vegas and possibly even the year before, the first NADA I went to in Orlando, but I don't recall going to any fair credit reporting seminars at that point in time.
Q. And after the February '07 class on FACTA at the NADA convention in Las Vegas, when did you first think about how it applied to you personally?
A. Actually applied to me personally was just in conversation with my cousin.
Q. How did that --
A. For whatever reason it just never dawned on me, you know, even though I'm doing this for the dealership and made sure the stores that I was at at

61

1  the time were not violating the FACTA law.
2     Q.   When was the conversation with your
3  cousin that you're just talking about?
4     A.   Within this year, maybe the end of last
5  year but the first part of this year, around
6  Christmas time I believe.
7     Q.   And this is Jeff Batterson?
8     A.   Yes.
9     Q.   And tell me about the conversation. Who
10 else was in the conversation?
11    A.   Just him. He just basically stated that,
12 you know.
13    Q.   What were you talking about?
14    A.   It reminded me of -- it reminded me of
15 the FACTA from the dealership side, you know, but I
16 never dawned on it from a personal standpoint of
17 looking at the receipts and that.
18    Q.   Were you in a store with him and looking
19 at a receipt?
20    A.   No, we were in a restaurant at dinner,
21 something like that.
22    Q.   Okay.
23    A.   I believe from what I remember he was
24 making -- he was picking up dinner and when he paid

62

1  for it, he had made mention of the receipts. And he
2  looks for that at that point because whatever,
3  however, he learned of it prior to that to, you
4  know, keep an eye on it.
5     Q.   What business is he in?
6     A.   Currently I believe he's like an
7  investment banker.
8     Q.   And what was he before he was an
9  investment banker?
10    A.   Well, I mean, he's just doing that as far
11 as I know. He was in college before that. I can't
12 remember specifically what he was doing. Over the
13 years I have seen him, many times with the holidays
14 as we grew up, we were second cousins and, you know,
15 in the recent years, we hung out a little bit more
16 often. So I don't -- other than going to college
17 and I know he was down in -- he lived in the city
18 for a while and went and saw him once or twice down
19 there. But other than that, I can't specifically
20 recall.
21    Q.   The two of you were in a restaurant early
22 this year, he's picking up the tab, looking at the
23 receipt and he makes a comment about the expiration
24 date, correct?

63

1     A.   Yeah.
2     Q.   Was the expiration date shown or not
3  shown on that tab?
4     A.   At that place I believe it was not shown,
5  yeah.
6     Q.   Okay.
7     A.   And that's where he said, you know, hey,
8  do you happen to check your receipts, you know, for
9  the expiration date being on there. And I was like,
10 what are you talking about actually. And then like
11 I said, when he started talking about it, then it
12 reminded me from, you know, the dealer application,
13 which that's just one small sliver of the fair
14 credit that affects a lot of the issues within my
15 job. That it dawned on me and I started to be more
16 conscious that any time I purchase, I make purchases
17 and then also, you know, I happened to look back,
18 randomly through my receipts. I didn't dig through
19 every single one, but I went through mine to see,
20 you know, if I had any at that time that, you know,
21 had that situation which led me to, you know, ask
22 him about it and learned of, you know, Keith at that
23 point in time.
24    Q.   Why did you go back through your prior

64

1  credit card receipts?
2     A.   Well, to see if I had any. Because
3  again, after learning the hard way from identity
4  theft, you know, I don't take that, you know,
5  lightly. I take that pretty seriously, especially
6  when it has inconvenienced me numerous times when I
7  would, you know, make any future purchases at this
8  point in time because I had to have the fraud alerts
9  put on each of my credit bureaus. I've seen it in
10 issues where other people have had their identity
11 stolen that I've had to handle situations at
12 dealerships for, and when it personally happened to
13 me and I'm still to this day still feeling the
14 effects of it because it is on there. So when you
15 go to buy a car or you go to make a home purchase or
16 whatever, they're questioning you like crazy whether
17 you're the real person or not.
18    Q.   Partly because of the reference on your
19 credit report that relates to the identity?
20    A.   Right. Which I didn't have on there
21 prior to the identity theft, which even after it was
22 put on, somebody still managed to steal my identity
23 a second time after there was a fraud alert. So
24 like I said, I don't take that lightly.

**Page 65**

Q. You said you went back through receipts randomly. Why didn't you go back through all your receipts?

A. From what I had seen handy there, I have receipts in various places, I stumble across when I pull out a folder and realize this is for remodeling repairs that I did on the house, they're in a separate folder, you know. Then I keep general receipts on a regular basis. I started to come to a point where I keep them kind of in envelopes based on months in case I need to refer to something, but when I do specific projects, I try to keep track of what I spend on that. Obviously with my travels and different clients I do work for I will have those receipts filed by, you know, the work that accompanies that client's job so I can get a true and accurate track of the expense structure on that job versus the income I've taken. So that's what I mean by it's different locations. If I kept them all in an envelope by each month that obviously would have been easier. But I don't keep every single receipt in that filing system.

Q. Did you keep the receipt that's Exhibit 2 in a file with any of your business?

**Page 66**

A. No, that would have been -- that was in one of those monthly files.

Q. Did you go through your monthly files for personal receipts?

A. No, the monthly is what I primarily looked at.

Q. And did you go through all of your monthlies?

A. What I had on my -- my regular monthly stuff I have there.

Q. So when you used the word randomly a few minutes ago, you actually went through all of your monthlies that you have retained?

A. I randomly went through all of my receipts, but I specifically went through my monthly accumulation of receipts.

Q. Personal rather than business?

A. I have receipts in various locations based on, as I just explained, whether it's home repairs and home projects versus business projects that are in different locations as you're questioning me, those are locations that I have not reviewed receipts that maybe it may have other incidents on that.

**Page 67**

Q. And did you find receipts from retailers other than Ritz that had an expiration date?

A. Yeah, actually I even found one from in Colorado where this year they had the entire credit card number in addition to the expiration date for a restaurant in Colorado this year. Like I said, I'm conscious of that at this point.

Q. The receipt is from 2008?

A. I'm sorry. 2007, I believe. The last 12 months is what I meant when I said last year or this current year.

Q. All right. So you found the Ritz receipt from December 2006. What did you do with it?

A. Out of the receipts that I had found, you know, in a brief recap, I had forwarded, you know, copies of the receipts to the attorney's office and had them review the receipts that I had questioned as far as being possible violations of the FACTA law, both in state and out of state. Again, I travel so there's numerous I have from other states also.

Q. How many receipts did you send to Mr. Keogh's office?

A. I would guesstimate around 15 or 20 that

**Page 68**

had the, you know, limited number of digits listed and the expiration date fully stated on the customer copy.

Q. And did you send him any receipts that had more than five digits of the credit card number printed?

A. Possibly six or so but that one that I, you know, recall recently was when I was reviewing my bills and my business files for the tax year of 2007, that's where I had just saw that one for the purchase at the restaurant in Colorado that had the entire credit card number on the receipt.

Q. Okay. Did you send Mr. Keogh any receipts other than Exhibit 2 from Ritz Camera Centers?

A. I don't believe so.

Q. In your jobs as controller or other similar positions with auto dealerships, what have you done to assist the dealerships in compliance with FACTA?

A. Well, some policies and procedures, again, the truncation is only a sliver of the issues for the dealership, and I focus more in on driver's license and Social Security numbers and credit aps,